SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

FAMILY DIVISION

```
-------------------------X
KAREN JOHNSON-NORMAN      :
                          :
          Petitioner,     :
                          :
          v.              :    Docket No.:  IF-2497-03
                          :
VIRGIL ROGERS,            :
                          :
          Respondent.     :
-------------------------X
```

Washington, D.C.
October 29, 2003

The above-entitled action came on for a hearing
before the Honorable LYNN LIEBOVITZ, Associate Judge, in
Courtroom Number 104.

APPEARANCES:

Karen Johnson-Norman, Pro Se
Washington, D.C.

On behalf of Defendant:

Steven Polin, Esquire
Washington, D.C.

PAMELA L. CARY
OFFICIAL COURT TRANSCRIBER          Telephone: 879-1757

1          P R O C E E D I N G S

2               THE DEPUTY CLERK:  Calling in the matter of Karen

3     Johnson versus Virgil Rogers, Case Number IF-2497-03.

4               MS. JOHNSON:  Good afternoon, Your Honor.  Karen

5     Johnson-Norman.

6               THE COURT:  Good afternoon.

7               MR. POLIN:  Steven Polin on behalf of Virgil

8     Rogers, Your Honor.

9               THE COURT:  Good afternoon.

10              Good afternoon, Mr. Rogers is now present.  I am --

11    I know that Ms. Norman-Johnson -- Johnson-Norman, I apologize

12    -- has not, and if you'd like to have a seat, please do, has

13    not necessarily been fully aware of all of the exhibits that

14    were entered in the Government's case and I just want her to

15    be aware of what they were because those are exhibits that I

16    have and I'm going to assume that you want me to consider

17    those exhibits, unless you tell me otherwise.

18              I had, in evidence, what was marked Government's

19    Exhibit 1, which was -- and 2 -- which were a letter and

20    envelope, which you testified you received in June of 2002.

21              I had Government's Exhibits 3 and 4, which were a

22    letter and envelope, which Ms. Johnson-Norman testified she

23    received in January of 2003.

24              I had Government's Exhibits 5 and 6, which were a

25    letter and envelope that Ms. Johnson-Norman testified she

1    received in April of 2003.

2         And I had Government's 6 and 7, which were a letter

3    and envelope that Ms. Johnson-Norman testified she received

4    in May of 2003.

5         In addition, I have a stipulation between the

6    defendant and the Government, which stated that, at all

7    times, relevant to the case, beginning September 27, 2000,

8    there was an order in effect which required that Mr. Rogers

9    is to stay away from, and have no contact with, Ms. Johnson-

10   Norman, which included staying away from her home and place

11   of business, and that Mr. Rogers has attempted to make not

12   attempt -- was required to make no attempt to contact Karen

13   Johnson-Norman in any manner, either directly or indirectly,

14   or through third parties.

15        In addition to that, I had a fingerprint card,

16   which a fingerprint examiner testified for the known prints

17   of Virgil Marcellus Rogers and were compared to items on

18   Government Exhibits -- Exhibit 3, which was the January 2003

19   letter and specifically that markings on that letter, which

20   were labeled 1B and 1E, indicated fingerprints which were

21   matched to Mr. Rogers.

22        Other than that, I had Exhibit 11, Government's

23   Exhibit 11, which indicated three emails from the Fortunate

24   address dated January 24, 2000, April 10, 2000 and June 14,

25   2000.  And those are the items that I have and will consider

1    in this case if that's what you want me to do.

2             MS. JOHNSON-NORMAN:  Yes, Your Honor.

3             THE COURT:  Mr. Poland, what I don't have are the

4    physical markings that your client --

5             MR. POLIN:  I thought that was all included in the

6    -- I'll take a look.  But I thought that was all included in

7    the -- I didn't take -- I don't think I took those back, but

8    I'll check.

9             THE COURT:  I don't think I have the physical

10   markings that your client put on letters to indicate things

11   he recognized as what he called significant paraphrases of

12   other things he'd received or seen in the past.

13            (Pause.)

14            THE COURT:  I don't.  Did we get defense exhibits

15   back or do we have that orange folder?

16            THE DEPUTY CLERK:  It's only the exhibits that have

17   -- that was defense of Exhibit Number 3.

