Appeal Nos. 04-FM-0196 and 03-FM-1255 (Consolidated)

# IN THE COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA

Virgil M. Rogers
Appellant

v.

Karen V. Johnson-Norman
Appellee

Appeal from the Superior Court of the District of Columbia Family Division
No: IF-2497-03
Honorable Lynn Leibovitz

Brief for the Appellee
Filed January 27, 2005

P. Todd Mullins (Bar No. 429539)
Rachel L. Strong
Sean P. Beaty
HOWREY, SIMON, ARNOLD & WHITE LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 383-7053

# TABLE OF CONTENTS

**Page(s)**

I.  STATEMENT OF THE ISSUES ..................................................................................1

II.  STATEMENT OF THE CASE ...................................................................................2

    A.  Proceedings Below..........................................................................................2

    B.  Motions in this Court and Resulting Orders ..................................................3

III.  STATEMENT OF THE FACTS ................................................................................4

    A.  *U.S. v. Rogers I* ...............................................................................................4

    B.  *U.S. v. Rogers II* .............................................................................................5

    C.  The CPO Petition ............................................................................................6

    D.  The Criminal Trial in *U.S. v. Rogers II* .......................................................7

    E.  The CPO Hearing.............................................................................................8

    F.  Motion to Reconsider the CPO .....................................................................10

IV.  ARGUMENT ..........................................................................................................10

    A.  The Trial Court Properly Exercised Jurisdiction .........................................11

        1.  The Trial Court had Statutory Subject Matter Jurisdiction.......................12

        2.  The Trial Court had Personal Jurisdiction over Mr. Rogers.....................14

        3.  The Trial Court Could Hear the CPO Petition Even Though Mr. Rogers was Acquitted in the Criminal Case ..............................................16

    B.  The CPO Hearing Was Properly Conducted.................................................19

        1.  Mr. Rogers Waived All Procedural and Evidentiary Arguments By Not Objecting Below .................................................................................20

        2.  The Trial Court Properly Admitted and Considered the Evidence............21

        3.  The Trial Court Properly Took Judicial Notice of the Related Criminal Stalking Proceeding. ..................................................................24

RECEIVED
JAN. 2 7 2005
DISTRICT OF COLUMBIA
COURT OF APPEALS

    4.   Mr. Rogers Was Not Denied An Opportunity to Cross Examine Ms. Johnson-Norman .................................................................................25

C.  There was Ample Evidence Supporting the Trial Court's Finding on Intent ........27

D.  The Provisions of the CPO Are Neither Unconstitutional Nor Unfair .................30

    1.   Extra-Territorial Effects Do Not Render a CPO Invalid............................31

    2.   The First Amendment Challenge is Meritless............................................32

    3.   The *Ex Post Facto* Clause is Inapplicable Here...........................................34

    4.   The Medical Conditions were Warranted and are not Prejudicial. ............35

    5.   The Second Amendment Does Not Apply to Private Gun Ownership .................................................................................................37

E.  The TPO was Properly Granted and Extended ......................................................37

F.  In the Absence of New Evidence or Authority, the Trial Court's Denial of Reconsideration Was Well Within Its Discretion...................................................39

V.  CONCLUSION .................................................................................................................40

# TABLE OF AUTHORITIES

(authorities chiefly relied upon are indicated with an asterisk *)

**Page(s)**

## CASES

*ABCD Corp. v. Henry*, 109 A.2d 133 (D.C. 1954) ............................................................20

*Addington v. Texas*, 441 U.S. 418 (1979) .....................................................................19

*Albergottie v. James*, 470 A.2d 266 (D.C. 1983) ...........................................................31

*Baum v. Solomon*, 14 Phila. 475, 478 (C.P. Phila. County 1986) ......................................22

*Beaner v. United States*, 845 A.2d 525 (D.C. 2004) ......................................................19

*Beard v. South Main Bank*, 615 A.2d 203 (D.C. 1992) ....................................................28

*Beckers v. Seck*, 14 S.W.3d 139 (Mo. Ct. App. 2000) ...............................................14, 15

*Beckwith v. Beckwith*, 355 A.2d 537 (D.C. 1976) ..........................................................31

*Bethard v. District of Columbia*, 650 A.2d 651 (1994) ...................................................35

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..................................................16

*Burnham v. Superior Court of California*, 495 U.S. 604 (1990) ......................................15

*Cloutterbuck v. Cloutterbuck*, 556 A.2d 1082 (D.C. 1989) .............................................35

*Collins v. Youngblood*, 497 U.S. 37 (1990) ..................................................................34

*Cruz-Foster v. Foster*, 597 A.2d 927 (D.C. 1991) .........................................4, 17, 30, 31, 36,

*Davis v. United States*, 834 A.2d 861 (D.C. 2003) ........................................................35

*Desai v. Fore*, 711 A.2d 822 (D.C. 1998) ....................................................................31

*Fisher v. Bander*, 519 A.2d 162 (D.C. 1986) ...............................................................15

*Fleming v. District of Columbia*, 633 A.2d 846 (D.C. 1993) ...........................................40

*Fortune v. Evans*, 58 A.2d 919 (D.C. 1948) .................................................................26

*Franklin v. District of Columbia*, 960 F. Supp. 394 (D.D.C. 1997), *vacated on other grounds*, 163 F.3d 625 (D.C. Cir. 1998) .................. ..........................................33

*Gee v. Lewisville Mem'l Hosp., Inc.*, 849 S.W.2d 458 (Tex. Civ. App. 1993).................22

*Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22 (D.C. 1992) ................ ..........................................................................26

*Goldman v. Secretary of Defense*, 734 F.2d 1531 (D.C. Cir 1984), *aff'd*, 475 U.S. 503 (1986) ..........................................................................................32

*Green v. Green*, 642 A.2d 1275 (D.C. 1994)................................... ...................................18

*Guaranty Dev. Corp. v. Liberstein*, 83 A.2d 669 (D.C. 1951) ..........................................19

*Helvering v. Mitchell*, 303 U.S. 391 (1938)........................................................................19

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ............................................15

*In re Banks*, 805 A.2d 990 (D.C. 2002), *cert. denied*, 539 U.S. 927 (2003) ....................17

*In re J.M.C.*, 741 A.2d 418 (D.C. 1999) ................................................ .........................25

*In re J.W.*, 837 A.2d 40 (D.C. 2003)..................................................................................11

*In re L.D.H.*, 776 A.2d 570 (D.C. 2001).............................................................................25

*Jemison v. National Baptist Convention, USA, Inc.*, 720 A.2d 275 (D.C. 1998) ..............14

*Jenkins v. Smith*, 535 A.2d 1367 (D.C. 1987).....................................................................11

*Johnson v. Lloyd*, 211 A.2d 764 (D.C. 1965) ....... ...........................................................30

*Johnson v. United States*, 763 A.2d 707 (D.C. 2000)........................................................16

*Luk v. Commonwealth*, 658 N.E.2d 664 (Mass. 1995) ......................................................19

*Miller v. Avirom*, 384 F.2d 319 (D.C. Cir. 1967) ..............................................................20

*Mouzavires v. Baxter*, 434 A.2d 988, 995 (D.C. 1981) ......................................................16

*Mullin v. N St. Follies, Ltd. P'ship*, 712 A.2d 487 (D.C. 1988) .......................................31

*Oubre v. District of Columbia Dep't of Employment Servs.*, 630 A.2d 699 (D.C. 1993) ........................................................................................................................................16

○ *Pentecostal Church of God I.M. of New Haven v. Pentecostal Church of God Int'l Movement*, No. CV010457417, 2001 Conn. Super. LEXIS 3530 (Dec. 13, 2001) ...........33

*Perry v. Sera*, 623 A.2d 1210 (D.C. 1993) ...................................................................40

*Purcell v. United States*, 594 A.2d 527 (D.C. 1991) ....................................................19

*Rose v. Silver*, 394 A.2d 1368 (D.C. 1978)..................................................................15

*\*S.S. v. D.M.*, 597 A.2d 870 (D.C. 1991) ....................................................................24

*Sandidge v. United States*, 520 A.2d 1057 (D.C. 1987) ...............................................37

*Savage v. Scales*, 310 F. Supp. 2d 122 (D.D.C. 2004)..................................................34

*Smith v. United States*, 837 A.2d 87 (D.C. 2003), *cert. denied sub nom.*, 124 S. Ct. 2435 (2004) ......................................................................................................19

*Southall v. United States*, 716 A.2d 183 (D.C. 1998)....................................................19

*Strassheim v. Daily*, 221 U.S. 280 (1911)....................................................................14

*Thompson v. United States*, 690 A.2d 479, 482 (D.C. 1997)..........................................35

*\*Tyree v. Evans*, 728 A.2d 101 (D.C. 1999)..................................................................26

*\*United States v. Baish*, 460 A.2d 38 (D.C. 1983) ........................................................14

*\*United States v. Smith*, 685 A.2d 380 (D.C. 1996) ................................................12, 28

*United States v. Johnson*, 497 F.2d 548 (4th Cir. 1974) ................................................37

*United States v. Jones*, 527 F.2d 817 (D.C. Cir. 1975)..................................................21

*\*United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984).........................16

*United States v. Rogers*, D.C. App. Nos. 01-CM-40, 01-CO-1531 and 01-CO-1586..................................................................................................................................4

*United States v. Rogers*, D.C. App. Nos. 04-CO-365 and 04-CO-785 (pending) ..............4

○  Contained in accompanying Unreported Decision Appendix.

*Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993).. ........... ...................................28

*Wallace v. Warehouse Employees Union No. 730*, 482 A.2d 801 (D.C. 1984)...........39, 40

*Washington Star Co. v. International Typographical Union*, 582 F. Supp. 301,
309 (D.D.C. 1983) ...............................................................................................................18

*Welch v. United States*, 466 A.2d 829 (D.C. 1983) ........................................................11

*Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612 (7th Cir. 2004)...............................22

## U.S. CONSTITUTION

U.S. Const. article I, section 9..............................................................................................34

U.S. Const. amend I ..............................................................................................................32

U.S. Const. amend II..............................................................................................................37

U.S. Const. amend V..............................................................................................................19

U.S. Const. amend. VI............................................................................................................17

U.S. Const. amend. VII...........................................................................................................18

## STATUTES

18 U.S.C. § 922(g)(8) (2000).............................................................. .................................37

D.C. Code § 16-1001 (2001)..................................................................................................12

D.C. Code § 16-1001(3) (2004)................................................. ..........................................12

*D.C. Code § 16-1001(5)(B) (2004)..............................................................................12, 13

D.C. Code §§ 16-1001 – 16-1006 (2004). ................................................................. passim

*D.C. Code § 16-1003 (2004)........................................................................ .............12, 13

D.C. Code § 16-1004 (2004).. ...............................................................................................38

D.C. Code § 16-1004(c) (2004) ............................................................................................32

*D.C. Code § 16-1004(d)..........................................................................................................37

*D.C. Code § 16-1005(c) (2004) ................................................................................17

D.C. Code § 16-1005(c) (2) ......................................................................................35

D.C. Code § 16-1005(c)(10) ......................................................................................30

D.C. Code § 17-305(a).............................................................................................27

*D.C. Code § 22-404(b) (2004)............................................................................13, 28

D.C. Code § 23-110 (2004)........................................................................................15

## RULES

D.C. SCR-Domestic Violence Rule 1 (2004) ..........................................................39

D.C. SCR-Domestic Violence Rule 9 (2004) .....................................................23, 28

D.C. SCR-Civil Rule 43(b) (2004) ........................................................................26

D.C. SCR-Civil Rule 52(a) (2004) ........................................................................28

D.C. SCR-Civil Rule 59(e) (2004) ........................................................................39

D.C. SCR-Civil Rule 60(b) (2004) ........................................................................39

## MISCELLANEOUS

Catherine F. Klein & Leslye E. Orloff, *Providing Legal Protection for Battered
Women: An Analysis of State Statutes and Case Law,* 21 Hofstra L. Rev. 801,
919-20 (1993)...........................................................................................................32

*Restatement (Second) Conflict of Laws* § 27 (1971).............................................15

*Restatement (Second) Conflict of Laws* § 53 (1971).............................................31

Pursuant to the Court's December 29, 2004 Order, Appellee Karen Johnson-Norman (herein "Ms. Johnson-Norman") hereby submits her consolidated brief responding to the briefs of Appellant Virgil M. Rogers (herein "Mr. Rogers") filed on March 30, 2004 and August 31, 2004.