18            THE COURT:  Do you have everything else?

19            THE DEPUTY CLERK:  One and 2.

20            THE COURT:  Do you have that?

21            THE DEPUTY CLERK:  No.  However, it was in the

22   stack because I gave it to Mr. Deville.

23            THE COURT:  To copy?

24            THE DEPUTY CLERK:  To copy.  It was one exhibit

25   with initials because I didn't open the envelope; maybe I

1  should have opened it.

2          THE COURT:  I opened it, so I have everything.

3          THE DEPUTY CLERK:  Oh, I know where everything -- I

4  -- could have gone.

5          (Pause.)

6          THE COURT:  While Mr. Poland is looking for that, I

7  am not going to accept additional evidence.  And what I'm

8  going to do is -- I can either put it in the record but put

9  on the record that I am not going to consider the items that

10  you provided to me this afternoon that were faxed to me.  And

11  I just want to make sure that Mr. Poland is satisfied that I

12  have everything that he wants me to consider.

13          MR. POLIN:  Well, other than if you're missing my

14  exhibits.

15          THE COURT:  I believe you -- of course, I was not

16  given any of these things to look at during the trial, and so

17  I believe that you had him mark up at least one exhibit, if

18  not two of the letters, to indicate portions that he

19  recognized from items of email that he'd either received or

20  seen of others.

21          MR. POLIN:  Right.

22          THE COURT:  And if you want to have him recreate

23  those, I'll happily have him do that.

24          MR. POLIN:  Thank you, Your Honor.

25          (Pause.)

1            MR. POLIN:  I have another copy if Mr. Rogers

2    can --

3            THE COURT:  You have another copy?

4            MR. POLIN:  Yeah.  Yes, I have another copy if the

5    Court will indulge Mr. Rogers.  I don't have the copy; if

6    there's anything with a blue defense exhibit on the back of

7    it.

8            THE COURT:  I have photocopies of the exhibits.

9            MR. POLIN:  Okay.

10           THE COURT:  And I guess Mr. Deville made them for

11   me and neglected to give me defense exhibits.

12           THE DEPUTY CLERK:  Is that two Exhibit Number 3s?

13           THE COURT:  I don't think I do.

14           THE DEPUTY CLERK:  Okay.

15           THE COURT:  Do you think that's it?

16           THE DEPUTY CLERK:  No.

17           THE COURT:  I mean I wish I had two Number 3s

18   because --

19           THE DEPUTY CLERK:  It's the lady's husband.

20           THE COURT:  I don't think -- you know, I think Mr.

21   Deville wasn't thinking about what I had today.

22           MR. POLIN:  Well, I'm at a loss, Your Honor.

23           THE COURT:  I'll be happy to have your client re-

24   indicate on exhibits -- does he have both of the letters that

25   he --

1          MR. POLIN:  There's only one letter that we -- we

2    did that, obviously.

3          THE COURT:  All right.  That's fine.

4          MR. POLIN:  Otherwise, we could have been up there

5    for a very long time.

6          (Pause.)

7          THE COURT:  Could you have the case number of

8    misdemeanor attempted stalking conviction?

9          MR. POLIN:  Yeah, the Court's indulgence.

10         (Pause.)

11         MS. JOHNSON-NORMAN:  Your Honor, I have a copy of

12   it.

13         THE COURT:  Can you just tell me the case number,

14   please?

15         MS. JOHNSON-NORMAN:  M as in Mary, 9709-00(a).

16         THE COURT:  And do both parties agree that the date

17   reflected in the stipulation is the date of conviction and

18   the date on which he was placed on probation in that case?

19         MR. POLIN:  Yes.

20         MS. JOHNSON-NORMAN:  And what date is that because

21   there's two?  There was the amendment and then there was

22   another revocation document.

23         THE COURT:  In September of 2000, the date that he

24   was first placed on probation in order to stay away.

25         MS. JOHNSON-NORMAN:  I actually think it was in

1   August, I'll get the right date.

2          THE COURT:  Mr. Poland, the stipulation which you

3   reached with the Government in the criminal case, says

4   effective September 27, 2000 and during all periods relevant

5   to this case, Mr. Rogers was required to stay away.  Is that

6   the effective date on which he was placed on probation in the

7   misdemeanor attempted stalking case?