## I.     STATEMENT OF THE ISSUES

Between his two briefs, Mr. Rogers has described a total of twelve "issues presented for review," (and many others are embedded in the body of his briefs[1]) several of which are overlapping. Ms. Johnson-Norman submits that the issues raised in this appeal can be condensed into the following:

1.  Did the trial court properly exercise jurisdiction over the Civil Protection Order (CPO) petition where the parties had been involved in a dating relationship and the harassment occurred in the District of Columbia?

2.  Did Mr. Rogers preserve his right to appeal any errors as to the conduct of the CPO hearing and, if so, did the trial court properly conduct the hearing, make appropriate findings, and reach a sound judgment?

3.  Were any of the conditions in the CPO unconstitutional, an abuse of the trial court's discretion, or prejudicial?

---

[1]  With varying degrees of depth, Mr. Rogers' briefs reference: whether the trial court had subject matter jurisdiction; whether the trial court had personal jurisdiction; whether venue was proper; whether Mr. Rogers was timely served with the petition; whether Mr. Rogers was legally extradited from California in his criminal case; whether the TPO was appropriately granted and extended; whether "sworn" testimony was required at the CPO hearing; whether evidence was admitted at the CPO hearing; whether Mr. Rogers was "denied" cross-examination of Ms. Johnson-Norman at the CPO hearing; whether Mr. Rogers had the requisite intent for the intra-family offense of stalking; whether the trial court made findings as to jurisdiction, service, notice, and the merits (and the propriety thereof); whether the medical conditions of the CPO were reasonable; whether the trial court was precluded from granting the CPO by the Sixth Amendment; whether the trial court was precluded from granting the CPO by the Seventh Amendment; whether the CPO violates the *Ex Post Facto* clause; whether the CPO violates the First Amendment; and, whether the CPO violates the Second Amendment.

4.    Was extension of the Temporary Protection Order (TPO) proper where Mr. Rogers consented and, if not, was any error harmless?

5.    Was the trial court's denial of reconsideration as to the CPO an abuse of its discretion?

## II.    STATEMENT OF THE CASE

### A.    Proceedings Below

The current appeal arises out of a petition for a CPO filed on August 1, 2003. After a hearing on the petition held on October 29, 2003, the trial court found that there was good cause to believe that Mr. Rogers had committed the intrafamily offense of stalking Ms. Johnson-Norman and issued a CPO. The CPO required the following of Mr. Rogers:

1.    not to assault, threaten, harass, or stalk Ms. Johnson-Norman or her child, her husband, or destroy her property;

2.    to stay at least 100 yards away from Ms. Johnson-Norman's person, home, workplace, vehicles, child's school/daycare, her child, her husband, Reid Temple AME Church, and her parents and siblings;

3.    not to contact Ms. Johnson-Norman or her husband, her parents, siblings, or children in any manner, including but not limited to: by telephone, in writing, e-mail, or in any other manner, either directly or indirectly through a third party; and

4.    to enroll in and complete, "within 72 hours of his release from custody" a counseling program for alcohol and drug abuse "at CSOSA's discretion," [2] and undergo a psychiatric health examination and follow any recommended treatment.

On November 10, 2003, Mr. Rogers noticed his appeal with this Court, challenging the issuance of the CPO. Appeal No. 03-FM-1255. On November 23, 2003, Mr. Rogers sought in

---

2    CSOSA is a reference to the Court Services and Offender Supervision Agency.

2

the trial court reconsideration of the CPO. That motion was denied on January 29, 2004. On March 3, 2004 Mr. Rogers noticed his appeal as to this denial. Appeal No. 04-FM-196.

### B.    Motions in this Court and Resulting Orders

This Court consolidated Mr. Rogers' two appeals by order dated March 26, 2004. Mr. Rogers originally filed a brief regarding appeal no. 03-FM-1255 on March 30, 2004 (herein "Mr. Rogers' first brief" cited as "Rog. Br. 1 at ___"). In this brief, Mr. Rogers appealed the entry of the CPO. In a July 19, 2004 Order, the Court required Mr. Rogers to file a supplemental brief addressing issues raised in appeal no. 04-FM-196 (appealing denial of reconsideration). Mr. Rogers filed a second brief on August 31, 2004 (herein "Rogers' second brief" cited as "Rog. Br. 2 at ___"). Rather than addressing reconsideration (the only issue raised in 04-FM-196), Mr. Rogers' second brief reprises arguments from the first brief (and adds new ones) that pertain only to the entry of the CPO that is the subject of 03-FM-1225.

Neither of Mr. Rogers' briefs contain cites to the record nor did Mr. Rogers file the relevant judgments, opinions or portions of the hearing transcript containing findings of fact and conclusions of law that relate to the issues on appeal.[3] For all these reasons, the Court would be on firm ground dismissing this appeal. However, recognizing that Mr. Rogers acts *pro se*, and in the interest of resolving this matter on the merits, Ms. Johnson-Norman has not so moved the Court. Instead, Ms. Johnson-Norman submits this consolidated brief[4] addressing arguments in

---

[3]    In fact, when Mr. Rogers filed this brief, he had not yet ordered the CPO hearing transcript. Ms. Johnson-Norman filed several motions for relief as to these and other defects. The Court ordered Mr. Rogers to make arrangements for the transcript to be prepared and denied Ms. Johnson-Norman's other requests in light of the Court's consolidation of the appeals and a revised briefing schedule.

[4]    On October 28, 2004, the Court ordered Ms. Johnson-Norman to file a consolidated brief addressing all issues after the Superior Court clerk's office sent up a record supplement. The clerk's office sent up the record supplement (all relevant materials from one of Mr. Rogers' prior-related criminal cases -- see discussion *infra* at pp 4-5 and 7-8) on December 21, 2004 and on December 29, 2004 this Court ordered the consolidated brief be filed within 30 days.

3

both of Mr. Rogers' briefs (as well as the issue of reconsideration), with the accompanying
Appellee's Record Appendix (cited herein as "R. ___").[5]

## III.    STATEMENT OF THE FACTS

Although Mr. Rogers' briefs refer to some of the critical background and procedural facts
relating to this matter, additional background facts (and record materials) are an important part of
the "mosaic" this Court has instructed must be considered in CPO cases. *See* discussion of *Cruz-Foster v. Foster*, 597 A.2d 927 (D.C. App. 1991) *infra* at 36.

The Court may recall some of the facts that give rise to this appeal. Contrary to Mr.
Rogers' claim that he has "no ties" to this jurisdiction (Rog. Br. 1 at 5), this is the sixth and
seventh time this Court has been called upon by Mr. Rogers, *pro se*, to address challenges to a
series of District of Columbia judicial proceedings arising out of stalking-related activity that
occurred after Mr. Rogers' and Ms. Johnson-Norman's romantic relationship ended sometime in
the summer of 2000. *See United States v. Rogers*, D.C. App. Nos. 01-CM-40, 01-CO-1531 and
01-CO-1586, Mem. and Judgment (2/12/03) (herein "*U.S. v. Rogers I*"); *United States v. Rogers*,
D.C. App. Nos. 04-CO-365 and 04-CO-785 (pending) (herein *U.S. v. Rogers II*). These cases are
discussed in detail below.

### A.    *U.S. v. Rogers I*

During 1998, Mr. Rogers and Ms. Johnson-Norman began a romantic relationship.
R. 152, 183. Mr. Rogers was a resident of Virginia. R. 379. Ms. Johnson-Norman was a resident
of Maryland, but worked in the District of Columbia. R. 8, 9, 12, 152. During the summer of
2000, their relationship ended, and the problems at issue in this lawsuit began.

Despite the "stay away" provisions of a pre-existing Maryland peace order, in 2000, Mr.
Rogers engaged in a pattern and practice of harassing Ms. Johnson-Norman. R. 52-54, 152-59.

---

5   Ms. Johnson-Norman has attempted in good faith to include in the Record Appendix all of the record material
that relates to the arguments of *either* party. Should Ms. Johnson-Norman prevail, she would reserve her right to
seek reimbursement for the costs of this additional effort to the extent it was required of Mr. Rogers.

Late in 2000, Mr. Rogers was arrested and charged in the District of Columbia with stalking Ms. Johnson-Norman. R. 52-54. In January 2001, in *U.S. v. Rogers I*, Mr. Rogers was tried in the Superior Court (Hess J.) on a reduced "attempted" stalking charge, found guilty, and convicted. R. 52-54, 89. Judge Hess sentenced Mr. Rogers to, among other things, 180 days confinement (suspended) and two years of supervised probation. R. 55. He also ordered Mr. Rogers to obtain a psychiatric evaluation. *Id.* And, most importantly for present purposes, he ordered Mr. Rogers to stay away from and not contact Ms. Johnson-Norman and her family. *Id. see also* R. 44, 144, 153. Subsequently, Mr. Rogers violated these stay away conditions and, on November 11, 2001, was rearrested, jailed, and again placed on probation. R. 437. As discussed more fully below, facts relating to *U.S. v. Rogers I* supported some of the trial court's findings and orders below.

### B.    *U.S. v. Rogers II*

From approximately May 2002 to May 2003, Mr. Rogers again persisted in harassing Ms. Johnson-Norman, in direct violation of the "no contact" conditions in his prior release and probation orders from *U.S. v. Rogers I*. Mr. Rogers again was arrested and, on July 22, 2003, charged in the D.C. Superior Court with stalking Ms. Johnson-Norman. R68, 88. The case (cited herein as *U.S. v. Rogers II),* was docketed in the criminal division as F-4208-03. R56-63. Although the *U.S. v. Rogers II* arraignment judge (Coburn J.) ordered Mr. Rogers to work-release pending trial (and again ordered Mr. Rogers not to contact Ms. Johnson-Norman), Mr. Rogers was nevertheless held for violating probation in *U.S. v. Rogers I.* R. 67, 455. Judge Hess ultimately revoked Mr. Rogers' probation (from *U.S. v. Rogers I*) and resentenced Mr. Rogers to 180 days imprisonment with credit for time served.

In sum, by the end of July 2003, Mr. Rogers was facing a Superior Court criminal stalking charge, was in custody in the D.C. jail, and under any circumstances would not be released until around November 7, 2003. As will be seen, these facts are significant in dispelling several of Mr. Rogers' arguments about service, the TPO and other matters.

### C.     The CPO Petition

On the morning of August 1, 2003, Ms. Johnson-Norman filed her CPO petition *pro se.*
R. 8-11. In her petition and accompanying affidavit, Ms. Johnson-Norman stated that:

1.     on about May 29, 2002, Mr. Rogers contacted her by telephone. R. 9;

2.     on or about June 18, 2002, she received a letter from Mr. Rogers that was not
signed. R. 9;

3.     on about January 14, 2003, she received another letter from Mr. Rogers that
was not signed. R. 9;

4.     on about March 19, 2003, Mr. Rogers called Ms. Johnson-Norman at work
using an alias. R. 9;

5.     on about April 28, 2003, Mr. Rogers sent Ms. Johnson-Norman another
unsigned letter (this letter referred to "other people" suggesting Mr. Rogers should
hurt Ms. Johnson-Norman). R. 8-9; and

6.     on about May 20, 2003, Mr. Rogers sent another unsigned letter to Ms.
Johnson-Norman (this letter stated that he had been in very close proximity to Ms.
Johnson-Norman within recent weeks). R. 8.

These contacts included those underlying Mr. Rogers' stalking charge in *U.S. v. Rogers II.*
*Compare* R. 8-9 *with* R. 64-66, 68. Ms. Johnson-Norman alleged in her petition and stated in her
affidavit that the contacts largely occurred "in D.C." (R. 8) and at her place of work (R. 8-9),
which is indisputably in the District of Columbia. *See e.g.*, R. 182. The CPO case was docketed
as IF 2497-03. R. 1.