8          MR. POLIN:  He was originally placed on probation

9   in that case, according to the Pre-Trial Services report,

10  March 19th of 2001.

11         THE COURT:  Well, what is the significance of the

12  September 27th procedure?

13         MR. POLIN:  I think that's the day that the case

14  came into the system and that's when the stay away was

15  established.

16         THE COURT:  Okay.

17         MR. POLIN:  I think that's -- I think --

18         THE COURT:  In March 2001 was testified to at the

19  trial as the date.

20         MR. POLIN:  Actually, that's a release order.  That

21  Government exhibit is a C-10 release order, Your Honor.

22         THE COURT:  All right.

23         MR. POLIN:  That's where the conditions -- it may

24  have been modified when he went to status, but that's -- for

25  the most part, that's --

```
 1              THE COURT:  And so the conviction is March of 2001?
 2              MR. POLIN:  Right.
 3              (Pause.)
 4              THE COURT:  All right.  I've been given a two-page
 5  document, which is --
 6              MR. POLIN:  It would have been Defense Exhibit 3,
 7  Your Honor.
 8              THE COURT:  All right.  And so I'm going to put
 9  Defense Number 3 on the back, Respondent's recreated exhibit
10  on the back of this document.  And I will accept this as an
11  indication that everywhere where there is an "x", Mr. Rogers
12  recognizes something in the letter, which was a copy of
13  Government's Exhibit --
14              MR. POLIN:  It was either 1 or 2.
15              THE COURT:  Three, I believe.
16              MR. POLIN:  Right.
17              THE COURT:  Government's Exhibit 3 and I think it
18  was Jury Exhibit 1.
19              MR. POLIN:  That's right.
20              THE COURT:  It was Jury Exhibit 1, wasn't it?
21              MR. POLIN:  It might.  No, I think we both had
22  Exhibit 3 for that.  Actually, I think we were both -- we
23  both had a -- that was both our Exhibits 2's.
24              THE COURT:  I'll resist the temptation.  It's
25  Government's Exhibit 1, your Exhibit 3.
```

```
 1              MR. POLIN:  Okay.

 2              THE COURT:  So it's a -- on the -- the "x's"

 3   represent the places where the defendant testified in the

 4   criminal case that he recognized either snippets or

 5   paraphrases of items he had either received in emails from

 6   the complainant or seen in emails that may have been

 7   transferred to her from other people.

 8              MR. POLIN:  Or that he may have sent her.  I think

 9   it was --

10              THE COURT:  Or that he may have sent.

11              MR. POLIN:  Yeah.  Part of it was actually from

12   poems and long writings that he has sent her.

13              THE COURT:  All right.

14              (Pause.)

15              THE COURT:  I'm going to staple this together.  Is

16   there anything else, Mr. Polin, that you want me to consider?

17              MR. POLIN:  No, Your Honor.

18              THE COURT:  Okay.  I make the following findings.

19              I listened carefully to all of the evidence, all of

20   the testimony of every witness, the arguments of counsel and

21   the Government -- and the prosecution of the criminal case,

22   Felony Number 4208-03.

23              As everybody knows, the standard of proof in that

24   case was beyond a reasonable doubt; the jury returned a

25   verdict of not guilty.  The petitioner has filed a petition
```

1  for a civil protection order based on the allegations, which

2  were the subject of the criminal case.

3          And in this proceeding, the standard of proof is a

4  preponderance of the evidence or a good cause to believe that

5  an intrafamily offense has occurred.

6          I find that Karen Johnson-Norman and Virgil Rogers

7  had a romantic relationship that began in 1998 and ended in

8  or about May or June of 2000.  During the time of the

9  relationship, Ms. Johnson-Norman was married.  The record was

10  that Ms. Johnson-Norman states that she ended the

11  relationship, Mr. Rogers states that he ended the

12  relationship and the reasons for it, and frankly, who ended

13  it, are not material to this proceeding.

14          Between the end of the relationship and August of

15  2000, the record discloses little contact between the

16  parties.

17          In August of 2000, the complainant, Ms. Karen

18  Johnson-Norman, who worked at Wells Fargo Bank, at the time,

19  was at work, on a Sunday, here in the District of Columbia,

20  and as she left work, and approached her car, she observed

21  Mr. Rogers approaching her car.

22          She indicated to him that she didn't want to speak

23  to him, she got into her car hurriedly, he reached into the

24  window and attempted to grab her hand, she snatched her hand

25  away, rolled up the windows and then called 911.  She then

1 | got out of the car as Mr. Rogers walked away and spoke to the
2 | police, describing him and his location as he walked away.