Later in the day on August 1, 2003, Mr. Rogers was brought to Superior Court Courtroom
103 (R. 1) from lock-up in Cell Block 103, where he was being held for a status hearing in
*U.S. v. Rogers II* on the same day. R. 11, 15, 57. There, in open court, he was served with the
CPO petition. R. 15. With both parties present, the trial court (Jackson, J.) granted a Temporary

6

Protective Order (TPO). R. 1, 13, 15.[6] The trial court extended the TPO "by consent" from August 15, 2003 to October 20, 2003. R. 1, R. 13.[7] As is the common practice in the Superior Court's Domestic Violence Unit when both parties consent, the trial court "trailed" the criminal and civil cases by positioning the civil matter for disposition on a date after which time it was expected that Mr. Rogers' criminal trial would be concluded. R. 1, 434.[8]

### D.    The Criminal Trial in *U.S. v. Rogers II*

On October 22, 23, 27 and 28, 2003, Mr. Rogers was tried before a jury in the Superior Court for criminal stalking in *U.S. v. Rogers II*. Judge Leibovitz presided over the trial. Attorney Steven Polin represented Mr. Rogers.

The Government and Mr. Polin both presented opening statements. R. 169-72, 173-79. Ms. Johnson-Norman testified for the Government, *inter alia,* regarding her past romantic relationship with Mr. Rogers and the letters and e-mails that Mr. Rogers sent her. R. 180, 183. She testified that she recognized on several occasions a purportedly "anonymous" telephone caller as Mr. Rogers. R. 190-91. She testified that the contacts were received in the District of Columbia. *See e.g.,* R. 202. She testified that she felt threatened and grew increasingly "terrorized" by these contacts. R. 209, 220. The trial court admitted the letters and e-mails into evidence. R. 205-06, 212, 220, 314. Mr. Rogers' attorney cross-examined Ms. Johnson-Norman extensively. R. 222-66. Mr. Rogers' contacts proved by this evidence included all of those

---

6    As Mr. Rogers observes, the TPO is dated "July 31, 2003 even though the petition was filed on August 1, 2003." *E.g.,* Rog. 2nd Br. at 4. Indeed, it appears that Judge Jackson wrote the incorrect date (by one day at the turn of the month) on the TPO (R. 13), whereas the docket entry clearly and correctly states that the TPO was entered on August 1, 2003. R1. Mr. Rogers did not order (and the Superior Court Clerk's office did not include in the record), the transcript of this August 1, 2003 hearing.

7    Mr. Rogers' assertion that the TPO on its face "indicated that it was only valid 14 days" (Rog. Br. 1 at 6) is flatly contradicted by the Order, which states at the bottom of the page that "the order is hereby extended to October 20, 2003" and again "TPO is extended to Nov. 3, 2003." R. 13.

8    The criminal case records show that during the August 1 criminal status hearing the criminal trial was continued until October 20, 2003. R. 57. So, the TPO was again extended by Judge Leibovitz on October 20, 2003 to November 3, 2003 to allow for the conclusion of the criminal trial. R. 13.

pleaded in the CPO Petition. *Compare* R. 8-9 *with* R. 190-91, 191-94, 201-04, 208-09, 210-13, 219-20.

The Government also put on a D.C. Metropolitan Police Department detective and a fingerprint expert in its case-in-chief. The fingerprint expert testified to a match between fingerprints on one of the letters to those of Mr. Rogers. R. 307-309. Mr. Rogers' counsel likewise cross-examined these witnesses. R. 267-84, 288-96, 301-11. The trial court admitted additional documents into evidence. R. 314. Mr. Rogers' counsel moved for a judgment of acquittal but Judge Liebovitz denied it because she found the evidence made out "a prima facie case of stalking." R. 316-17.

Mr. Rogers testified in the defense case regarding, *inter alia,* his attempted stalking conviction and resulting stay away order. R. 331. He denied making the contacts. *E.g.,* R. 345, 358. The Government cross-examined him. R. 322-99. Defense exhibits were admitted. R. 347. The Government recalled Ms. Johnson-Norman for rebuttal testimony, and again, Mr. Rogers' counsel cross-examined her. R. 403-408. Both sides made closing arguments. R. 412-433.

The jury acquitted Mr. Rogers on October 28, 2003. R. 434. After the jury was excused, Judge Leibovitz observed "we still have pending the intrafamily matter... I had trailed that." *Id.* Judge Leibovitz set for the next day, October 29, 2003, a hearing on the CPO petition.

## E.     The CPO Hearing

Judge Leibovitz presided over the CPO hearing on October 29, 2004. Mr. Rogers and Ms. Johnson-Norman were both present. R. 142. Attorney Polin again represented Mr. Rogers. *Id.* Ms. Johnson-Norman was *pro se.*

Judge Leibovitz admitted into evidence most of the exhibits from the criminal trial. R. 143-151. She also admitted a stipulation relating to, and took judicial notice of, some of the prior criminal proceedings and stay away orders dating back to 2000 (R. 148-150) – and observed how those facts related, *inter alia,* to Mr. Rogers' intent and state of mind. R. 158.

8

Judge Leibovitz also took note of the testimony from the criminal case that ended the day before and over which she had presided. R. 151. For a further discussion of these evidentiary matters, *see* discussion *infra* at 21-22. After making clear what evidence was in the record, Judge Leibovitz repeatedly offered both sides the opportunity to supplement it, but neither side chose to submit more evidence. R. 146, 151. Judge Leibovitz then announced (as recorded in eight pages of the hearing transcript) detailed findings of fact, including that:

- "Karen Johnson-Norman and Virgil Rogers had a romantic relationship" that began in 1998 and ended sometime in 2000. R. 152.

- Mr. Rogers sent Ms. Johnson-Norman letters and e-mails and made telephone calls to her in: August 2000, September 2000, May 2002, June 2002, January 2003, March 2003, April 2003 and May 2003. R. 152-154.

- "[T]hese letters entirely disclose themselves as letters sent by Mr. Rogers." The judge expressly discredited Mr. Rogers' testimony that he did not send them (R. 155), and recited facts contained in (or surrounding) the letters that compelled her to find "by a far greater standard, than preponderance," that Mr. Rogers sent the letters. R. 156.

- Mr. Rogers sent the letters to and made the other contacts with Ms. Johnson-Norman "in the District of Columbia." R. 155.

- The letters were "the writings of an angry and obsessive former lover who is unwilling to permit the relationship to be over." R. 158.

- Mr. Rogers sent the letters "knowing first of all that she most profoundly did not want the contact... he was on probation at the time of the contacts; he had been found guilty of this very offense, attempted stalking; he was under the effect of a stay away order." R. 158.

- From the "content of the letters and all these facts, [Rogers] acted intentionally, willfully, and with malice, that he acted with an effort to cause emotional distress to Ms. Johnson-Norman that did in fact cause a great deal of emotional distress and fear and that the emotional distress and fear were reasonable." R. 159.

Judge Leibovitz then stated her conclusion of law, including that "there is a preponderance of evidence and ... there is good cause to believe that between June 2002 and May 2003 to be specific, Mr. Rogers committed the offense of stalking, particularly harassment ... and that there

9

is good cause to believe that [Rogers] poses a danger to Ms. Johnson-Norman." *Id.* Judge Leibovitz then granted the CPO, which also summarizes her findings in writing. *Id.*, R. 51

### F.    Motion to Reconsider the CPO

Mr. Rogers sent a letter dated November 26, 2003 to Judge Leibovitz' chambers (received December 5, 2003) complaining about the CPO. R. 84-87. The letter primarily addressed some of the specific stay away and medical provisions of the CPO. Judge Leibovitz treated the letter as a "motion to reconsider" and, in a detailed opinion and order, in which she reprised the record and her trial findings, Judge Leibovitz denied the motion on January 29, 2004. R. 88-92.[9]

### IV.    ARGUMENT

Mr. Rogers' serial briefs assert a long list of purported injustices and errors below. Most are vaguely articulated and unaccompanied by factual citation or legal authority. The *cognizable* assertions of error, principally lack of jurisdiction, failure of due process at the CPO hearing, unconstitutional or unfair provisions of the CPO, and inappropriate extension of the TPO, all fail.

**First**, the trial court properly exercised jurisdiction over the CPO petition because the stalking conduct occurred "in the District of Columbia," and Mr. Rogers' criminal acquittal did not deprive the trial court of jurisdiction or otherwise preclude the issuance of a protective order in the civil case (because, *inter alia*, of the lower standard of proof in the second proceeding).

**Second**, the trial court properly conducted the CPO hearing -- giving Mr. Rogers an ample opportunity to mount a defense (including a chance to cross examine Ms. Johnson-Norman) -- and based its judgment on extensive findings of fact and conclusions of law stated on the record. Mr. Rogers received all the process that was due.

---

9    Although not a part of this appeal, on February 10, 2004, Mr. Rogers also filed with the trial court a motion to "rescind" the CPO. On February 26, 2004, the trial court denied Mr. Rogers' motion to rescind. On March 12, 2004, Mr. Rogers filed a motion to reconsider the denial of his motion to rescind the CPO. This also was denied.

**Third**, the trial judge's finding as to the element of Mr. Rogers' intent was based on extensive evidence and clearly permissible.

**Fourth**, the provisions of the CPO are neither unfair nor unconstitutional; they are standard CPO provisions expressly authorized by statute and entirely warranted under the facts and circumstances before the trial court.

**Fifth**, Mr. Rogers *consented* to the extension of the TPO until his stalking trial was to commence (and any error was harmless because he was incarcerated and already subject to a stay away order all during the relevant time period).

**Finally**, the CPO was well-founded and Mr. Rogers presented nothing afterwards to justify disturbing it, so denial of reconsideration was well within the trial court's discretion.

Almost none of Mr. Rogers' assignments of error were raised or preserved by his counsel below. Most of them were not prejudicial. None of them are meritorious. The proceedings in the trial court were entirely proper and the judgments below should in all respects be affirmed.

### A.     The Trial Court Properly Exercised Jurisdiction

Mr. Rogers mounts a number of jurisdictional attacks or assertions that might be classified as such in that they question the authority of the trial court to even hear the case.[10] These arguments largely present issues of law and are accordingly reviewed *de novo*. *In re J.W.*, 837 A.2d 40, 44 (D.C. 2003) (stating that "[l]ike all questions of law, we review questions concerning the trial court's jurisdiction *de novo*."). It is clear that none of these arguments are well grounded, and the trial court's jurisdiction over the case below should be affirmed.

---

[10] Mr. Rogers also seems to argue, summarily and without support, that the D.C. Superior Court was not a proper venue and was *forum non conveniens*. Rog. Br. 1 at 9, 11. This Court has long applied a stringent standard for *forum non conveniens* dismissal: "[w]hether the District of Columbia is the best forum for this litigation is not the issue; rather [the court] must determine whether the District has so little to do with this case that its courts should decline to hear it." *Jenkins v. Smith*, 535 A.2d 1367, 1371 (D.C. 1987). In this case, it is clear from Mr. Rogers' alleged conduct and subsequent criminal prosecution that the District was an appropriate venue for the petition hearing. And as this Court long ago observed "[t]he Superior Court of the District of Columbia . . . sits as a single unitary judicial district, and change of venue is not available." *Welch v. United States*, 466 A.2d 829, 834 (D.C. 1983).

1.    The Trial Court had Statutory Subject Matter
Jurisdiction

Mr. Rogers' central argument is that the trial court did not have subject matter
jurisdiction because "there is an unambiguous statutory requirement that the party initiating this
petition 'shall reside' in the District of Columbia." Rog. Br. 1 at 11. Mr. Rogers, however, cites
only part of the relevant statute. Jurisdiction also lies when an intrafamily offense occurs in the
District of Columbia, regardless of the parties' residence.

Authority for the trial courts of the District of Columbia to hear CPO Petitions is found in
D.C. Code §§ 16-1001 to 16-1006 (2004). Section 16-1003 authorizes "with respect to an
intrafamily offense" a complainant to "file a petition for civil protection in the Family Division"
of the Superior Court.[11]  An intrafamily offense is, in turn, defined in D.C. Code § 16-1001(5) as
"[A]n act punishable as a criminal offense committed by an offender upon a person. . . (B) with
whom the offender maintains or maintained a romantic relationship . . . ." The statute also
requires that a person seeking a CPO under this subparagraph "shall reside in the District of
Columbia *or the underlying intrafamily offense shall have occurred in the District of Columbia.*"
*Id.* (emphasis added). Thus, for the trial court to have subject matter jurisdiction in an
intrafamily offense case, there are three requirements:  (1) an act punishable as a criminal
offense; (2) the requisite relationship between the parties and (3) either that the Petitioner lives in
D.C., the Respondent lives in D.C., or the underlying offense occurred in D.C. Ms. Johnson-
Norman's pleading met all three requirements.