3 | In September of 2000, Mr. Rogers was charged with
4 | an offense relating to contact between him and Ms. Johnson-
5 | Norman.  And on September 27th of 2000, was ordered to stay
6 | away from Ms. Johnson-Norman, to have no contact with her,
7 | stay away from her home, her place of business and to make no
8 | attempt to contact her, in any manner, and the stipulation of
9 | the parties is the reflection of the order that was in place.
10 | That order was in place, at all times, from then throughout
11 | every instance relevant to this case.

12 | In March of 2001, the defendant was -- the
13 | respondent, Mr. Rogers, was convicted of, and placed on
14 | probation for, the offense of attempted stalking.  And,
15 | again, ordered as a condition of probation, to have no
16 | contact with the complainant of any kind.

17 | In May of 2002, Ms. Johnson-Norman's birthday, I
18 | find that the defendant -- respondent telephoned Ms. Johnson-
19 | Norman to wish her happy birthday, that she hung up the
20 | phone.

21 | In June of 2002, I find that the respondent, Mr.
22 | Rogers, sent Ms. Johnson-Norman a letter and that that letter
23 | is what was marked Government's Exhibit 1 and was enclosed in
24 | the envelope marked Government's Exhibit 2 in the criminal
25 | trial.

1          In January of 2003, I find that the respondent sent

2   Ms. Johnson-Norman a letter, which was moved into evidence in

3   the criminal trial as Government's Exhibit 3 and enclosed in

4   an envelope, which was Government's Exhibit 4.

5          In March of 2003, I find that the respondent

6   telephoned Ms. Johnson-Norman at her work place, represented

7   that he was an individual, Mr. Lee, and when Ms. Johnson-

8   Norman answered the telephone, he attempted to speak with her

9   and she hung up the phone.

10          In April of 2003, I find that Mr. Rogers sent to

11  the petitioner, at her place of work, a letter which was

12  received in evidence as Government's Exhibit 5 and enclosed

13  in an envelope, which was Government's Exhibit 6.

14          And, finally, in May of 2003, I find that the

15  respondent sent Ms. Johnson-Norman a letter, which was marked

16  Government's Exhibit 6 and enclosed in Government's Exhibit 7

17  received in evidence during the trial.

18          The letter received in June of 2002, as is the case

19  with every single one of these letters, it's either unsigned

20  or signed in Arabic in some -- with some words that is not

21  readable by anyone who doesn't know Arabic.

22          Each of the letters includes multiple page, single-

23  spaced, extremely repetitive excoriations of Ms. Johnson-

24  Norman for having done things to the writer, which were

25  objectionable to him.  Each one is placed in an envelope with

 1  a pasted on address and with markings, which clearly are an

 2  effort to hide the identity of the sender.

 3        The letters are all sent to a location at which, at

 4  the time the letters were received, Ms. Johnson-Norman was

 5  not working and I find that during the timeframe relevant to

 6  this case, Ms. Johnson-Norman's workplace changed from 1750 H

 7  Street, N.W. to --

 8        MR. POLIN:  It's the other way around, Your Honor.

 9        THE COURT:  Excuse me.  I apologize, from 2020 K

10  Street, N.W., Suite 420 to 1750 H Street, N.W., Suite 400 and

11  that the exception, I believe, of Government's -- well, that

12  every single one of these items was addressed to the old

13  address, even after dates -- the date on which Ms. Johnson-

14  Norman moved to the new address.

15        These letters entirely disclose themselves as

16  letters sent by Mr. Rogers, although he testified that he

17  didn't send them, although he suggested in his testimony that

18  they were composites of emails that were either sent to Ms.

19  Norman or sent by her to Mr. Rogers or sent by other people

20  to him, the letter themselves are from him to her and are

21  clearly from him to her.

22        Now the earlier letters addressed in the June 15,

23  2002, excoriates her repeatedly for hurting him for what

24  she's done to him, reproaching her, this is not harassment,

25  which I take to be a referral to the allegations of

1   harassment that were made against him.  This note is private;

2   no one else is to be involved, I deserve an explanation; you

3   know how to reach me.