First, Ms. Johnson-Norman alleged that Mr. Rogers stalked her. It is undisputed that
stalking is a "criminal offense" within the meaning of the statute. The elements of stalking are
that the defendant willfully, maliciously, and repeatedly followed or harassed the victim and that
the defendant either (1) intended to cause the victim emotional distress or (2) placed the victim in
reasonable fear of death or bodily injury. *United States v. Smith*, 685 A.2d 380, 383 (D.C. 1996);

---

11    *See* D.C. Code § 16-1001(3) for clarification that "'Family Division' means the Family Division of the Superior
Court of the District of Columbia."

12

D.C. Code § 22-404(b) (2004). Using the form supplied by the Superior Court's Domestic Violence Unit, Ms. Johnson-Norman alleged, *pro se,* numerous instances of unwanted letters, e-mails, and phone calls from Mr. Rogers. R. 8-9. She pleaded that Mr. Rogers had stated he was "very angry" with her and that others had told Rogers "that hurting the Petitioner would be an appropriate retaliation." R. 9. She pleaded that the contacts made her "feel threatened." R. 9. Thus, Ms. Johnson-Norman alleged the elements of stalking.

Second, Ms Johnson-Norman alleged the requisite relationship between the parties by checking the box on the Superior Court form petition indicating that the parties had a "romantic/dating relationship." R. 8. Although he contests the matter here, Mr. Rogers testified as much (R. 324) and, thus, the romantic nature of the relationship is really beyond dispute.

Finally, contrary to Mr. Rogers' assertion that Ms. Johnson-Norman's petition "did not reveal any substantive ties to the District of Columbia" (Rog. Br. 1 at 5), Ms. Johnson-Norman pleaded that the "incident[s] … occur[ed] in D.C."(R. 8) and, as to each contact, pleaded that it occurred "at Petitioner's work" (R. 8-9) which was, indisputably, in D.C.

Ms. Johnson-Norman, therefore, pleaded all the elements of an "intrafamily offense" under D.C. Code §§ 16-1003 and 16-1001(5)(B) and jurisdiction in the Superior Court was clearly proper. Notably, the trial court's findings later confirmed the presence of all of these elements.[12]

---

[12]  The trial court found that Mr. Rogers sent Ms. Johnson-Norman letters and e-mails and made telephone calls to her in "in the District of Columbia." R. 152-55. The trial court found further that the letters were "the writings of an angry and obsessive former lover who is unwilling to permit the relationship to be over," (R. 158) and that Mr. Rogers sent the letters "knowing first of all that she most profoundly did not want the contact… he was on probation at the time of the contacts; he had been found guilty of this very offense, attempted stalking; he was under the effect of a stay away order." R. 158. Finally, the trial court found that Mr. Rogers acted "intentionally, willfully, and with malice, that he acted with an effort to cause emotional distress to Ms. Johnson-Norman that did in fact cause a great deal of emotional distress and fear and that the emotional distress and fear were reasonable." R. 159. Mr. Rogers' argument (Rog. Br. 1 at 12-13) that the CPO is void because the court failed to "check the box" (on the Superior Court form CPO) that stated the basis for jurisdiction is frivolous. Any ministerial failure to "check the box" on a court form is harmless where the trial court made clear in its findings of fact and conclusions of law that it had subject matter jurisdiction.

13

Mr. Rogers' assertion, that the offense did not occur "in the District because [he] was in California during the periods alleged" (Rog. Br. 2 at 11) (a fact that is only partially supported in the record) misstates the law. Stalking occurs where the victim is located, and is not limited to the location of the perpetrator. *See United States v. Baish*, 460 A.2d 38, 43 (D.C. 1983) (reversing D.C. Superior Court's denial of jurisdiction over criminal charge of "making threats to do bodily harm" where defendant's repeated threatening phone calls were made outside of, but were received in, the District of Columbia); *see also Beckers v. Seck*, 14 S.W.3d 139, 143-44 (Mo. Ct. App. 2000) (physical location of stalking defendant outside the forum state "irrelevant" where defendant directed interstate mail and telephone calls to the forum state for no other purpose than to contact plaintiff). *See generally Strassheim v. Daily*, 221 U.S. 280, 284-85 (1911) (observing that jurisdiction over a person is appropriate where acts were "done outside a jurisdiction, but intended to produce and producing detrimental effects within it."). Ms. Johnson-Norman's allegation (later proved at trial) that the harassing communications in this case were received in the District of Columbia conferred jurisdiction in the D.C. Superior Court. To hold otherwise in this age of global communications technology would permit mail and electronic stalkers to escape jurisdiction in the place where the contacts impacted the victim.

### 2. The Trial Court had Personal Jurisdiction over Mr. Rogers

Mr. Rogers argues that the trial court lacked personal jurisdiction over him and that exercise of jurisdiction violated his 14th Amendment due process rights because he lacked "sufficient contacts" with the District of Columbia.[13] This issue was not raised in the CPO proceeding where Mr. Rogers was represented by able counsel. Unlike issues of subject matter jurisdiction, appellants must raise an objection to personal jurisdiction at the outset of a proceeding rather that raising the issue for the first time on appeal. *Jemison v. National Baptist*

---

13  Mr. Rogers also argues that the trial court did not have "personal jurisdiction" over Ms. Johnson-Norman. Rog. Br. 2 at 13. But there is no such requirement for petitioners who otherwise properly avail themselves of the trial court's jurisdiction pursuant to D.C. Code §§ 16-1001 to 16-1006 (2001 & Supp. 2004).

*Convention, USA, Inc.*, 720 A.2d 275, 282 (D.C. 1998) (holding that where appellant failed to raise an objection at the trial court to personal jurisdiction he has waived the objection on appeal). Accordingly, personal jurisdiction is not appealable here.

In any event, it is well settled that where a person is physically present within a jurisdiction (as Mr. Rogers was on August 1, 2003 when he was served with the CPO petition), there is no deprivation of due process by exercising personal jurisdiction over him. The Supreme Court has ruled that "jurisdiction based on physical presence alone constitutes due process . . . ." *Burnham v. Superior Court of California*, 495 U.S. 604, 619 (1990); *see also Restatement (Second) Conflict of Laws* § 27 (1971).[14] Even if Mr. Rogers had not been served in D.C., the D.C. Long-Arm statute authorizes personal jurisdiction over Mr. Rogers because Ms. Johnson-Norman alleged that Mr. Rogers committed wrongdoing that had a significant impact in D.C. *See Fisher v. Bander*, 519 A.2d 162, 165 (D.C. 1986) (under D.C. Long-Arm statute, where defendant purposefully directs activities toward D.C., he must present a "compelling" case that jurisdiction is nevertheless unreasonable); *see also Beckers v. Seck*, 14 S.W.3d at 143-44 (as to jurisdiction over defendant in stalking charge, physical location of defendant "irrelevant" where defendant directed interstate mail and telephone calls to the forum state for no other purpose than to contact plaintiff).

Contrary to Mr. Rogers' assertion, none of these jurisdictional principles offends the Fourteenth Amendment. This Court has recognized that Congress enacted the District's long-arm statute with the intent to permit *in personam* jurisdiction over non-resident defendants "to the full extent permitted by the due process clause of the Fifth and Fourteenth Amendments." *Rose v. Silver*, 394 A.2d 1368, 1369 (D.C. 1978). Due process under the Fourteenth Amendment for non-resident respondents is evaluated under the "minimum contacts" test reaffirmed in

---

[14] Mr. Rogers obliquely asserts that he was only present in D.C. because he was "illegally" extradited from California in connection with *U.S. v. Rogers II*. Rog. 1st br. at 8. But Mr. Rogers raised this issue (unsuccessfully) in *U.S. v. Rogers II*. *See* motion to dismiss dated 8/30/03 in F-4208-3 (R. 456-60) and Government's Omnibus Opposition to Defendant's Pretrial Motions dated 10/17/03. R. 436-54. He also raised it unsuccessfully on a motion under D.C. Code §23-110 (2004) and the issue is now on appeal in D.C. App. Nos. 04-CO-365 and 04-CO-785.

15

*International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). More recently, the Supreme Court followed *International Shoe* and its progeny, and held in *Burger King Corp. v. Rudzewicz* that jurisdiction is proper where the respondent's actions created contacts with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). In this case, it is manifest that Mr. Rogers' alleged actions of sending harassing letters and e-mails to Ms. Johnson-Norman in the District created sufficient contacts with the District to satisfy *International Shoe*. *See e.g. Mouzavires v. Baxter*, 434 A.2d 988, 995 (D.C. 1981) (noting that personal jurisdiction can exist where the nonresident defendant's only contact with the forum has been by mail or telephone).

### 3.  The Trial Court Could Hear the CPO Petition Even Though Mr. Rogers was Acquitted in the Criminal Case

Mr. Rogers seems to argue that, even if jurisdiction was proper in the first instance, several legal doctrines barred the trial court's ultimate adjudication of the case because he was acquitted in *U.S. v. Rogers II*. But each argument is meritless.

#### a.  Collateral Estoppel did not Bar the CPO Proceeding

Mr. Rogers suggests, without any legal support, that the doctrine of "collateral estoppel" bars the trial court's adjudication of the CPO case after the criminal acquittal. *E.g.* Rog. Br. 1 at 13. But the doctrine does not apply here. In general, collateral estoppel bars the "relitigation of issues of fact or law determined in a prior proceeding which were essential to that judgment." *See e.g. Oubre v. Dis. of Columbia Dep't of Employment Servs.*, 630 A.2d 699, 703 (D.C. 1993). However, this Court and others have made clear that acquittal in a criminal case, where the standard of proof is "beyond a reasonable doubt," does not preclude re-litigation of the same fact issues when presented in a subsequent action governed by a lower standard of proof such as "preponderance of the evidence." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 358, 362 (1984) (and cases cited); *Johnson v. United States*, 763 A.2d 707, 711 (D.C. 2000). As the Supreme Court has observed, the acquittal "merely proves the existence of a reasonable doubt as to . . . guilt . . . . [It] did not negate the possibility that a preponderance of

16

the evidence could show that [the defendant] was engaged in [the unlawful activity]." *89*

*Firearms*, 465 U.S. at 361-62.

Judge Leibovitz expressly observed the difference in the standards of proof between Mr.

Rogers' criminal case and the civil case seeking a CPO:

> "[a]s everybody knows, the standard of proof in that case [*U.S. v. Rogers II*] was
> beyond a reasonable doubt; the jury returned a verdict of not guilty... (but) in this
> proceeding the standard is a preponderance of the evidence or good cause to
> believe that an intrafamily offense occurred."

R. 151-52. *See* D.C. Code § 16-1005(c) (2004) (stating "[i]f, after hearing, the Family Division

finds that there is *good cause* to believe the respondent has committed or is threatening an

intrafamily offense, it may issue a protection order . . ." (emphasis added); *see Cruz-Foster*, 597

A.2d 927, 930 and n.3 (D.C. 1971) (stating evidentiary burden on CPOs and CPO extensions is

the "normal standard in civil cases" of "preponderance of the evidence"). The trial court

reiterated the basis for its decision in its reconsideration opinion. R. 91. Given the difference in

standard of proof, the criminal acquittal did not bar the trial court's review of the civil case.

### b.    The CPO Proceeding did not Violate the 6th or 7th Amendments

Mr. Rogers argues that the trial court erred in the CPO proceeding by "usurping the

universal province of the jury in violation of the Sixth and Seventh Amendments." Rog. Br. 1 at

12-13. This argument demonstrates a fundamental misunderstanding of the law and a confusion

regarding the role of the judge in successive criminal jury and civil bench trials.

First, Mr. Rogers argues that "[t]he Sixth Amendment has been usurped and a fair trial

denied where a jury has possibly become partial due to the trial judge formulating a bias or

making opinions on the alleged facts in the case." Rog. Br. 1 at 13. But, the Sixth Amendment,

which guarantees "in *criminal prosecutions* . . . the right to a speedy and public trial, by an

impartial jury" applies exclusively to criminal trials and is inapplicable to this civil matter. *See*

*In re Banks*, 805 A.2d 990, 1000-02 (D.C. 2002), *cert. denied,* 539 U.S. 927 (2003) (where

defendant charged with both criminal and civil contempt, argument that he was denied Sixth

17

Amendment right to trial by jury appropriately directed to criminal but not civil proceeding). Any Sixth Amendment complaints Mr. Rogers might have about the judge's actions in the criminal trial, in which he was *acquitted*, would be properly addressed to that case. Additionally, Mr. Rogers' assertions in this case that the judge improperly influenced the jury are factually impossible. The CPO proceeding was not a jury trial; it happened a day after the criminal jury trial concluded and the jury was dismissed. So it was not possible for the trial judge to deny Mr. Rogers a fair trial *in the CPO proceeding* by influencing the jury.