4           The letters themselves are obsessive, the letters

5   are a hurt former lover, the letters make reference to Ms.

6   Johnson-Norman's husband, the letters make reference to the

7   love they had and the relationship they had.

8           And the universe of human beings who could have

9   written this letter, I would find by a far greater standard,

10  than preponderance, is narrowed to one human being and one

11  human being only, and that is Mr. Rogers.

12          The letter in January of 2003, refers to Marvin

13  Gaye and is -- the front cover is a poster or a cover of some

14  sort indicating themes regarding love.  There's a photo of

15  her which Mr. Rogers admitted that he took, his fingerprints

16  appeared on two of the documents in that enclosure, all of

17  which came in an envelope from some other location, the

18  document within that in which there is a last page and has

19  the respondent's fingerprint on it indicates a statement

20  about his lusting for her and refers to the photo, talking

21  about the photo of this woman shows her glowing and suggests

22  that she was much happier then than she is now, and I find

23  it's the defendant's obsessive efforts to persuade both

24  himself and Ms. Johnson-Norman that she was better off with

25  him than without him, he asserts that she should have prized

1   the time with him and list things like their conversations

2   and the intellectual nature of their relationship and their

3   sexual relationship.

4        Again, in the letter which was Government's Exhibit

5   5, it's addressed to Kolena (phonetic), a nickname which I

6   find was a name that was special to or unique to Mr. Rogers

7   addressing of Ms. Johnson-Norman during their relationship

8   and was based on a necklace that she had, which had that name

9   on it, an Hawaiian version of her name.

10       In that letter he's, and this is the April 2003

11  letter, the respondent is becoming much more insistent.  He

12  states in the letter that this writing needs to be done, that

13  it is unfair of her to say she's been traumatized by him,

14  that he needs to get these things off of his chest, your

15  reasoning is not good enough, I have never told you I'd end

16  your life, and he refers repeatedly, throughout the letter,

17  to modes of physical harm that he suggest he would not

18  employ, even though others might have suggested to him he

19  could or should, against Ms. Johnson-Norman, that you think

20  it's -- because we broke up, you think it's rational that I

21  was going to kill you.

22       Again, a reference to their relationship and the

23  circumstances in which Ms. Johnson-Norman had made efforts to

24  end his contact with her in court.

25       There is simply no other human being disclosed in

1   this record who could have written these words to her.

2   Others have said that I should probably want to hurt you.  I

3   don't care what anyone thinks about my writing, I will always

4   be defiant and arrogant as hell.  Now you tried to destroy my

5   career and cause me to lose my liberty.

6           Again, referring to his military career, which

7   ended, as he testified, and all of this is consistent with

8   his testimony.

9           There is nothing any of these documents, which is

10  consistent with a love note or a love email or a poem that

11  anyone sent anyone during a relationship.  It is all

12  consistent with the writings of an angry and obsessive former

13  lover who is unwilling to permit the relationship to be over.

14          Again, he referred, at the end of this letter, to

15  his email address, Fortunate, which is reflected in

16  Government's Exhibit 11 and then, finally, there's the letter

17  in which he states he hasn't changed his address and that's

18  in May of 2003.

19          I find that the respondent made each of these

20  communications to the complainant; that he did so knowing,

21  first of all, that she most profoundly did not want the

22  contact and he makes that clear in each letter; he was on

23  probation at the time of some of the contacts; he had been

24  found guilty of this very offense, attempted stalking; he was

25  under the effect of a stay away order.

1          And from the content of the letters and all of

2    these facts, I find that the respondent acted intentionally,

3    willfully and with malice, that he acted with an effort to

4    cause emotional distress to Ms. Johnson-Norman, that he did,

5    in fact, cause a great deal of emotional distress and fear,

6    that the emotional distress and fear were reasonable.

7          The nature of the letters is so obsessive and makes

8    references to physical harm and is so insistent that the

9    complainant had absolutely no right to end the contact and

10   there is nothing she can do about ending the contact, that

11   she had every reason to be tremendously disturbed by the

12   contacts.

13         I, therefore, find that there is a preponderance of

14   evidence and that there is good cause to believe that between

15   June 2002 and May 2003, to be specific, the respondent

16   committed the offense of stalking, particularly harassment,

17   by writing letters and making the phone calls and having the

18   other contacts that he did.