Second, Mr. Rogers argues that the trial court violated the Seventh Amendment[15] by rendering a judgment that he believes differs from that of the jury's. Specifically, Mr. Rogers argues that "[t]he judge was precluded from making findings during the proceeding or usurping the universal province of the jury to act as the fact finders in that case. The judge was the arbiter of law only." Rog. Br. 1 at 12. But the Seventh Amendment does not apply because the CPO hearing did not involve a matter "where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII; *see Washington Star Co. v. International Typographical Union*, 582 F. Supp. 301, 309 (D.D.C. 1983) (demand for injunctive or other equitable relief as opposed to a suit at common law does not implicate Seventh Amendment). Even if the Seventh Amendment applied, the judge did not make findings in the criminal case. And, while such a statement regarding the role of a judge might be true in a criminal trial, it clearly is not in a CPO hearing, which is a bench trial. SCR-DV 9(b)(2) states "[t]he Court shall, without a jury, hear and adjudicate petitions for civil protection orders . . . ." *See, e.g., Green v. Green*, 642 A.2d 1275, 1281 n.10 (D.C. 1994). In bench trials, the judge is both the fact finder and the arbiter of law. SCR-DV 9(c) (stating "the Court shall make those findings of fact essential to the ultimate conclusion of law"). Thus, it is properly the role of the judge to make findings of fact.

---

15  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

Additionally, as discussed above with respect to collateral estoppel, the standard of proof in a criminal case is "beyond a reasonable doubt" while the standard of proof in a CPO proceeding is the lower "preponderance of the evidence/good cause to believe." That the jury in Mr. Rogers' criminal case found that the Government had not proven, beyond a reasonable doubt, that Mr. Rogers' stalked Ms. Johnson-Norman, does not preclude the court in the civil proceeding from finding that Ms. Johnson-Norman did prove stalking under the "good cause" standard. *Addington v. Texas*, 441 U.S. 418, 423-24, 426 (1979) (discussing the difference between "beyond a reasonable doubt," "clear and convincing," and mere "preponderance" standards).[16]

## B. The CPO Hearing Was Properly Conducted

Mr. Rogers' raises a host of issues challenging the trial court's conduct of the CPO hearing. However, trial courts enjoy great latitude in conducting hearings and therefore challenges to trial court procedures are reviewed only for "abuse of discretion." *E.g. Guaranty Dev. Co. v. Liberstein*, 83 A.2d 669, 671 (D.C. 1951). The standard is even more exacting where, as here, objections are not preserved in the lower court. Where he did not object below, Mr. Rogers must show either (1) a "miscarriage of justice," *i.e.* actual innocence or (2) that the trial court's error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Beaner v. United States*, 845 A.2d 525, 539 (D.C. 2004); *Southall v. United States*, 716 A.2d 183, 189 (D.C. 1998); *see also Smith v. United States*, 837 A.2d 87, 97 (D.C. 2003), *cert. denied sub nom.* 124 S. Ct. 2435 (2004). Mr. Rogers' arguments do not sustain these

---

[16]  Mr. Rogers also may be arguing that subjecting him to a civil case for a CPO based on stalking after he was acquitted in the criminal case violated the Fifth Amendment to the U.S. Constitution's proscription against "Double Jeopardy." If so, the argument is misplaced. The Double Jeopardy Clause applies only to successive *criminal* jeopardy -- and does not apply where, as here, the two successive cases involve neither two criminal violations nor two criminal punishments. *Helvering v. Mitchell*, 303 U.S. 630, 633 (1938). And the Double Jeopardy Clause does not apply because the civil statute authorizing protective orders is, as Mr. Rogers concedes elsewhere, non-punitive. Rog. Br. 2 at 6; *see generally Purcell v. United* States, 594 A.2d 527, 529 (D.C. 1991) (stating standard for determining whether a civil statute is punitive); *Luk v. Commonwealth*, 658 N.E.2d 664, 668-73 (Mass. 1995) (same as to driver's license revocation).

19

weighty burdens and all of his challenges to the CPO hearing procedure, evidence, and the like should be rejected out of hand.

### 1.    Mr. Rogers Waived All Procedural and Evidentiary Arguments By Not Objecting Below

At the CPO hearing, Mr. Rogers was represented by very able counsel -- Mr. Polin had just one day prior secured Mr. Rogers' acquittal in the criminal case. Mr. Polin was certainly aware of the facts in the case. He presumably was aware of all relevant trial procedures, the rules of evidence, and his obligation to object to any inappropriate conduct at the hearing. But he did not object to the manner in which the hearing was conducted or the evidence expressly relied upon by Judge Leibovitz. Mr. Polin made no objection, for example, when Judge Leibovitz admitted the documents (R. 143-51) or when she stated that she had "listened to all the testimony on the criminal case." R. 151. He offered nothing when she stated that she wanted to "make sure that Mr. Poland [sic] is satisfied that I have everything he wants me to consider." R. 146. Similarly, when later asked if he wanted the trial court to consider "anything else," Mr. Polin simply answered, "No Your Honor." R. 151.[17]

Mr. Rogers cannot object to trial court procedural or evidentiary "errors" for the first time on appeal. This Court has stated time and again that "matters not objected to during the trial cannot be considered for the first time on appeal." *ABCD Corp. v. Henry*, 109 A.2d 133, 134 (D.C. 1954). In fact, the concept was such a judicial staple that the Court stated "authorities need not [even] be cited in support of this proposition." *Id.* Hence, "[q]uestions not properly raised and preserved during the proceedings under examination and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal." *Miller v.*

---

17  Mr. Rogers claims in his second brief that he requested "the opportunity to personally address the court, which the judge denied." Rog. Br. 2 at 5. However, the hearing transcript makes clear that this exchange (R. 165), related to the Court's consideration of some of the protective order conditions, happened *after* the evidentiary phase of the proceeding (R. 143-151); *after* Judge Leibovitz had already made her findings and ruled in Ms. Johnson-Norman's favor on the merits (R. 159); and, *after* Mr. Rogers' lawyer had (at Judge Leibovitz, express invitation) already addressed Judge Leibovitz on the remedial matter. R. 163-65. A party does not have the right separately to address the trial court when his lawyer has already done so.

*Avirom*, 384 F.2d 319, 322 (D.C. Cir. 1967). This requirement is "not obeisance to ritual," but takes into consideration issues of "fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact." *Id.* (quotation omitted).

This requirement is particularly appropriate where, as here, the appellant was represented below by counsel. *United States v. Jones*, 527 F.2d 817, 830 (D.C. Cir. 1975) (stating "any prejudice was waived by . . . counsel's failure to raise an objection at trial.") Accordingly, this Court should summarily reject any arguments that: (a) there was no evidence admitted, (b) that there was no testimony, (c) that reliance on the evidence from the criminal case was improper, and (d) that Mr. Rogers was denied cross-examination of Ms. Johnson-Norman.

### 2. The Trial Court Properly Admitted and Considered the Evidence

Even if not waived, Mr. Rogers' assertions that there was "no evidence presented in open court" below (Rog. Br. 1 at 6, 7) and that the trial judge did not "permit" evidence (Rog. Br. 1 at 12) are demonstrably false. Judge Leibovitz began the CPO hearing by clarifying the exhibits she had before her and "that were entered in the Government's case" (*U.S. v. Rogers II* concluded the day before), "because those are the exhibits I have and I'm going to assume that you [speaking to Ms. Johnson-Norman] want me to consider those exhibits unless you tell me otherwise." R. 143. Specifically, the Judge recounted that she had before her:

- Exhibit 1 and 2 -- a letter and envelope that Ms. Johnson-Norman "testified [she] received in June of 2002." R. 143.

- Exhibit 3 and 4 -- a letter and envelope which "Ms. Johnson-Norman testified she received in January of 2003." R. 143.

- Exhibits 5 and 6 -- a letter and envelope that Ms. Johnson-Norman "testified she received in April of 2003." R. 144.

- Exhibits "6 (sic) and 7," which were a letter and envelope that "Ms. Johnson-Norman testified she received in May of 2003." R. 144.

21

- A stipulation that at all relevant times "there was an order in effect which required Mr. Rogers to stay away from and have no contact with…Ms. Johnson-Norman." R. 144.

- A finger print card that the government expert "testified for the known prints of Virgil Marcellus Rogers … and were compared to fingerprint … items in Government Exhibit 3 which was the January 2003 letter… which were matched to Mr. Rogers." R. 144.

- Exhibit 11 – three e-mails to Ms. Johnson-Norman from the "Fortunate"[18] address dated January 24, 2000, April 10, 2000 and June 14, 2000. R. 144-45.

Upon inquiry, Ms. Johnson-Norman agreed with Judge Leibovitz that these were the exhibits she wanted the trial court to "consider in this case." R. 144-45. Importantly, Mr. Rogers' lawyer made no objection to the admissibility of these documents (presumably because their admissibility was substantially litigated in the criminal case). Mr. Rogers' counsel also offered evidence; namely Defense Exhibit 3 -- an annotated version of Government Exhibit 1 with markings Mr. Rogers used during his testimony to indicate phrases or words he recognized as unique. R. 150.

Mr. Rogers argues that the trial court did not use the word "admitted" when identifying and describing the exhibits, but no controlling authority mandates the trial court's use of particular words to admit evidence. Although it does not appear that courts of the District of Columbia have squarely addressed the question, several jurisdictions hold that no "magic words" are required to admit evidence into a record. *E.g. Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 622 (7th Cir. 2004). Instead, these courts look to the totality of the trial record to determine, for example, whether (as here) the exhibits were offered by a party as evidence (R. 144-45, 150), whether the trial court identified the exhibits for the record (R. 143-51), and whether the trial court based its rulings on the evidence. R. 143-51. *Gee v. Lewisville Mem'l Hosp., Inc.*, 849 S.W.2d 458, 461 (Tex. Civ. App. 1993); *see also Baum v. Solomon*, 14 Phila. 475, 478 (C.P.

---

[18]   Mr. Rogers and Ms. Johnson-Norman both testified at the criminal trial that "Fortunate" was a distinctive part of an e-mail address used by Mr. Rogers. R. 158, 342-43.

22

Phila. County 1986), Based on the totality of the trial record, any suggestion that the trial court did not admit these documents into evidence is frivolous.

After reviewing the documentary evidence, the Judge Leibovitz recounted the *U.S. v. Rogers I* "misdemeanor attempted stalking conviction." R. 148. She found that case resulted in orders on September 2000 and March 2001 prohibiting Mr. Rogers from contacting Ms. Johnson-Norman. R. 153. She then took judicial notice of the proceeding in *U.S. v. Rogers II* that concluded the day before. Specifically, Judge Leibovitz stated that she had "listened carefully to all of the evidence, all of the testimony of every witness, the arguments of counsel and the Government -- and the prosecution of the criminal case." R. 151. For example, the judge recounted the testimony about an incident in August of 2000 that resulted in a 911 call where Mr. Rogers approached Ms. Johnson-Norman's car outside her workplace in D.C. R. 152. Again, Mr. Rogers' lawyer made no objection. Finally, the trial court had before it Ms. Johnson-Norman's sworn and notarized affidavit in support of the original petition, which contains six paragraphs of narrative describing Mr. Rogers' harassing contacts, including details of dates and locations, all of which was consistent with Ms. Johnson-Norman's testimony in the criminal case. R. 8-12.[19] Mr. Rogers' assertion that the trial court entered the CPO without any evidence to support it is flatly wrong.

Far from "preventing [Mr. Rogers] from contesting the entry" of the CPO (Rog. Br. 1 at 6), the trial court stated: "I just want to make sure that Mr. Poland (sic) is satisfied that I have

---

19  In attacking the trial court's reliance on the criminal trial testimony, Mr. Rogers contends that Ms. Johnson-Norman was required to provide sworn testimony "during" the CPO hearing. He cites no authority for this proposition, however. The Superior Court Domestic Violence rules, which govern the conduct of CPO hearings, simply state that "whenever a petition for a civil protection order...is filed, both the petitioner and the respondent *may* present evidence, including their own testimony and testimony of other witnesses, and physical evidence." SCR-DV 9(b)(1) (emphasis added). But the rule does not *require* testimony. And Ms. Johnson-Norman did address the Court at the CPO hearing and when Judge Leibovitz asked Ms. Johnson-Norman a question, she admonished her "I'll remind you that you are still under oath; you were placed under oath during the trial..." R. 159. In any event, under the unique circumstances of this case, where there was plenty of "oral testimony" in the criminal case to which the judge paid "very close attention." The argument is a red-herring.

everything that he wants me to consider." R. 146. And later, the Court and Mr. Polin had the

following colloquy:

    The Court:    Is there anything else Mr. Polin you want me to consider?