19         And that I further find that there is good cause to

20   believe the respondent poses a danger to Ms. Johnson-Norman.

21         I will enter a civil protection order.  I have a

22   proposed civil protection order.  I just need to ask you Ms.

23   Johnson-Norman and I'll remind you that you are under oath;

24   you were placed under oath during the trial, who is Percy

25   Norman?

```
 1              MS. JOHNSON-NORMAN:  That's my husband.

 2              THE COURT:  All right.  Reid Temple AME Church is

 3   the church you testified about and are still a member of; is

 4   that correct?

 5              MS. JOHNSON-NORMAN:  Yes.

 6              THE COURT:  All right.  I am ordering Mr. Rogers as

 7   follows.

 8              For a period of 12 months from today, you may not

 9   assault, threaten, harass or stalk Ms. Johnson-Norman or

10   Percy Norman or her children or destroy her property.

11              You must stay at least 100 yards away from her

12   person, her home, her work place, from her child, from Percy

13   Norman, from Reid Temple AME Church.

14              You may not contact her or Percy Norman or her

15   parents or her siblings or her children, in any manner,

16   including, but not limited to, by telephone, in writing, or

17   in any other manner, including email, voicemail, pager,

18   directly yourself and indirectly through a third party or in

19   any other way.

20              You may not possess, purchase, receive or sell any

21   firearm or ammunition.  Mr. Rogers, do you understand each

22   and every part of the order that I'm entering today?

23              MR. ROGERS:  Yes.

24              THE COURT:  And do you understand that if you

25   violate any provision of the order, you could be found in
```

1    criminal contempt, which carries a penalty of 180 days in

2    jail and a $1,000 fine for each and every violation; do you

3    understand?

4              MR. ROGERS:  Yes.

5              THE COURT:  Is there anything further?

6              MR. POLIN:  Yes, Your Honor.  The TPO was applied

7    for, I believe -- entered on August 1st.  We'd request that

8    the date of this order begin August 1st, in which the date

9    that the TPO was entered.

10             THE COURT:  No.  It's a one-year order, it's being

11   entered today and it will be effective until one year from

12   today.

13             And Ms. Johnson-Norman can inquire about the

14   methods by which she can file a motion for contempt if she

15   feels she has to by going up to the 4th Floor Intake Center

16   or talking to the prosecutors in the criminal case, and in

17   addition, if she feels it's appropriate, the methods by which

18   she may file for an extension.

19             MR. POLIN:  And this order doesn't contemplate any

20   contact that Ms. Johnson may have with Mr. Rogers or members

21   of Mr. Rogers' family?

22             THE COURT:  No, it does not; it binds Mr. Rogers.

23             MR. POLIN:  I understand that.

24             THE COURT:  It does not bind Ms. Johnson-Norman.

25             MR. POLIN:  All right.  I was just asking for

1    clarification, Your Honor.

2             THE COURT:  Okay.  It should be clear.

3             MR. POLIN:  Thank you, Your -- no -- I mean, I'd --

4    we understand what it means to Mr. Rogers.

5             THE COURT:  All right.  Is there anything further?

6             MR. POLIN:  No.

7             THE COURT:  I will get ya'll a copy of the signed

8    order in just one minute.

9             Sir, please step back with the Marshal and we'll

10   give it to you in the back.

11            Yes, ma'am, did you have a question?

12            I'm sorry.  Mr. Rogers, please return to this

13   table, I'm sorry.

14            MS. JOHNSON-NORMAN:  Yes.  I just want to make sure

15   that that includes my family; I thought you said siblings and

16   parents, as well.

17            THE COURT:  I did.

18            MS. JOHNSON-NORMAN:  Okay.  The TPO also offered --

19   requested a psychiatrist evaluation or treatment.

20            THE COURT:  In other words, your petition asked for

21   treatment.

22            MS. JOHNSON-NORMAN:  Yes, exactly.

23            THE COURT:  Let me ask first; are you asking me to

24   order any sort of domestic violence program here?