    Mr. Polin:    No Your Honor. R. 151

Contrary to his assertion that the trial court "denied Rogers the opportunity to rebut the

allegations" (Rog. Br. 2 at 7), the trial court allowed ample opportunity for Mr. Rogers to present

a case.

### 3.    The Trial Court Properly Took Judicial Notice of the Related Criminal Stalking Proceeding.

Although he elsewhere asserts that Judge Leibovitz issued the CPO "off the cuff" (Rog.

Br. 1 at 13), in his second brief, Mr. Rogers at least acknowledges that Judge Leibovitz

considered substantial evidence but argues (without support) that it was all evidence from the

criminal case and that this process was somehow improper. Rog. Br. 2 at 6. As discussed above,

there was substantial evidence introduced at the CPO hearing *quite apart* from Judge Leibovitz's

observations about the criminal testimony. And it was not improper for the trial court to take

judicial notice of the relevant background facts from the criminal trial proceedings -- a procedure

to which Mr. Rogers did not object below.

Under certain circumstances, a court may take judicial notice of its own records and

proceedings, especially where the prior proceedings relate to the same parties and subject matter

as the later case (even though the later case involves different legal issues or remedies) and the

parites' counsel do not object. For example, in *S.S. v. D.M.*, 597 A.2d 870 (D.C. 1991) the

Superior Court presided over an adoption proceeding that followed a neglect proceeding

involving the same child and the same respondent mother. The trial court, without objection,

took notice of the prior neglect proceeding orders and the findings of fact relating thereto. *Id.* at

881-82. In affirming this procedure, it was particularly significant to this Court that, as here,

appellant's counsel was on notice that the trial court was considering "the file" from the prior

case and did not object. *Id.* 881-883. *See also In re J.M.C.*, 741 A.2d 418, 424-26 (D.C. 1999) (stating that "'in appropriate cases, a judge may take judicial notice of the contents of court records in a related prior proceeding," especially "where, as in this case, the interested parent was a party to and was represented by counsel in the prior . . . proceeding'"); *see also In re L.D.H.*, 776 A.2d 570, 574 (D.C. 2001) (same).

Immediately prior to presiding over the CPO hearing, Judge Leibovitz presided over the four-day criminal case, which was based on substantially the same facts presented in the CPO petition.[20] This was no accident of process. The trial court had (with Mr. Rogers' consent) "trailed" the civil case. R. 434. And, the transcripts of several bench conferences during the criminal trial, as well as the transcript of the CPO hearing, make it abundantly clear that Judge Leibovitz paid very close attention to, took notes of, and recalled in detail the testimony in the criminal case. R. 335, 401.[21] Judge Leibovitz obtained facility with the criminal case testimony no doubt because she had trailed, and expected to preside over, the CPO case. R. 434. It was entirely reasonable for Judge Leibovitz to consider the criminal case testimony, her prior finding of a "prima facie case of stalking" (R. 316-17) (along with the documents, stipulation, affidavit, etc. tending to show Mr. Rogers' stalking) in reaching the conclusion that there was "good cause to believe" that Mr. Rogers stalked Ms. Johnson-Norman.

### 4.    Mr. Rogers Was Not Denied An Opportunity to Cross Examine Ms. Johnson-Norman

Mr. Rogers repeatedly asserts that cross-examination of Ms. Johnson-Norman "is an absolute right that was denied to Rogers in this case." Rog. Br. 1 at 14, 16; *see also* Rog. Br. 1 at 6, Rog. Br. 2 at 8. These assertions are plainly contradicted by the record.

---

20  As noted *supra* at 6, the incidents that were the subject of the criminal trial were essentially the same contacts identified in the CPO petition as the trial court's recitation during the CPO hearing also makes clear. R. 151-52.

21  Notably, she considered and rejected in the criminal case a motion for judgment of acquittal and, in so doing, recited the evidence supporting a *"prima facie* case of stalking." R. 316-17.

25

First, as the entirety of the CPO hearing transcript makes plain, Mr. Rogers never sought, and was certainly not "denied," the chance to cross-examine Ms. Johnson-Norman. R. 142-66. Second, that Ms. Johnson-Norman did not take the stand in her case-in-chief is immaterial to Mr. Rogers' exercise of the right to cross-examine. Mr. Rogers could have called Ms. Johnson-Norman in his own case and examined her as a hostile witness with leading questions as if on cross-examination.[22] He chose not to do so. As recounted above, Judge Leibovitz repeatedly and explicitly asked Mr. Rogers' counsel if he had "anything else" for her to consider, and he did not raise this issue. R. 146. Finally, Mr. Rogers' counsel *did* cross-examine Ms. Johnson-Norman, extensively, twice, in the criminal case -- all of which Judge Leibovitz had "listened to very carefully."

In support of his argument that "denial of an opportunity to cross-examine" is impermissible, Mr. Rogers cites a number of cases that are easily distinguishable because the appellant in each of those cases actually requested cross-examination of a witness and was expressly denied that right by the trial court. For example, in *Tyree v. Evans*, the trial court flatly stated that Tyree's counsel would not be allowed to cross-examine the petitioner during the CPO hearing. 728 A.2d 101, 103 (D.C. 1999). On appeal, this Court held that "[a] *complete denial* of the opportunity to cross-examine . . . is impermissible." *Id.* (emphasis added). But Mr. Rogers' assertion that he was banned from cross "in exactly the precise manner which the court found inappropriate in *Tyree*" (Rog. Br. 2 at 9) is incorrect. Unlike the appellant in *Tyree* (and *Glenbrook*, 605 A.2d 22 and *Fortune*, 58 A.2d 919 -- also cited by Mr. Rogers),[23] neither Mr. Rogers nor his counsel even inquired about cross-examination.

---

22  The District of Columbia Superior Court Rules explicitly afforded Mr. Rogers the opportunity to call Ms. Johnson-Norman as an adverse witness for cross-examination. SCR 43(b) (stating that "a party may call an adverse party... and interrogate the witness by leading questions and contradict and impeach the witness in all respects. . . ."). SCR 43 is expressly incorporated into the Superior Court Domestic Violence Rules applicable in Intra-family Matters. *See* SCR-DV 1.

23  The scenario in *Glenbrook* was similar to that in *Tyree* -- during a hearing before the District of Columbia Zoning Board, a party sought to cross-examine a witness. The Board denied outright the cross-examination. *Glenbrook Rd. Ass'n v. Dis. of Columbia Bd. of Zoning Adjustment*, 605 A.2d 22, 38 (D.C. 1992). And the facts in

26

Perhaps recognizing the weakness of the "denial of cross-examination" argument, Mr. Rogers' alternatively suggests he had no motive to put on *any* evidence -- purportedly because "the petitioner had not submitted any direct testimony and had not moved the court to admit any evidence, [and therefore] Respondent didn't have any evidence in which to base a defense or to rebut" Rog. Br. 2 at 5. This sophistry is plainly contradicted by the record.[24] Judge Leibovitz spent a half an hour going through all the evidence she was considering. Judge Leibovitz, the courtroom deputy clerk, and Mr. Rogers' lawyer engaged in extensive colloquy to clarify the documentary evidence of record. R. 145-46. Indeed, Mr. Rogers did submit a case by, for example, submitting defense exhibits. *See e.g.* R. 150-51. And his counsel asserted a correction to Judge Leibovitz's finding as to the address of Ms. Johnson-Norman's workplace where some of the harassing communications took place – a correction that Judge Leibovitz accepted. R. 155. Accordingly, any suggestion that Mr. Rogers and his counsel thought there was not "any evidence" and were not on notice of the need for a defense is groundless. Mr. Rogers and his counsel apparently made a conscious decision not to call Ms. Johnson-Norman – or any other witnesses – to the stand. This was a reasonable tactical choice under the circumstances. Mr. Rogers cannot now claim error.

### C.    There was Ample Evidence Supporting the Trial Court's Finding on Intent

Mr. Rogers argues that the trial court erred by entering the CPO because there was not "good cause to believe" that Mr. Rogers committed an intrafamily offense, citing a series of cases regarding the "specific intent" requirement. Rog. Br. 2 at 14-15. Yet, where the trial court sits as the trier-of-fact, review of the trial court's *fact-finding* is limited to a search for findings that are "plainly wrong or without evidence to support." D.C. Code § 17-305(a). This court interprets

---

*Fortune v. Evans*, 58 A.2d 919 (D.C. 1948) appear to have been the same: "The court . . . refused to permit cross-examination." *Id.* At 920.

24  If Mr. Rogers' counsel actually believed this was the state of the record he would no doubt have moved (but did not) for a summary judgment or for a judgment on the pleadings.

27

D.C. Code § 17-305(a) as "indistinguishable from the 'clearly erroneous' standard" under SCR 52 (a). *Vereen v. Clayborne,* 623 A.2d 1190, 1193 (D.C. 1993). Here, the trial court's findings[25] that there was good cause to believe that Mr. Rogers stalked Ms. Johnson-Norman, including as to the intent element, are supported by the evidence and should be upheld.

As noted earlier, the legal elements of stalking include that the defendant willfully, maliciously, and repeatedly followed or harassed the victim and that the defendant either intended to cause the victim emotional distress or placed the victim in reasonable fear of death or bodily injury. *United States v. Smith,* 685 A.2d 380, 383 (D.C. 1996); D.C. Code § 22-404(b) (2004). Based on the evidence, the trial court expressly found that there was good cause to believe that Mr. Rogers committed stalking, namely harassment, "intentionally, willfully, and with malice." R. 159. The trial court elaborated on this finding in its reconsideration opinion stating that Rogers "had engaged in a course of conduct whereby he repeatedly, intentionally, and maliciously contacted petitioner with the intent to cause petitioner emotional distress and with the effect of doing so." R. 90.

The trial court found that Mr. Rogers sent Ms. Johnson-Norman unwanted letters and e-mails and made telephone calls to her on numerous occasions. R. 152-55. It found further that the letters were "the writings of an angry and obsessive former lover who is unwilling to permit the relationship to be over." R. 158. Judge Leibovitz found that Mr. Rogers sent the letters

---

25  Mr. Rogers repeatedly asserts that "the trial judge was required to issue written findings of fact and conclusions of law prior to issuing 12-month injunctive relief," citing SCR 52(a). *See, e.g.,* Rog. Br. 1 at 13. But, as he elsewhere admits, the rules specifically governing domestic violence cases contain no such rule. SCR – DV 9(c) requires that the court "make findings of fact essential to the ultimate conclusion of law" but does not require that such findings be in writing. Besides, on page three of the form CPO, the trial court *wrote*: "Court finds that between June 2002 and May 2003, Respondent committed the offense of stalking against the petitioner by writing letters and making telephone calls and that the Respondent poses a danger to the petitioner." R. 51. And, Mr. Rogers' assertion that the trial judge "did not make any *oral* or written findings" (Rog. Br. 1 at 12) (emphasis added) is a flat misrepresentation of the record. The trial judge made, on the record, detailed oral findings of fact and conclusions of law -- which satisfy both SCR 52(a) and SCR-DV 9(c). R. 159-59. This fact also distinguishes *Beard v. South Main Bank,* 615 A.2d 203 (D.C. 1992) cited by Rogers for the proposition that "review in this case is severely hindered by the trial court's failure to state on the record the reasons for its decision." *Id.* at 205. Indeed, in the paragraph quoted by Rogers, the *Beard* court observed that (unlike here): "there was no hearing at which the court might have given us some insight into the basis for its ruling." *Id.* Even then, the *Beard* court merely remanded the case so that the trial court could re-examine the record.