25            MS. JOHNSON-NORMAN:  I'm not sure what's available,

1 | Your Honor.  I just know the police officer; in fact, there's
2 | nothing for him.
3 |         THE COURT:  I don't think that a domestic violence
4 | intervention program, frankly, is appropriate.  But what I
5 | will consider, and I'll hear you, Mr. Polin is, first of all,
6 | whether to have Mr. Rogers screened for drug and alcohol use
7 | and if referred for treatment, based on that screening, that
8 | he would have to go.
9 |         The other question I have for you is, shouldn't I
10 | have him receive a mental health evaluation through CSOSA?
11 |         MR. POLIN:  There's been -- well, let me address
12 | the first question.
13 |         THE COURT:  I mean -- I assume since he's been on
14 | probation, that he's received services.
15 |         MR. POLIN:  Right and he has -- and on top of that,
16 | there's been absolutely no -- there's nothing in the Pre-
17 | Trial Services report nor is there anything in either this
18 | record or the record of the other stalking case that
19 | indicates that drugs or alcohol were an issue or even that
20 | Mr. Rogers -- I don't know if he socially drank but certainly
21 | there was absolutely no -- there's no scintilla of evidence
22 | that there's -- that drug and alcohol played any part in any
23 | of this conduct.
24 |         THE COURT:  All right.
25 |         MR. POLIN:  And based on that, I don't -- and also,

 1   too, based on my interactions with Mr. Rogers, I don't have

 2   any concerns in that area, any drug and alcohol concerns

 3   about Mr. Rogers.

 4           The other consideration that I think the Court

 5   needs to take into account is that on his release from

 6   serving his sentence, he's returning to California.

 7           THE COURT:  I will make an explicit finding that I

 8   don't think there's any place that Mr. Rogers could be where

 9   Ms. Johnson-Norman wouldn't reasonably feel concerned for her

10   own safety and through additional contacts.

11           MR. POLIN:  No, I wasn't talking about that.

12           THE COURT:  What I will do is order that he receive

13   a mental health evaluation through CSOSA and follow any and

14   all recommended treatment.  In other words, it'll be an

15   evaluation that he will receive and he must receive whatever

16   treatment and he can deal with them as to where that takes

17   place, what they recommend.

18           MR. POLIN:  Will they do that at the jail?

19           THE COURT:  No, they would do it once he's

20   released.  He must report once he's released to Room 1230 of

21   this building to be screened for that.  And I'm also ordering

22   that he receive an alcohol and drug screening and if referred

23   for treatment, he must go.  And, at that time, he can address

24   with them the issues of where he's living.

25           MR. POLIN:  All right.  Well, that was the reason

1   why I brought it, his California residency.  It wasn't any

2   reference to that; anyone would be safer 3,000 miles away.

3   It just has to do with, you know, there is -- the respondent

4   is now asking that all of these conditions be placed on this

5   and I was just bringing it to the Court's attention in terms

6   of practicality to --

7           THE COURT:  The requests are reasonable and I am

8   going to order that he be screened for drug and alcohol abuse

9   and that he be -- receive a mental health evaluation and

10  follow any and all recommended treatment.

11          In order to do that, Mr. Rogers, you need to listen

12  to his, I'm ordering that as soon as you are released, you

13  must report to Room 1230 on this floor of this building to be

14  enrolled in these two screenings or to receive these two

15  screenings.  If you fail to go, you will be in violation of

16  my order; do you understand?

17          MR. ROGERS:  Can I just address it for one minute?

18          THE COURT:  No.  Do you understand what I just said

19  to you?

20          MR. ROGERS:  I got it.

21          THE COURT:  All right.  Thank you.

22          All right.  Thank you very much and I will get the

23  order to you in the back.

24          MS. JOHNSON-NORMAN:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1              MR. POLIN:  Thank you, Your Honor.

2              THE COURT:  Thank you, Mr. Polin.

3                     *   *   *   *   *

4

5             CERTIFICATE OF TRANSCRIBER

6        I, PAMELA L. CARY, an Official Court Transcriber

7 for the Superior Court of the District of Columbia, do hereby

8 certify that in my official capacity I prepared from

9 electronic recordings the proceedings had and testimony

10 adduced in the matter of Karen Johnson-Norman v. Virgil

11 Rogers, Docket Number IF-2497-03, in said Court, on the 29th

12 day of October, 2003.

13        I further certify that the foregoing 24 pages were

14 transcribed to the best of my ability from said recordings.

15        In witness whereof, I have subscribed my name this

16 the 27th day of April, 2004.

17

18

19

20                 OFFICIAL COURT TRANSCRIBER

21

22

23

24

25