28

"knowing first of all that [Ms. Johnson-Norman] most profoundly did not want the contact… he was on probation at the time of the contacts; he had been found guilty of this very offense, attempted stalking; he was under the effect of a stay away order." R. 158. In so noting, Judge Leibovitz relied on the prior stay away orders as perhaps the strongest evidence that Mr. Rogers was, at the very least, *aware* that his conduct might cause emotional harm or place Ms. Johnson-Norman in reasonable fear of harm: on at least three prior occasions (in obtaining the Maryland Peace Order and twice in *U.S. v. Rogers I*) Ms. Johnson-Norman had invoked the judicial process to stop Mr. Rogers from contacting her. R. 403. Also, Ms. Johnson-Norman testified that Mr. Rogers on at least one prior occasion threatened her with physical violence (R. 403) and she explained fully why she was in fear of Mr. Rogers. R. 403-04.

In addition, the text of the letters reviewed by the trial court reveal Mr. Rogers' awareness that his contacts with Ms. Johnson-Norman were causing (and would continue to cause) emotional distress. In the letters and e-mails, Mr. Rogers for example:

- acknowledged that Ms. Johnson-Norman felt that Mr. Rogers wanted "to harm" her. R. 18.

- stated that Ms. Johnson-Norman's conduct had "destroyed every bit of feeling there ever was for you." R. 18

- acknowledged the possibility that he might "upset you by writing, if it does that bothers me, but it has to be done." R. 31.

- admitted that at times, he had "been very angry with" Ms. Johnson-Norman. R. 31

- stated, "I do care if my letter bothers you, but … it is the best outlet for me to express these things." R. 31

- stated that he "can understand why you may have been alarmed by some things I have done in the past." R. 36.

- stated "you have left me absolutely no choice to respond . . . enough is enough … I am very affected and disturbed by all of this . . . you should probably be expecting to feel more heartache in the future because of all this." R. 31

29

During the criminal trial, Ms. Johnson-Norman testified to the several occasions when she directly conveyed to Mr. Rogers that his contacts were unwelcome and upsetting -- both incidents resulting in a 911 call. R. 404-05, 190-91. She testified that the contacts made her feel "frightened and shocked." R. 198, 201. These facts amply permit the conclusion that Mr. Rogers acted "intentionally, willfully, and with malice, that he acted with an effort to cause emotional distress to Ms. Johnson-Norman that did in fact cause a great deal of emotional distress and fear and that the emotional distress and fear were reasonable." R. 159.

Questions of intent are inherently fact-bound. The question presented on appeal is not whether on this evidence reasonable people might come to different conclusions as to Mr. Rogers' intent. That factual determination was committed to Judge Leibovitz as the trier of fact and the present question is whether her finding was "clearly erroneous." *Johnson v. Lloyd*, 211 A.2d 764, 765 (D.C. 1965). Under this permissive standard, her conclusion was entirely reasonable and must be sustained.

### D.    The Provisions of the CPO Are Neither Unconstitutional Nor Unfair

Mr. Rogers submits that the CPO contains a laundry list of allegedly "overreaching" provisions. R. 85. But the CPO statute grants broad discretion to the trial court to fashion remedies relating to intrafamily offenses. It expressly authorizes some types of remedies and also generally authorizes the trial court to direct "the respondent to perform or refrain from other actions *as may be appropriate* to the effective resolution of the matter." D.C. Code §16-1005(c)(10) (2004) (emphasis added). The statute's grant of authority could hardly be broader. Indeed, in *Cruz-Foster v. Foster*, 597 A.2d 927 (D.C. 1991), a seminal domestic violence case (cited by Mr. Rogers), this Court observed that "in 1982, the Council of the District of Columbia broadened the remedies available under the Act and criticized the prior judicial interpretation of the legislation as having been too narrow, so that truly effective remedies [were] not ordered in some cases." *Id.* at 929 (quotation omitted). Accordingly, in *Cruz-Foster* this Court made clear that a paramount consideration with respect to the Intrafamily Offenses Act is the remedial nature

30

of CPOs and directed that the statute be liberally construed in furtherance of its remedial purpose. *Id.*[26] Accordingly, this Court's review of the CPO provisions is limited to searching for an "abuse of discretion." *See generally Albergottie v. James*, 470 A.2d 266, 270 (D.C. 1983) (observing that grant of "injunctive relief is discretionary with the trial court and will be reversed on appeal only when that discretion has been abused"). In light of these principles, all the provisions of the CPO must be affirmed.

## 1.   Extra-Territorial Effects Do Not Render a CPO Invalid

Mr. Rogers argues, without citing any legal authority, that the trial court does not have the authority to order him to stay away from Ms. Johnson-Norman's church (Reid Temple AME Church) because it is located in Maryland, which is "outside the trial court's jurisdiction." Rog. Br. 1 at 16. The law, however, is clear that where (as here) a trial court properly has jurisdiction over a claim and party, the court can "order an act which has an effect in another state or is to be carried out in another state." *Beckwith v. Beckwith*, 355 A.2d 537, 540 (D.C. 1976); *see also Desai v. Fore*, 711 A.2d 822, 824 (D.C. 1998). *Beckwith* and *Desai* are consistent with the general principle that a state has power to order a person who is subject to its jurisdiction "to do an act, or to refrain from doing an act, [even] in another state." *Restatement (Second) Conflict of Laws* § 53 (1971). The church provision in the CPO was well-founded on the facts of this case; the record demonstrates that Ms. Johnson-Norman is very active and frequently present at her church, serving on several church boards and committees. R. 185-88. The record also reveals Mr. Rogers once showed up at the church when Ms. Johnson-Norman was present, which resulted in a disquieting incident involving church officials and other third parties -- and one of Mr. Rogers' probation revocations. R. 362, 186-90.

Additionally, Mr. Rogers' argument makes no practical sense. It is inconceivable that the trial court could properly order Mr. Rogers to stay away from Ms. Johnson-Norman in the

---

26   Even without the command of *Cruz-Foster*, in general, the lower court's power to fashion an injunctive remedy in a CPO is akin to its inherent equitable powers, which carry a broad discretion to fit the remedy to the facts and needs of the prevailing equity petitioner. *See Mullin v. N St. Follies, Ltd. P'ship*, 712 A.2d 487, 494 (D.C. 1988).

31

District of Columbia but not to stay away from her (or a location she frequents) just a few steps across the District line in Maryland (or across the river in Virginia). An effective stay away order creates a zone of safety -- space and locations in which the Petitioner can feel safe that the Respondent will not intrude. *See generally* Catherine F. Klein & Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law*, 21 Hofstra L. Rev. 801, 919-20 (1993). Spatial remedies such as "stay 100 yards away from the petitioner" may not in all cases be enough to achieve that purpose. The statute expressly recognizes this general principle by authorizing orders to stay away from certain premises. D.C. Code § 16-1004(c)(4) (2004). Although the petitioners' church is not one of the enumerated premises, common sense dictates that additional "locational" zones of safety requested by the petitioner, such as church grounds, a school campus, or an office complex may also be needed. And, as a practical matter, those zones may be located in other jurisdictions -- especially when the case is in the Superior Court, which (like other urban trial courts such as those in Philadelphia, New York City and St. Louis) sits in one of several jurisdictions that collectively encompass a single, integrated metropolitan area.[27]

## 2.    The First Amendment Challenge is Meritless

Mr. Rogers also argues that the CPO condition to stay away from Reid Temple AME Church violates his First Amendment right to freedom of religion. But the courts routinely issue stay away orders relating to churches. *See e.g.*, Klein & Orlov, 21 Hofstra L. Rev. at 921 n.759.

"The free exercise clause of the first amendment guarantees both the freedom to believe and the freedom to act." *Goldman v. Secretary of Defense*, 734 F.2d 1531,1540 (D.C. Cir 1984), *aff'd*, 475 U.S. 503 (1986). Here, Mr. Rogers apparently feels his freedom to "act" on his religion is thwarted by the CPO's proscription of his attendance at Reid Temple AME Church in

---

27   Mr. Rogers' related assertion that the CPO statute did "not permit the court to include 'parents,' 'children,' or 'siblings' in the CPO" is similarly baseless. This sort of remedy is routinely ordered in CPO cases. *See generally* Klein & Orloff, 21 Hofstra L. Rev. at 919-20. If sustained, Mr. Rogers' argument would substantially impair the trial courts' power to issue effective CPOs in contravention of the both the letter and spirit of the law.

32

Maryland (even though he purportedly lives in California). But the law does not support his argument. While the freedom to *believe* is "absolute; *conduct* is regulable for a permissible reason, provided that the regulation is not unduly restrictive." *Id* at 1540-41 (emphasis added). And when grounds to do so exist, excluding a party from a particular church property is not *ipso facto* unconstitutional. *See e.g. Pentecostal Church of God I.M. of New Haven v. Pentecostal Church of God Int'l Movement*, No. CV010457417, 2001 Conn. Super. LEXIS 3530, at **24-25 (Dec. 13, 2001) (enjoining certain church members from entering plaintiff church based on resolution of church property dispute). One who challenges government restrictions has the duty to show that he has been precluded from religious experiences that his faith "*mandates* . . . [t]his interference must be more than an inconvenience, the burden must be *substantial* and an interference [must be] with a tenet or belief that is *central* to religious doctrine." *Franklin v. District of Columbia* 960 F. Supp. 394, 433-34 (D.D.C. 1997) (emphasis added). Mr. Rogers' challenge falls well short of these marks.

To begin with, Mr. Rogers has not shown that he is an adherent of the AME (African Methodist Episcopal) Church. The record reveals only that he went to an AME church once – attendant to one of the disturbing incidents at Reid Temple about which Ms. Johnson-Norman testified in the criminal trial. R. 188-93. And if Mr. Rogers is an AME adherent, then he should be able to articulate why the tenets of the AME Church require him to attend the *Reid Temple* AME Church in Maryland (as opposed to the dozens of other AME churches that this Court may judicially notice are flourishing in the Washington, D.C. metropolitan area[28], as well as the many AME churches conveniently located in Mr. Rogers' purported home state of California). R. 79 (listing address in Woodland CA). He has made no such showing. He has not explained how any legitimate interest of his in attending Reid Temple outweighs the Government's obviously legitimate interest in protecting Ms. Johnson-Norman from additional fear and emotional harm

---

28  http://phonebook.superpages.com/yellowpages/c-AfricanMethodistEpiscopalchurches/S-DC/T-Washington.

33

resulting from his appearance at her church. The First Amendment argument does not withstand the slightest scrutiny.

### 3.    The *Ex Post Facto* Clause is Inapplicable Here

Mr. Rogers argues that the CPO in this case violates the *Ex Post Facto* clause of the United States Constitution because he is ordered to stay 100 yards away from persons he claims not to know (like Ms. Johnson-Norman's parents, and siblings), and places he has yet to visit (like Ms. Johnson-Norman's child's daycare). Rog. Br. 1 at 16. He argues he could unwittingly violate the CPO. Mr. Rogers' argument is legally wrong and logically flawed.

The *Ex Post Facto* clause, contained in Article I, Section 9 of the U.S. Constitution, addresses laws passed, as its Latin name suggests, "after the fact." Generally, it bars "any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission." *Collins v. Youngblood*, 497 U.S. 37, 42 (1990). This case, however, does not involve an *ex poste facto* situation. First, although the prior-related proceedings were criminal, *this is not a criminal case* -- the CPO statute and the order in this case are civil in nature.[29] *See Savage v. Scales*, 310 F. Supp. 2d 122, 135 n.10 (D.D.C. 2004) (clause applies to criminal not civil statutes). Second, the CPO does not punish Mr. Rogers for some act that he committed in the past. Instead, the CPO instructs Mr. Rogers prospectively that certain acts in the future will be illegal and punishable.

It seems that Mr. Rogers' argument is more one of impermissible "vagueness" in that he is arguing that the CPO is purportedly too vague to be fairly understood. If Mr. Rogers' argument presupposes that he could be found in criminal contempt based on a vague order, then the argument misapprehends the law of contempt. Violation of a CPO would subject Mr. Rogers

---

[29]  Mr. Rogers seems to recognize this when he states that "the CPO statute does not implicate any punitive provisions." Rog. Br. 2 at 6.

to contempt only for a "knowing" violation.[30] Thus, the contempt risk to a respondent due to lack of understanding of the provision of a CPO is virtually nonexistent. *Cloutterbuck v. Cloutterbuck*, 556 A.2d 1082, 1086 (D.C. 1989). Simply put, if Mr. Rogers knows Ms. Johnson-Norman's spouse, sibling or child, then he must avoid contact; if he does not know them and unwittingly runs into one of them on the street, he is not at risk for contempt.

In any event, it is difficult to see how Mr. Rogers can sustain this vagueness argument based on the following exchange from the CPO hearing:

> The Court:    Mr. Rogers, do you understand each and every part of the order that I'm entering today?
>
> Mr. Rogers:   Yes. R. 160

### 4.    The Medical Conditions were Warranted and are not Prejudicial.

In recognition that psychiatric or substance abuse problems are frequently at the root of intrafamily offenses, the CPO statute expressly authorizes courts to require the CPO respondent "to participate in psychiatric or medical treatment or appropriate counseling programs." D.C. Code § 16-1005(c)(2) (2004). After hearing all of the evidence, Judge Leibovitz ordered a narrowly drawn mental health/substance abuse remedy; she ordered Mr. Rogers to report from jail (within 72 hours of release upon completion of his sentence (in *U.S. v. Rogers I*)) to CSOSA for screening and to follow any recommended treatment. R. 50.

Mr. Rogers argues that there was "absolutely no basis" (Rog. Br. 2 at 18) in this case for such an order -- but the basis was substantial. To begin with, Mr. Rogers had been ordered in the past by the Superior Court, as well as the Air Force (during a period of active duty service), to seek psychiatric treatment as a result of his stalking behavior against Ms. Norman-Johnson. *See* R. 52-54, 362-63. Ms. Johnson-Norman pleaded this fact in her petition (R. 11), specifically

---

30  To establish the elements for contempt, the complainant would have to present evidence proving that Mr. Rogers engaged in "willful disobedience." *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003) (quoting *Thompson v. United States*, 690 A.2d 479, 482 (D.C. 1997)); *see also Bethard v. Dist. of Columbia*, 650 A.2d 651, 653 (1994).

35

requested the medical conditions in her petition (R. 11), and requested them anew at the hearing. R. 162. Mr. Rogers' prior treatment was a matter of public record, and his counsel confirmed at the hearing the trial court's assumption that "since he's been on probation he's received services..." R. 163. Mr. Rogers later argued (on reconsideration) that the prior evaluations resulted in a recommendation of "no treatment" but did not provide any records to substantiate that claim. R. 86.

Even without this history, given the underlying facts of the case, it was reasonable for Judge Leibovitz to find that there was good cause for Mr. Rogers to at least be *screened* for psychiatric problems and substance abuse. Here is a man who was ordered by courts in *two* jurisdictions on at least five different occasions between 2000 and 2001, to leave Ms. Johnson-Norman alone (and was jailed for violating one of those orders), and he continued to stalk her anyway. Given the existence of these orders and Mr. Rogers' awareness of the consequences of violating them, it was not unreasonable for the trial court to conclude that he *might* be clinically obsessed or suffer from some other impairment. In its reconsideration opinion, the trial court succinctly summarized the point: "the evidence of respondent's repeated, obsessive, distressing contacts with petitioner in the face of a court order supported the court's conclusion that respondent may need mental health and/or substance abuse treatment..." R. 90. The documentary evidence also supported the court's conclusion. The language in the letters Mr. Rogers sent to Ms. Johnson-Norman is, at times, chilling -- in the words of the trial court "extremely repetitive excoriations of Ms. Johnson-Norman" (R. 154) that included thinly-veiled threats involving violence, sexual assault, and retaliation. R. 155-58. As Judge Leibovitz concluded: "the letters themselves are obsessive." R. 156. Finally, the judge had an opportunity to assess Mr. Rogers' demeanor and behavior during five days of proceedings, including when he testified for most of a day in the criminal trial.

In *Cruz-Foster*, this Court remanded to the lower court the denial of a CPO extension precisely because the trial court had *failed* to take into account the "entire mosaic" of the petitioner's and respondent's history. *Cruz-Foster* 597 A.2d 929. Based on the "entire mosaic"

36

in this case, Judge Leibovitz found that the medical condition "requests are reasonable," and she had an ample basis to order screening and treatment, if warranted. R. 165. As *Cruz-Foster* teaches, the ultimate object of the CPO was protection of Ms. Johnson-Norman. *Id.* If the root cause of this years-long course of harassing behavior was a medical condition, then screening and treatment might lead to permanent cessation of the stalking behavior long after the expiration of the trial court's other proscriptions. If, on the other hand, screening revealed no problems, then no treatment would have been required and Mr. Rogers would merely have been subjected to a few hours of medical evaluation at government expense.

### 5.    The Second Amendment Does Not Apply to Private Gun Ownership

Mr. Rogers' claim that the CPO provision stating that he may not possess a firearm during the length of the CPO violates his "Second Amendment rights" fails because this Court agrees "with numerous other courts that 'the Second Amendment guarantees a collective rather than an individual right.'" *Sandidge v. United States*, 520 A.2d 1057, 1058 (D.C. 1987). Simply put, the Second Amendment protects the rights of a "militia" and, in modern cases, has been ruled to implicate only today's "militia" -- the National Guards of the several states and the District of Columbia and not private gun ownership. *Id.* Moreover, as expressly noted in the CPO, the firearms condition is merely a logical and compulsory application of a federal statute – 18 U.S.C. § 922(g)(8) (2000) – which proscribes anyone found to have committed an intrafamily offense from owning a firearm during the period he or she is subject to the protective order. In general, the federal firearms statute has routinely withstood Second Amendment challenge. *E.g. United States v. Johnson*, 497 F2d 548, 550 (4th Cir. 1974). Mr. Rogers' quarrel with the firearms condition is baseless.

### E.    The TPO was Properly Granted and Extended

Mr. Rogers' argues that the trial court improperly issued and extended the TPO in violation of D.C. Code § 16-1004(d). But, as Mr. Rogers correctly notes elsewhere, D.C. Code

§ 16-1004(d) applies only to "*ex parte*" TPO proceedings. D.C. Code §16-1004(d) authorizes the trial court to issue a 14-day temporary order *ex parte* so long as the *adversarial* hearing for a protective order is commenced before the expiration of the temporary order. But the TPO in this case was not issued *ex parte* -- Mr. Rogers was present in court on August 1, 2003 when the TPO was granted. R. 1, 15. Thus, § 16-1004 does not apply.[31]

Mr. Rogers asserts that the "affidavit of service" showing that he was present in the courtroom when the TPO was issued "only two hours" after the petition was filed is "false" and "inherently incredible" (R. 117, Rog. Br. 1 At 17). But he cites no evidence on the matter and the record belies this revisionist history; Mr. Rogers was in the Moultrie Courthouse on August 1, 2003 for a status hearing in *U.S. Rogers II* and present in Courtroom 103 during the civil proceeding. R. 1, 15, 57.

Mr. Rogers' argument also fails because he *consented to the TPO extension*. The record shows that Mr. Rogers consented to the extension of the TPO from August 1, 2003 to at least October 20, 2003, the original date of his criminal stalking trial. Specifically, the jacket entry for IF 2497-03 on August 1, 2003 indicates: "*TPO is extended by consent until Oct. 20th, 2003 at 9:00 am.*" R. 1 (emphasis added). And nothing in the record suggests that Mr. Rogers objected to the second extension from October 20 to November 3. In any event, Mr. Rogers' apparent argument (Rog. Br. 1 at 17) that any defect in the validity of the *TPO* somehow invalidates the (later) issuance of the *CPO* is nowhere supported in the statute.[32] Thus, even if the TPO was somehow improperly granted or extended, it does not impact the issuance of the CPO.

---

31   Nothing in D.C. Code § 16-1004 suggests the trial court cannot extend the 14 day order after a hearing *at which both parties are present* is, in the words of the statute, "commenced" -- to bridge the gap between the time the hearing on the CPO is "commenced" and *concluded*. Common sense suggests this procedure is permissible -- where an initial CPO hearing is held within 14 days of the initial *ex parte* temporary order (which would typically issue at or near the time of the petition), the parties might need a continuance to further prepare their case. The court might reasonably determine, even over objection, that a further interim order is appropriate and such an order would no longer be "*ex parte*" because the Respondent would necessarily be present at the hearing when it is issued. But these facts are not present here.

32   The temporal language in D.C. Code Section 16-1004 speaks only to the circumstances under which a 14 day *ex parte* order can issue -- it does not follow that a defect in a TPO invalidates a subsequent CPO that is otherwise validly issued.

38

Finally, had there been any error in the extension of the TPO, it was harmless, and now moot. Notably, by the time the first TPO was issued, and during all the relevant time thereafter, Mr. Rogers' probation in *U.S. v. Rogers I* had been revoked, and he had been re-sentenced to incarceration. Also, he had been ordered by the Superior Court just ten days before (in *U.S. v. Rogers II*) to "stay away" from Ms. Johnson-Norman. R. 69. Mr. Rogers does not argue that the TPO restrictions had any material impact beyond restrictions already imposed by his arraignment and sentencing orders in *U.S. v. Rogers I* (R. 89) plus the release conditions in *U.S. v. Rogers II*.

### F.    In the Absence of New Evidence or Authority, the Trial Court's Denial of Reconsideration Was Well Within Its Discretion

Mr. Rogers' November 23, 2003 letter presented no colorable basis for the trial court to reconsider the CPO. A "motion for reconsideration," is typically regarded as either a motion to alter or amend a judgment under SCR 59 or for relief from the judgment under SCR 60(b). *Wallace v. Warehouse Employees Union No. 730*, 482 A.2d 801, 803-04 (D.C. 1984).[33] In the case of the former, the request seeks correction of a ruling of law; in the latter, relief is sought based on, *inter alia*, mistake or newly discovered information. *Id.* Mr. Rogers' motion did not specify on which grounds he was moving. Instead, he advised the trial court that he was "perplexed and bothered" (R. 85) and accused the trial court of "bias and caprice." R. 87.[34] The trial court treated his letter as a Rule 59 Motion. R. 88. This holding was correct because Mr. Rogers presented no newly discovered information or mistake. The trial court noted that the motion was untimely because it was filed after the deadline (ten days after judgment). R. 91; SCR 59(e). The trial court also correctly observed that the motion failed to establish an error of law (or mistake or newly discovered material). Rather, Mr. Rogers mostly stated why he

---

33   SCR 59 and 60 are both expressly incorporated into the Superior Court Domestic Violence Rules applicable in Intra-family Matters. See SCR-DV 1.

34   Also, he copied, among others, the Chief Judge of this Court, the National Rifle Association, the "Civil Liberties Union," a D.C. Council Member, the Chief Judge of the Superior Court, and several Committees of Congress.

39

disagreed with the trial court's ruling -- arguing, without citation, jurisdictional and Constitutional issues all of which are presented here. Those arguments were as groundless then as they are now.

This Court reviews the lower court's disposition of such a motion for "abuse of discretion" (*Wallace,* 482 A.2d at 810) and reversal is rarely appropriate. *Id.* at 804. *Perry v. Sera,* 623 A.2d 1210, 1217-18 (D.C. 1993) (standard of review for denial of reconsideration under 59 is for abuse and trial court does not abuse its discretion when it refuses to review its own decision *de novo*). Review is particularly narrow where, as here, the motion was untimely. *Fleming v. District of Columbia,* 633 A.2d 846, 848-9 (D.C. 1993) ("where a motion for reconsideration is untimely...the denial of such a motion is not an appealable order.") For all of the reasons discussed *supra,* the trial court's denial of reconsideration was not an abuse of discretion.

## V.    CONCLUSION

The criminal case jury found that Mr. Rogers was "not guilty" only after weighing the evidence against the weighty "beyond a reasonable doubt" standard. In the CPO proceeding, Judge Leibovitz weighed the evidence against a lower burden of proof. Mr. Rogers may feel that the *result* was incorrect, but arguments that the *process* was unjust simply do not rest on accurate factual premises or correct interpretations of the law, and therefore cannot be sustained. Jurisdiction below was unquestionably proper. In conducting the proceedings, the trial court admirably balanced the rights and needs of both parties along with the public's need for the timely and efficient administration of justice. The remedies contained in the CPO were fair and appropriate under the circumstances. Mr. Rogers can demand no more from the system and the judgments of the trial court should in all respects be affirmed.

40

Respectfully submitted,

P. Todd Mullins (Bar No. 429539)
Rachel L. Strong
Sean P. Beaty
HOWREY, SIMON, ARNOLD & WHITE LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 383-7053

Attorneys for
Appellee Ms. Karen Johnson-Norman

Dated: January 27, 2005

41