SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION

- - - - - - - - - - - - - - x
                :
UNITED STATES OF AMERICA    :
                :
      v.         :   Case No. M9709-00
                :
VIRGIL RODGERS,      :
                :
    Defendant.    :
- - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, January 17, 2001

The above entitled action came on for a trial before the HONORABLE JOHN R. HESS, JUDGE, in Courtroom Number 201.

APPEARANCES:

On Behalf of the Government:

DIANE LUCAS, Esquire

On Behalf of the Defendant:

BRIAN McDANIEL, Esquire

*Deposition Services, Inc.*

6245 Executive Boulevard
Rockville, MD 20852

2300 M Street, N.W.
Suite 800

# TABLE OF CONTENTS

|  | | | | Page |
|---|---|---|---|---|
| Renewal of motion for judgment of acquittal | | | | 263 |

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **GOVERNMENT'S WITNESSES** | | | | |
| Karen Johnson-Norman | | | | |
| (By Ms. Lucas) | 88 | | | |
| (By Mr. McDaniel) | | 95 | | |
| (By Ms. Lucas) | | | 154 | |
| (By Mr. McDaniel) | | | | 172 |
| John Zangas | | | | |
| (By Ms. Lucas) | 205 | | | |
| Mary Kirby | | | | |
| (By Ms. Lucas) | 214 | | | |
| (By Mr. McDaniel) | | 218 | | |
| Stephan Allen | | | | |
| (By Ms. Lucas) | 219 | | | |
| (By Mr. McDaniel) | | 222 | | |
| Ralph Durant | | | | |
| (By Ms. Lucas) | 227 | | | |
| (By Mr. McDaniel) | | 230 | | |
| (By Ms. Lucas) | | | 235 | |
| **DEFENDANT'S WITNESSES** | | | | |
| Percy Norman | | | | |
| (By Mr. McDaniel) | 237 | | | |
| (By Ms. Lucas) | | 259 | | |

FORM FED ® PENGAD · 1-800-631-0989

taf

1                    P R O C E E D I N G S

2              (Portions of the following proceedings were

3    indiscernible as indicated in the transcript.)

4              DEPUTY CLERK: This is the matter of the United

5    States v. Virgil Rodgers, M9709-00.

6              MS. LUCAS: Good morning, Your Honor, Diane Lucas

7    appearing on behalf of the United States.

8              MS. McDANIEL: Good morning, Your Honor, Brian

9    McDaniel on behalf of Mr. Rodgers who's present.

10             MR. RODGERS: Good morning, Your Honor.

11             THE COURT: Good morning everyone.  You all may have

12   a seat.  Are we ready for the complaining witness?

13             MS. LUCAS: She's right outside.  I can bring her

14   in.

15             THE COURT: All right.  Recalling Ms. Karen Johnson-

16   Norman.  I'm going to remind you you're still under oath, Ms.

17   Norman.  You may have a seat.

18                    KAREN JOHNSON-NORMAN,

19   having been previously duly sworn, testified further as

20   follows:

21             MS. LUCAS: Your Honor, at this time I'd like to

22   play the videotape that had been admitted and stipulated into

23   evidence by defense counsel.

24             MR. McDANIEL: Very well.

25             THE COURT: All right.

26             MS. LUCAS: Which is marked for identification

27   purposes as Exhibit 3 I believe.

taf

1                    (Thereupon, a videotape, is played.)

2            THE COURT: Can you see that?

3            MR. McDANIEL: Not really.

4            DEPUTY CLERK: Please come up here.

5            MR. McDANIEL: Thank you.

6                         DIRECT EXAMINATION

7            BY MS. LUCAS:

8        Q    There are two cars that are (indiscernible) video.

9    Could you tell me which if either one of the two cars was

10   your vehicle.

11       A    My vehicle was the car to the right.

12           MR. McDANIEL: Your Honor, we will take our seats.

13   That was the end of the tape.  Are you done with the tape?

14           MS. LUCAS: Yes.

15           THE COURT: Very well.

16           MS. LUCAS: Okay.

17           BY MS. LUCAS:

18       Q    Do you recognize anybody that was in the video?

19       A    I absolutely do.

20       Q    And who do you recognize?

21       A    The defendant, Virgil Rodgers, was the person in

22   that tape.

23       Q    And was there actually two different people who you

24   described which are the two people in that videotape with Mr.

25   Rodgers?

26       A    Yes, the first person depicted in the tape with the

27   blue jeans on and the white t-shirt was the defendant, Virgil

88

taf

1    Rodgers.

2        Q    All right.  I know that you --

3            THE COURT: Do you want to play that back again.  I

4    thought you were looking for something else.

5            MR. McDANIEL: Your Honor, we didn't object to the

6    tape and we still don't object to the tape and we would

7    stipulate to the fact that Mr. Rodgers was at the Kinko's.

8            THE COURT: Oh.  Where was he there, I saw a couple

9    of individuals.

10            MS. LUCAS: There were two individuals.

11            THE COURT: Yes.

12            MS. LUCAS: He's the one in the white t-shirt and --

13            THE WITNESS: And the blue jeans.

14            THE COURT: Are you playing that back?

15            BY MS. LUCAS:

16        Q    I would ask you if this over a course of time?

17        A    Yes, it is.

18        Q    And does the tape itself correspond with the time

19    in which the defendant was visible in the camera,

20    approximately a 20 minute period of time?

21        A    Correct.

22            MR. McDANIEL: I'm sorry, how is it that she

23    determines that?

24            THE WITNESS: Because I viewed the tape in full and

25    I'm the one who itemized exactly the frames and the times

26    that the defendant actually appeared on the tape.

27            MS. LUCAS: This is the condensed version of the

89

taf

1    tape we talked about yesterday and defense counsel indicated

2    he would go with the short version rather than the entire

3    half an hour period of time (indiscernible).

4            MR. McDANIEL: As we stated, you know, I don't have

5    a problem with the admission of this tape.  The tape depicts

6    my client as being at the Kinko's and we stipulate to the

7    fact that he was at the Kinko's.

8            THE COURT: You want to play that back please.

9            MS. LUCAS: Yes.  I would like to ask the witness

10   one more question which is --

11           BY MS. LUCAS:

12       Q    This is over a period of time, is that correct?

13       A    That is correct

14           (Thereupon, the videotape was replayed.)

15           MS. LUCAS: The first time shown is 1802 hours.

16           THE COURT: Who is that individual?

17           THE WITNESS: That is the defendant, Virgil Rodgers.

18           THE COURT: And he was coming in the door at Kinko's

19   and now he's inside, is that it?

20           THE WITNESS: That's correct.  That's him peering

21   out the front window looking in the direction of my car.

22           BY MS. LUCAS:

23       Q    That's at 1818 hours.

24       A    That's him going towards the window, that's him

25   leaving the window, my car is immediately to the right where

26   he is approaching the rear of, right there.  That is my car

27   and coming to the right if you can see a blur right there I

90

taf

1    get in my car.  Yesterday if you, he disappears because

2    yesterday I testified to the fact right there, right there

3    that he bent down and put his face very close to my window

4    while I had locked the door and while I had called the 9-1-1

5    operator.

6            THE COURT: I think the question was asked of you

7    from the time we first saw him in this video to the time he

8    left how much time elapsed?

9            THE WITNESS: It happened so quickly I'd have to

10   just look at the frames.

11           THE COURT: What was that 20 minute period that

12   somebody was talking about?

13           THE WITNESS: That's from the time that he entered

14   Kinko's, Your Honor, from the time that he left Kinko's to

15   approach me.

16           THE COURT: That was my question.

17           THE WITNESS: In other words --

18           THE COURT: Twenty minutes, okay.

19           MS. LUCAS: Approximately 20 minutes the end of this

20   is about 8:24, 8:25.

21           THE COURT: Okay, thank you.

22           BY MS. LUCAS:

23   Q    Ms. Johnson-Norman, when was it that you filed or

24   made an initial complaint about the defendant stalking you?

25   A    June 16th of the year 2000.

26           MR. McDANIEL: Objection.

27           MS. LUCAS: This is about her actions.

91

taf

1          MR. McDANIEL: Objection overruled.

2          BY MS. LUCAS:

3     Q    June 16th?

4     A    Of the year 2000.

5          THE COURT: That's when you first made a complaint

6     about him stalking you, is that the question, your answer?

7          MS. LUCAS: Yes.

8          THE COURT: Okay.

9          BY MS. LUCAS:

10    Q    And your husband and you did not separate until

11    what time in July?

12    A    It was around the July, 4th of July weekend.  My

13    first complaint was a temporary peace order that I obtained

14    from the district court of Maryland on June the 16th, and

15    that expanded until July the 26th.  It initially was for a 10

16    day period from June 16th to June the 26th at which time the

17    defendant and I went to court on June 26th.  On the day

18    before the hearing I met with defendant and he and I agreed

19    halfheartedly, but he agreed that we would go to mediation

20    and I would not at that point have to do anything else in

21    terms of contacting his supervisor or pressing to get a full

22    peace order.  That was the day before the trial on the 25th.

23    The 26th we went to court, I went before Judge Brown, the

24    defendant appeared before Judge Brown, we both, I asked for a

25    mediation because I didn't want to get up here and have to be

26    embarrassed to, to air my dirty laundry to the extent that I

27    have to do it now.  And on top of that defendant's roommate

taf

1    had called me and asked me not to press charges.

2              MR. McDANIEL: Objection.

3              THE COURT: Sustained.  Ms. Lucas.

4              BY MS. LUCAS:

5        Q    After the 26th did you go through mediation with

6    the defendant in Maryland?

7        A    No, I did not.  On the --

8        Q    And why not?

9        A    On the 26th of June we went to court and I asked

10   for Judge Brown to extend the peace order for an additional

11   30 days so it extended from June the 26th to July the 26th, I

12   asked for mediation, the judge, I had already contacted a

13   couple of companies who we could actually go through the

14   mediation with, I decided for an Anne Arundel County because

15   it was in Columbia and it was away from Washington and it was

16   in Maryland where we both lived.  I told Virgil Rodgers that

17   I would have it set up with the court and that the court

18   would contact him to tell him what the date of mediation

19   would be, because as of June the 26th I did not have a day

20   scheduled.

21       Q    You made then a complaint, further complaint after

22   that time, is that correct?

23       A    Unfortunately, that's correct.

24       Q    And you contacted the defendant's supervisor at

25   work, is that correct?

26       A    In addition to filing another, a petition for

27   contempt after the June 26th date.

93

taf

1      Q   And when did you contact his employment?

2      A   I don't know the specific date, but it was in June.

3  I was at my wit's end because I had been repeatedly contacted

4  even after June 26th.

5         MR. McDANIEL: Objection.

6         THE COURT: Excuse me.  You've answered the

7  question.

8         THE WITNESS: It was sometime in June.  I went to

9  the JAG office down Bowling Air Force base.

10        THE COURT: Just wait for the questions.

11        THE WITNESS: Sorry.

12        BY MS. LUCAS:

13      Q   When did your husband find out about the problems

14  you were having with the defendant at that time?

15      A   Oh, he's, he's, he knew before then.  I had an

16  incident way back in '99, I had several incidents way before

17  then.

18      Q   With regards to your separation that wasn't until

19  July I take it?

20      A   Yes.  It was the beginning of July, it was over --

21        THE COURT: We went over this yesterday.

22        THE WITNESS: Okay.

23        MS. LUCAS: Thank you.  I don't have any further

24  questions of this witness, Your Honor.

25        THE COURT: Okay, thanks.

26        MR. McDANIEL: May it please the Court.

27                     CROSS EXAMINATION

taf

1          BY MR. McDANIEL:

2     Q    Good afternoon, Ms. Norman-Johnson.

3     A    Good afternoon.

4     Q    Your husband did not know about the entire nature

5     of your relationship with Mr. Rodgers until August, isn't

6     that correct?

7     A    I did not tell him myself until that time.

8     Q    Okay.  Well, then as far as you know your husband

9     did not know about the true nature of your relationship with

10    Mr. Rodgers until August of 2000, is that correct?

11    A    No, that's not correct.

12    Q    Okay.  What is it that you understood --

13         THE COURT: I'm sorry.  Did you say that's not

14    correct?

15         THE WITNESS: No, that's not correct.  My husband

16    told me that he knew without me having to tell him.

17         BY MR. McDANIEL:

18    Q    Okay.  When did he tell you this?

19    A    He's, he's eluded to the fact many times.  I just

20    denied it.

21    Q    And so he didn't know for sure that you were in any

22    sexual relationship with Mr. Rodgers until August of 2000, he

23    just --

24    A    That's --

25    Q    -- suspected that, correct?

26    A    That's correct.

27    Q    Okay.  And, in fact, he had these suspicions of you

95

taf

1    since 1999, correct?

2        A    I would say so, yes.

3        Q    Early part of 1999 or the latter?

4        A    I would say so, yes.

5        Q    And so at some point in time in early 1999 he asks

6    you what your relationship with this individual is, Virgil

7    Rodgers, correct?

8        A    That's correct.

9            MS. LUCAS: I'm going to object as far as relevance.

10            MR. McDANIEL: It goes every bit to the motivation

11    of Ms. Norman-Johnson --

12            THE WITNESS: It's Johnson-Norman.

13            MR. McDANIEL: Johnson-Norman in filing these

14    charges and, above and beyond that, Your Honor, she's

15    testified as to certain communications that she made to her

16    husband on direct examination which would open it up at least

17    for some perusal on cross examination.

18            THE COURT: Would counsel come to the bench.  Want

19    to step down there for a minute.

20            THE WITNESS: Sure.

21            (Bench conference with Mr. McDaniel and Ms. Lucas)

22            THE COURT: I just want to recall your opening

23    statements.  You're saying that they had this relationship

24    while she was married and that the complainant now is making

25    these charges against the defendant to --

26            (This portion of the tape was indiscernible.)

27            MR. McDANIEL: Allegations in 1999, Your Honor, in

96

taf

1    an attempt to explain who Mr. Rodgers was, that they took her

2    relationship with Mr. Rodgers was to her husband's

3    satisfaction and she was alleging an affair, but he was

4    stalking her.  She made this allegation to her husband in an

5    attempt to (indiscernible) 1999, the early part of 1999 until

6    today which in essence is the same allegation that

7    (indiscernible).

8             THE COURT: All right.

9             (This portion of the tape was indiscernible.)

10            THE COURT: I prohibited you from doing it in your

11   case in chief, and I said that they may very well open it up,

12   and I caution Mr. McDaniel that you might very well be

13   opening this up.

14            (This portion of the tape was indiscernible.)

15            THE COURT: All I'm suggesting is if you go into

16   this that's your defense that she is making up the stalkings

17   to cover up her elicit relationship that you might very well

18   be opening it up for the Government to come back and explain

19   circumstances prior to the date set forth in this

20   information.

21            MR. McDANIEL: Again, I can understand what Your

22   Honor's cautioning, but I would caution that counsel is fully

23   aware of the possibility of opening up the door.

24            THE COURT: Okay.

25            MR. McDANIEL: I mean I would proffer to the Court

26   that the mere asking a question of the witness who would

27   testify to certain things on direct examination does not

97

taf

1  necessarily open up the door to actions of the defendant.

2       THE COURT: Okay. I'm not ruling on it, I'm just

3  saying it could very well happen.

4       MR. McDANIEL: Certainly.

5       (This portion of the tape was indiscernible.)

6       THE COURT: I think he has a right to go into her

7  motivation, and her motivation being perhaps that none of

8  this ever happened and she's making it up. You may come

9  back.

10      (Open court)

11      THE COURT: You may proceed. Objection's overruled.

12      BY MR. McDANIEL:

13  Q    Ma'am, do you recall my last question?

14  A    I do not. Can you please repeat it.

15  Q    And I don't recall it verbatim myself, but I'll see

16  if I can't rephrase it. In early 1999 your husband had asked

17  you certain questions about the nature of your relationship

18  with Mr. Virgil Rodgers, isn't that correct?

19  A    I'd say about half, half of '99, by June '99.

20  Q    By June of 1999?

21  A    Yes.

22  Q    And that was because there were certain things that

23  were indicating to him that you may have been having a

24  relationship with another individual, is that right?

25  A    I assume so.

26  Q    Okay. And when he asked you originally about Mr.

27  Rodgers did you deny or admit to the fact that you and Mr.

98

taf

1    Rodgers had a relationship?

2        A    No, I denied it.

3        Q    Okay.  And you denied it at that time and continued

4    to see Mr. Rodgers, correct?

5        A    That is correct.

6        Q    Okay.  And at some point in time your husband

7    continued to have problems with your whereabouts or for

8    whatever reason believed that you were having another

9    relationship, correct?

10       A    I would assume so, yes.

11       Q    Okay.  And he asked you again about the nature of

12    this relationship with Mr. Rodgers, isn't that correct?

13        MS. LUCAS: I would object as to what time frame he

14    was referring to.

15        BY MR. McDANIEL:

16       Q    Let's talk about late 1999.  November of 1999.

17       A    November of 1999 there was a confrontation between

18    my husband, yes.

19       Q    That's right.  And at that point in time you were

20    still seeing Mr. Rodgers, correct?

21       A    It was very sporadic, and at that point about,

22    about three or four weeks or so before I really can't

23    remember the exact time the defendant and I had a falling out

24    as we had had so many times before.

25       Q    Okay.

26       A    The defendant took, came to my subdivision

27    uninvited.

99

taf

1          THE COURT: I think you've answered the question,

2    miss.

3          THE WITNESS: Okay.

4          BY MR. McDANIEL:

5      Q    Well, after November of 1999 you resumed your

6    intimate relationship with Mr. Rodgers, correct?

7      A    Yes, I'd say back in March.

8      Q    Okay.  But at some point in time in explaining who

9    Mr. Rodgers was to your husband you explained to your husband

10   that Mr. Rodgers was stalking you, isn't that right?

11     A    I don't know if I used those terms, yes, you're

12   right, I did, because I had actually filed peace orders prior

13   to that time too, so yes.

14     Q    Okay.  And your husband in wanting to believe you

15   and wanting to believe that you weren't having this type of

16   relationship with Mr. Rodgers believed that he was, in fact,

17   stalking you, is that right?

18          MS. LUCAS: Objection, speculation as to what was in

19   the mind of the husband.

20          THE COURT: Sustained.

21          BY MR. McDANIEL:

22     Q    Well, let me ask you this, when was the first time

23   you told your husband, if you recall, that Mr. Rodgers was

24   around you because he was stalking you?

25     A    I, I absolutely don't recall.

26     Q    Would it be some time close to the November 1999

27   date?

100

taf

1      A    Well, I filed for a restraining order against him

2    in November, it was November the 1st of '99 I filed because

3    he actually physically came and grabbed my cell phone out of

4    my hand.

5                MR. McDANIEL: Objection, Your Honor, to the --

6                THE WITNESS: I filed, that's the question.

7                THE COURT: The question is when.

8                MR. McDANIEL: When, correct.

9                THE WITNESS: Okay.  The, the answer is about the

10    first time, maybe not even the first time, but one of the

11    times was November.

12                BY MR. McDANIEL:

13      Q    Okay.  And you then saw Mr. Rodgers from I think

14    the November 1999 date until, based upon your testimony,

15    April or March of 2000, correct?

16                MS. LUCAS: Objection.  That's not what she

17    testified to.

18                THE WITNESS: Thank you.

19                THE COURT: He's asking her.

20                BY MR. McDANIEL:

21      Q    Well, you can give me --

22      A    No.  That is not what I testified to yesterday.

23      Q    When did you stop seeing Mr. Rodgers?

24      A    I testified yesterday and I testified again today

25    that he and our, he and my relationship was extremely

26    sporadic.  There was a six week period of time --

27      Q    Ma'am, I understand it was sporadic.  When was the

101

taf

1    last time that you were with Mr. Rodgers intimately?

2        A    You know, I really don't remember.  Yesterday I

3    testified it's April or May.

4        Q    Okay so April or May?

5        A    March, April or, or, you know, I really don't

6    remember.

7        Q    March, April or May of last year.

8        A    I think it was April or May.

9        Q    Okay.  So it could have been as late as May of

10   2000, correct?

11       A    At the very best it could have been the beginning

12   of April because I filed based on incidents that happened

13   April 25th.

14       Q    Ma'am, you just said either April --

15           MS. LUCAS: Objection.  Counsel's not allowing the

16   witness time to finish her answer.

17           MR. McDANIEL: Your Honor, she's gone through April

18   to May to the beginning of April.

19           THE WITNESS: I didn't say the beginning of April,

20   counsel.

21

22           THE COURT: Just (indiscernible).  Just listen to

23   the question and answer it, and please don't volunteer.

24           THE WITNESS: Thank you.

25           BY MR. McDANIEL:

26       Q    Okay.  So either April, either March, April or May

27   was the last time that you were intimate with Mr. Rodgers,

taf

1    correct?

2        A    My answer was yes.

3        Q    Okay.  And the first time you explained that you

4    recall explaining Mr. Rodgers away to your husband by

5    explaining to him that he was stalking you was in November of

6    1999, correct?

7            MS. LUCAS: Objection, asked and answered.

8            MR. McDANIEL: Just so I can get this time frame

9    down, Your Honor.

10           THE COURT: All right.  She may answer.

11           BY MR. McDANIEL:

12       Q    November of 1999.

13       A    That's one of the times, I don't remember when was

14   the first or the last.

15       Q    And that's right, because you've made that

16   allegation on more than one occasion, isn't that right?

17       A    Yeah.  I, I made it when it was accurate.

18       Q    Okay.  So you said the first time which indicates

19   to me that there's more than one time that you've made the

20   allegation to your husband that Mr. Rodgers was stalking you.

21       A    Yes, February of 2000.

22       Q    Okay.  And so are those the only two times that

23   your husband, well, that you explained to your husband that

24   Mr. Rodgers was around you because he was stalking you?

25       A    That I can readily recall right now, yes.

26       Q    Okay.  And if I asked your husband those same

27   questions he's going to say that you told him two times,

taf

1    correct?

2         A    Feel free to.

3         Q    Is that what your understanding is?

4         A    I can't tell you what he's gonna answer to.

5              THE COURT: (Indiscernible) understand February 2000

6    you also told your husband that the defendant was stalking

7    you, but he in fact was not --

8              THE WITNESS: That he came around uninvited --

9              THE COURT: -- is that what you're saying?

10             THE WITNESS: -- Your Honor.  That he came around

11   uninvited.  I don't know if I used the word stalking.

12             BY MR. McDANIEL:

13        Q    No, you know, Ms. Norman-Johnson, you did say you

14   used the word stalking.  You just said that 10 minutes ago.

15   Let me ask you a question.

16        A    I would be more than happy to show you the

17   pleadings that I filed.

18        Q    No.  Ma'am, I'm talking about the conversation that

19   you had with your husband, how you explained away Mr.

20   Rodgers.

21        A    Explained away?

22        Q    Explained away.  Mr. Rodgers --

23             MS. LUCAS: Objection, that is not -- counsel is

24   asking multiple questions and not giving the witness

25   sufficient time to answer each question.

26             THE COURT: All right.

27             MR. McDANIEL: I'll allow Your Honor --

taf

1          THE COURT: Just one second.  Again, please listen

2   carefully to his questions.

3          THE WITNESS: Sure.

4          THE COURT: Answer that question and please don't

5   volunteer.

6          THE WITNESS: Okay, Your Honor.

7          THE COURT: Go ahead.

8          MR. McDANIEL: Thank you, Your Honor.

9          BY MR. McDANIEL:

10     Q    Let's go back.  Now it's your testimony that you

11   don't recall if, in fact, you explained to your husband or

12   used the word stalking to your husband, is that correct?

13          MS. LUCAS: I'm going to object to his use of the

14   word explain.  What is he talking about the word explaining.

15          MR. McDANIEL: Used the word stalking.

16          THE COURT: Overruled.  Go ahead.

17          BY MR. McDANIEL:

18     Q    Do you not recall using the word stalking now or is

19   it that you used it once in November of 1999 and again in

20   February of 2000 or do you just not recall using the word at

21   all, which one is it?

22     A    I believe that I used the word stalking.

23     Q    Okay.  And you believe that you used it for the

24   first time, for the first time in November of 1999, correct?

25          MS. LUCAS: Objection.

26          THE COURT: What's the grounds of the objection?

27          MS. LUCAS: He is misrepresenting her testimony.

105

taf

1    She said she did not know whether it was the first time that

2    she used the word stalking to her husband, it may have been,

3    there may have been a time before that.  She's already --

4            THE COURT: That's what he's --

5            MR. McDANIEL: That's fine.

6            THE COURT: That's what he's trying to nail down.

7            MR. McDANIEL: Right.

8            BY MR. McDANIEL:

9       Q    So there actually may have been a time before

10   November of 1999 that you told your husband that Mr. Rodgers

11   was stalking you, correct?

12      A    Actually, I think it was after that time.

13      Q    Okay.  So based upon what you recall right here

14   today the first time you recall using the word stalking in

15   explaining Mr. Rodgers to your husband was in November of

16   1999?

17      A    Yes.

18      Q    Okay.  That was the first time.  When is it, based

19   upon your recollection, that you used the word stalking in

20   explaining Mr. Rodgers to your husband for the second time?

21      A    I think again, and I'll repeat what I previously

22   answered, I said that I think it's February.

23      Q    Okay.  Okay.

24      A    And this is February 2000.

25      Q    Right.  And did you at any point in time after

26   February 2000 explain to your husband that Mr. Rodgers was

27   around because he was stalking you?

106

taf

1    A    Is the question since February 2000?

2    Q    Since February 2000.

3    A    I, I'm sure that I have because I filed again June

4    the 16th for a temporary restraining order.

5    Q    Okay.  But in February 2000 you explained to your

6    husband that Mr. Rodgers was around because he's stalking you

7    does he not at this point have a heightened sensitivity to

8    Mr. Rodgers either being around or you not being available at

9    certain times?

10        MS. LUCAS: Objection.

11        THE WITNESS: How do I answer that?

12        BY MR. McDANIEL:

13    Q    I mean based upon what you recall.

14    A    I can't answer that.

15        MS. LUCAS: Objection, that's a totally

16        THE WITNESS: That's a question that you'd have to

17    ask him.

18        THE COURT: Excuse me.  Just one second.  Sustained.

19    She would not know what's going through his mind.

20        MR. McDANIEL: I'll rephrase the question.

21        BY MR. McDANIEL:

22    Q    Between February 2000 and April, the beginning of

23    May of 2000, okay, did your husband at any point in time

24    question you about either your whereabouts or your

25    relationship with Mr. Rodgers?

26    A    I can't remember.  I'm sure, but I can't remember

27    any specifics.

107

taf

1    Q    And if you are sure you can't recall if you did

2    have a conversation with him or not about that, correct?

3    A    I, I mean I live in the same house with him, I'm

4    sure at some point we had a conversation.

5    Q    Right.  And when faced with the allegation of

6    either Mr. Rodgers being with you or you being around Mr.

7    Rodgers do you anticipate that you might have used the same

8    excuse that you had used in November of 1999 and February of

9    2000?

10    MS. LUCAS: I'm going to object to counsel using the

11    word excuse to portray the issue of the stalking, that she

12    told her husband this as an excuse.

13    MR. McDANIEL: The excuse is for --

14    THE COURT: She said the reason she did it was to

15    explain away his presence.

16    THE WITNESS: That's not what I said, Your Honor.

17    THE COURT: Isn't it?

18    THE WITNESS: No, it's not.  I said --

19    THE COURT: I thought you said in November of '99,

20    February of 2000 that your husband was asking you about

21    having spent some time with other individuals perhaps Mr.

22    Rodgers --

23    THE WITNESS: May I respond?

24    THE COURT: and that you explained the reason you're

25    around this individual is because the individual was stalking

26    you.

27    THE WITNESS: Your Honor --

108

taf

1    THE COURT: Did I misunderstand you on that?

2    THE WITNESS: Completely.

3    MS. LUCAS: Yes, I think you did.

4    MR. McDANIEL: That's my understanding, Your Honor.

5    THE WITNESS: Completely, Your Honor.

6    THE COURT: Let's straighten me out then.

7    THE WITNESS: Your Honor, at those times that I just

8    mentioned the defendant and I had a broken relationship that

9    resulted in physical confrontations between he and I in which

10   he snatched my cell phone from my hand --

11   THE COURT: No.

12   THE WITNESS: -- he came over uninvited, I filed

13   charges --

14   THE COURT: I don't want to go into all of these

15   details.  I just want to know these conversations and why you

16   told him that, if you told him that.

17   THE WITNESS: I never told him that he was around

18   because he was stalking me.  I told him he stalked me when he

19   physically and actually stalked me.  I didn't have to explain

20   away anything.  He knew that I had a relationship with Virgil

21   Rodgers.  I don't have to explain anything.  It's a little

22   obvious.  You're, you're acting as though I'm looking for an

23   excuse.  I don't need an excuse, I, I had a relationship with

24   him.

25   BY MR. McDANIEL:

26   Q    So why didn't you just tell your husband at that

27   time that you were having a sexual relationship with Mr.

109

taf

1  Rodgers?

2      A    Because I didn't want to.

3      Q    Right, because you were married, correct?

4      A    I testified yesterday, yes.

5      Q    Right, and you don't want your husband to know that

6  you're having sex with Mr. Rodgers, isn't that right?

7           MS. LUCAS: Objection, Your Honor.

8           BY MR. McDANIEL:

9      Q    I mean let's not play, let's not act like you

10  wanted him to know and he knew --

11          THE COURT: There's no jury here.  We will be here

12  forever if every question is --

13          THE WITNESS: Exactly.

14          THE COURT: Let's move on.

15          BY MR. McDANIEL:

16     Q    So you want --

17          THE WITNESS: Your Honor, I wanted to clarify my

18  testimony.

19          BY MR. McDANIEL:

20     Q    You want the Court to believe and understand that

21  you weren't telling your husband that Mr. Rodgers was

22  stalking you because you wanted to hide your relationship

23  with Mr. Rodgers or the true nature of your — let me finish

24  my question — or the true nature of your relationship with

25  Mr. Rodgers.  You wanted to tell your husband that he was

26  stalking you because, in fact, he was actually stalking in

27  November although you continued your relationship after that,

110

taf

1    and he was actually stalking you in February although you

2    continued your relationship with him after that, is that

3    right?

4            MS. LUCAS: Objection.  Totally compound question,

5    Your Honor.

6            THE COURT: It's the same question except the two

7    different dates.

8            THE WITNESS: Okay.  Do you want to repeat your

9    question?

10           BY MR. McDANIEL:

11   Q    I'll break it down.

12   A    Please do.

13   Q    You want the Court to believe that you used the

14   words or explanation to your husband that Mr. Rodgers was

15   around in November of 1999 because he was stalking you

16   although you continued your relationship with him after

17   November 1999, correct?

18   A    Correct.

19   Q    And you also want the Court to believe that you

20   were actually explaining to your husband that Mr. Rodgers was

21   stalking in February of 2000 although you continued your

22   relationship with him from February 2000 to, based upon your

23   testimony, May of 2000, correct?

24   A    Sporadic at best.  Yeah.

25   Q    Correct?

26   A    Correct.

27   Q    Okay.

111

taf

1    A    Stalking is stalking.  When you have a broken

2    relationship they stalk you.

3    Q    Ma'am, I haven't asked a question, I'm sorry.

4    A    Oh, I'm sorry, too.

5    Q    Okay. You are an attorney, correct?

6    A    That is correct.

7    Q    All right, so you are familiar with the rules of

8    evidence, correct?

9    A    Yes, I am.

10    Q    You're familiar with some statutes, some criminal

11    statutes, correct?

12    A    Very limited, no.  I'm a commercial finance

13    attorney.

14    MS. LUCAS: Objection, irrelevant.

15    THE COURT: I don't know what's the basis for

16    something about -- are you laying a foundation for something?

17    MR. McDANIEL: Yes, Your Honor.  It --

18    THE COURT: Well, we will be forever on this.  I

19    have no way of knowing whether this is a foundation for

20    another legitimate question or not.  I'm assuming it is since

21    he's an experienced lawyer.

22    MR. McDANIEL: I'm going to cut to the chase, Your

23    Honor.

24    THE COURT: All right.

25    MR. McDANIEL: I'm going to cut to the chase.

26    BY MR. McDANIEL:

27    Q    When you filed your various peace orders and/or

112

taf

1    actions here in the District of Columbia you understand the

2    importance of using certain language, isn't that correct?

3        A    No.

4        Q    You don't understand that it's important to impress

5    upon the court that you are in fear of bodily harm or in fear

6    of your life when filing these actions?>

7            MS. LUCAS: I'm going to object.  Is he talking

8    about something specific, Your Honor, that he'd like to point

9    to?

10            MR. McDANIEL: I'm talking about --

11            MS. LUCAS: Or just in general.

12            THE COURT: Objection's overruled.  Go ahead.

13            BY MR. McDANIEL:

14        Q    You understand the importance of those words or

15    that language, correct?

16        A    I understand that if it's part of, if it's part of,

17    of a crime to kill someone you have to have a dead body.

18        Q    Element.

19        A    I understand that.

20        Q    Right.

21        A    Okay, I understand what the elements of a crime

22    are.

23        Q    Okay.

24        A    At least I think with my limited criminal

25    knowledge.

26        Q    Right.  And so you understand with your limited

27    knowledge of criminal law that it's important that the judge

taf

1    be impressed that you were in fear for your life or of some

2    eminent bodily harm as I think you testified to on yesterday

3    in supporting your claim, isn't that right?

4        A    Can you repeat that.

5        Q    You understand that it's important that you impress

6    upon the judge that you were in fear of bodily harm or some

7    eminent bodily harm in support of your claim here today,

8    correct?

9        A    I understand what the elements are, and I

10   understand if I feel in eminent bodily harm then I am able to

11   say that.

12       Q    That's right.  But you understand that it's

13   important for you to impress that upon the court, isn't that

14   right?

15       A    I understand it's important to tell exactly if I

16   feel and can show the elements of a crime.

17       Q    Okay.  You were upset yesterday that the judge

18   didn't hold Mr. Rodgers, right?

19       A    I can't say I was pleased.

20       Q    Right.  And you understand that Mr. Rodgers has

21   been incarcerated for some considerable amount of time --

22       A    Yes.

23       Q    -- on some other -- okay.

24       A    On the peace order violation, yes, I do.

25       Q    Right.  And if you had your druthers Mr. Rodgers

26   would be locked up for how long?

27            MS. LUCAS:  Objection.

114

taf

1          THE COURT: Sustained.

2          MR. McDANIEL: Might I have the tape.  9-1-1 tape.

3    I have the actual tape recorder here, Your Honor, or is it a

4    tape recorder that was --

5          MS. LUCAS: I do have a tape recorder.

6          MR. McDANIEL: May I approach the witness, Your

7    Honor?

8          THE COURT: Yes.

9          (This portion of the tape was indiscernible.)

10          THE WITNESS: It doesn't matter.

11          (This portion of the tape was indiscernible.)

12          THE WITNESS: J before N.

13          (Thereupon, the 9-1-1 tape was played.)

14          TIME OPERATOR: (Indiscernible) and 10 seconds.

15          (This portion of the tape was indiscernible.)

16          (Thereupon, the tape was stopped.)

17          MS. LUCAS: I'm sorry.  I don't believe that was

18    rewound from yesterday and you were getting a radio run.

19          BY MR. McDANIEL:

20    Q    This is the radio run from the August 13th incident

21    that you listened to on yesterday.  Do you recall listening

22    to that?

23    A    Yes.

24    Q    And that was the date that Mr. Rodgers interacted

25    with you at the Kinko's, correct?

26    A    That is correct.

27          (Thereupon, the tape was played.)

taf

1    OFFICER STEPHANIE BALL: CCN number 109270.  It

2 relates to an incident which occurred at approximately 1830

3 hours,  location 20th and K as in King Street, NW.  It's

4 recorded on 11/7/2000 by Officer Stephanie Ball of

5 Communications Division.

6    TIME OPERATOR: Good afternoon, at the tone the time

7 will be 6:28 and 50 seconds.

8    9-1-1 OPERATOR: Police emergency, (indiscernible)

9 62.

10    MS. JOHNSON-NORMAN: Hi.  I'm on 20th and K Street.

11    9-1-1 OPERATOR: Mm-hm.

12    MS. JOHNSON-NORMAN: I need someone to come down

13 here as soon as possible.

14    9-1-1 OPERATOR: What section of the city?

15    MS. JOHNSON-NORMAN: 2020 K Street, NW.

16    9-1-1 OPERATOR: What's the problem?

17    MS. JOHNSON-NORMAN: I am being stalked, the guy is

18 right outside my car, I have a peace order against him.

19 Please send somebody as soon as possible.

20    9-1-1 OPERATOR: Okay, one moment.  Your at 20th and

21 K as in King Street?

22    MS. JOHNSON-NORMAN: Yes.

23    9-1-1 OPERATOR: Northwest?

24    MS. JOHNSON-NORMAN: Uh-huh.

25    9-1-1 OPERATOR: Can you give me a description of

26 him.

27    MS. JOHNSON-NORMAN: Yeah, he's light skinned, tall,

taf

1    thin, (indiscernible) he has on jeans, he has a white shirt.

2         (Thereupon, the tape is stopped.)

3         BY MR. McDANIEL:

4    Q    When providing that description you were sitting in

5    your vehicle, correct?

6    A    That is correct.

7    Q    And it's your testimony that while you were

8    providing that information to the dispatch that Mr. Rodgers

9    was right outside your vehicle?

10   A    Yes.

11   Q    For the entire time?

12   A    Yes.

13   Q    And at some point in time (indiscernible), correct?

14   A    That is correct.

15   Q    And I think you testified on yesterday that at this

16   point in time based upon what it is that we hear there that

17   you were in fear for your life?

18   A    And angry, correct.

19   Q    So you were fearing for your life at the same time

20   that you were angry, correct?

21   A    Correct.

22   Q    You didn't sound to me to be that upset

23   (indiscernible) the information to the dispatch, were you not

24   upset or you were just calming yourself or how does that

25   work?

26   A    I was extremely upset and trying to talk and give

27   exactly what I needed.  I need this person to leave me alone

117

taf

1    for the rest of my life.

2        Q    No, I understand that, but you're also trying to

3    communicate with the dispatcher, isn't that right?

4        A    That is correct.

5        Q    And would you characterize your tone there as

6    relatively calm?

7        A    At the beginning perhaps, but you can hear how my

8    voice cracked when you stopped the tape.

9        Q    Right, and I think when we listen to the tape

10   further we'll hear your voice even get more exacerbated.

11       A    Correct.

12            (Thereupon, the 9-1-1 tape is played.)

13            9-1-1 OPERATOR: Is anyone around?  This is a black

14   male?

15            MS. JOHNSON-NORMAN: Yeah.  Please hurry.

16            9-1-1 OPERATOR: Okay.  What's your name, ma'am?

17            MS. JOHNSON-NORMAN: It's Karen Johnson-Norman.

18   He's walking away, I want him arrested please, is anyone else

19   hearing me?

20            9-1-1 OPERATOR: Okay, ma'am, we're sending someone.

21   What's the phone number you're calling from?

22            MS. JOHNSON-NORMAN: It's my cell phone, 202-213 --

23            (Thereupon, the tape was stopped.)

24            BY MR. McDANIEL:

25       Q    And at this point in time as your voice becomes a

26   little bit more fluctuated you are describing to the

27   dispatcher that Mr. Rodgers is walking away, correct?

                                                              118

taf

1    A    Correct.

2    Q    And you're agitated at this point in time because

3    you want somebody to come and arrest Mr. Rodgers, isn't that

4    right?

5    A    I want to be left alone, yes.

6    Q    But you also want to have him arrested?

7    A    I want someone to get him away from me, yes.

8    Q    Ma'am, you also want them to come arrest him,

9    right?

10    A    Yes.

11    Q    Okay.  Now, you get out of your vehicle, isn't that

12    right?

13    A    That is correct.

14    Q    And when you get out of your vehicle you go toward

15    Mr. Rodgers' vehicle, correct?

16    A    Yes.

17    Q    And I think in the tape we're going to hear you say

18    to Mr. Rodgers, huh-uh don't go anywhere now.  Isn't that

19    right?

20    A    He could not hear me.

21    Q    But you said that?

22    A    Yes, I did say that.

23    Q    Okay.  And that's because you wanted Mr. Rodgers to

24    stay there?

25    A    I wanted for him to get caught in the act, yes.

26    Q    Right.  You wanted Mr. Rodgers to stay there,

27    correct?

119

taf

1      A    No, I wanted him to get caught in the act.

2      Q    Well, when you say huh-uh don't go anywhere now

3   what were you wanting him to do?

4      A    I wanted the policeman to come right at that moment

5   to get him right there.

6      Q    Right, but you knew the police weren't coming right

7   then, right?

8      A    I had no way of knowing that.

9      Q    Well, let me ask you this, did you think that if

10  you stayed there there was a possibility that he was going to

11  get out of his car and do some physical harm to you?

12     A    I would say yes.

13     Q    Okay.  But you wanted him to stay anyway, correct?

14     A    Yes, I wanted him to get captured.

15         (Thereupon, the 9-1-1 tape is played.)

16         MS. JOHNSON-NORMAN: -- 90.  Please send someone

17  right away.

18         9-1-1 OPERATOR: 213 -- ma'am, I can talk to you and

19  send the police at the same time.

20         MS. JOHNSON-NORMAN: If he gets away they will not

21  arrest him, okay?

22         9-1-1 OPERATOR: We are sending someone, ma'am.

23         MS. JOHNSON-NORMAN: Please come.

24         9-1-1 OPERATOR: Okay.

25         MS. JOHNSON-NORMAN: He's getting in his car now.

26         9-1-1 OPERATOR: Okay.  What kind of car is he in?

27         MS. JOHNSON-NORMAN: It's a Mitsubishi Galant,

120

taf

1    Oregon tags DCE-506.  Ma'am, he is pulling off now.  Do not

2    let him -- please send somebody.  Huh-uh, don't go nowhere

3    now.

4              (Thereupon, the tape was stopped.)

5              BY MR. McDANIEL:

6         Q    Okay.  So you describe to the dispatch that he was

7    pulling off, is that right?

8         A    Correct.

9         Q    Okay.  And as he's pulling off you're still in

10   proximity enough to his vehicle that you believe that he can

11   hear you say huh-uh don't go anywhere now?

12        A    No, I said he could not hear me.

13        Q    Okay.  But did you say it with the intent to have

14   him stay or for him to hear what you were saying?

15        A    He could not hear me.

16        Q    You were just talking to yourself?

17        A    Yes.

18        Q    Uh-huh.  Where were you in proximity to his car?

19        A    I was at the corner before the corner, his car was

20   at the corner, there's no way he could have even gotten to

21   me, I could have gotten in Kinko's quicker than he could've

22   gotten to me.  What I testified yesterday --

23        Q    I'm sorry, ma'am, let me ask you another question.

24   Where was your vehicle in connection to or in proximation to

25   his vehicle?

26        A    The picture showed that my vehicle was at the front

27   side of Kinko's.

taf

1    Q    Correct.

2    A    That's a one-way street.  His vehicle was on

3  another one-way street at the, right at the corner.

4    Q    At the end of that corner?

5    A    At the end of that corner, on the opposite side of

6  the street.

7    Q    Okay.

8    A    It's a one-way street.  His vehicle was not on this

9  side, it was on this side of the street here, Kinko's is at

10  the corner, it's an intersection.  My car was in front of

11  Kinko's.  Okay, Kinko's has a huge glass window --

12    Q    Right.

13    A    -- if I, I was in the service lane, okay, walking

14  in the service lane, you walk, you, I don't even have to get

15  to the end of Kinko's to see his car.  And I testified

16  yesterday that when I saw that he was a distance away from me

17  which he could not get me then which I knew that I could

18  retreat and get away.  That's as far as I went.  I didn't go

19  up to his car.

20    Q    Right, okay.  But you had gotten out of your

21  vehicle and that's the language that we hear here?

22    A    That is correct.

23    Q    Now, when did you have an opportunity to see the

24  tape at Kinko's?

25    A    I can't remember the date.  I didn't see the tape

26  at the Kinko's, I saw it at the precinct.

27    Q    Do you know when you saw it?

122

taf

1    A    No.

2    Q    You don't know approximately how long after the

3    incident you saw it?

4    A    No.

5              MR. McDANIEL: May we approach, Your Honor?

6              THE COURT: Very well.

7              (Bench conference with Mr. McDaniel and Ms. Lucas)

8              MR. McDANIEL: This witness testified to certain

9    proceedings in Maryland with respect to the peace order, not

10   necessarily the facts supporting the peace order, but the

11   actual proceedings and conversations that she had with Mr.

12   Rodgers in regard to mediation.  And I wish some advance

13   notice on whether or not Your Honor will allow me to engage

14   her in some question about those conversations as opposed to

15   conversations about or facts that support the information

16   underlying the request for the peace order.

17             (This portion of the tape was indiscernible.)

18             THE COURT: To come in as to what transpired, the

19   basis of the peace orders was to show that the defendant was

20   on notice as to what he could do and what he couldn't do with

21   respect to this individual.  As far as all of the facts and

22   circumstances which justify the peace order I ruled that that

23   could not come in in the Government's case in chief.

24             MR. McDANIEL: There was testimony about

25   conversations that she had with Mr. Rodgers about mediation,

26   you know, whether or not the matter would go to mediation.

27             THE COURT: That was brought out on cross

123

taf

1    examination.

2             MR. McDANIEL: No, that was direct examination.

3             THE COURT: It was?

4             MR. McDANIEL: It was June 26th --

5             THE COURT: Oh, I'm sorry, yes.

6             MR. McDANIEL: — hearing, and then she said

7    something about having met with Mr. Rodgers on June the 25th.

8             THE COURT: Much of this she volunteered.

9             MR. McDANIEL: Right.

10           THE COURT: I'm trying to be strict as to what

11    happened in Maryland before the dates set forth in this

12    information to show only that this defendant was on notice

13    because he could have been (indiscernible) --

14           MR. McDANIEL: Correct.  Okay.

15           THE COURT: -- as to all of the facts which may have

16    justified a peace order are not relevant here.

17           (Open Court)

18           THE COURT: You may come back.

19           BY MR. McDANIEL:

20      Q    Let's talk a little about the contacts between

21    August 7th and September the 18th.  Now, you testified that on

22    August 7th Mr. Rodgers was in front of your office building

23    in his vehicle, correct?

24      A    That's not correct.  I said at a garage that's on

25    20 something K Street.

26      Q    Is that near your office?

27      A    It is.  It's one block over and down towards

taf

1    Georgetown.

2        Q    And at that point in time you saw Mr. Rodgers'

3    vehicle and it was at the mouth of the garage, is that

4    correct?

5        A    Correct.

6        Q    But there was enough room for you to go out,

7    because you made that right hand turn?

8        A    That is correct.

9        Q    And at this point in time you all didn't have any

10   interaction with one another, is that right?

11       A    Absolutely none.

12       Q    And at this point are you in fear for your life or

13   did you fear that there was going to be some physical contact

14   between Mr. Rodgers and yourself?

15       'A    I was in my vehicle with the door locked, and he

16   was in his vehicle so I would say not at that point.

17       Q    So the answer to that question is no?

18       A    I would say no immediate danger, yes.

19       Q    The next time you alleged that there was contact

20   was on the August 13th date which we've just described,

21   correct?

22       A    That's correct.

23       Q    Okay.  Now, when Mr. Rodgers came out of the

24   Kinko's, I think we saw there on the tape, he didn't run at

25   you or anything, did he?

26       A    He walked.

27       Q    And were you walking at that time or did you, I

125

taf

1  think you testified that you ran to your car.

2       A    I, I didn't say ran, I said I walked quickly to my

3  car around the front side because I saw him coming towards

4  the back.

5       Q    Okay.  And he came around the back, isn't that

6  right?

7       A    Correct.

8       Q    And he said to you that he wanted to talk to you?

9       A    Something of that nature, yes.

10      Q    Okay.  And you didn't say anything to him, you just

11  got in your vehicle?

12      A    I, I froze and I may have said something, but I

13  don't remember.

14      Q    But all you recall him saying at that point in time

15  was that he wanted to talk to you?

16      A    Yes.

17      Q    And you said that he reached out towards you and

18  that you had to snatch away, isn't that right?

19      A    Correct.

20      Q    Now, he didn't grab you, did he?

21      A    He grabbed at me, his fingers brushed me, I really

22  can't remember if it was a full grab, but I thought it was a

23  brush, it was contact in which I had to disengage my arm from

24  him.

25      Q    Ma'am, so he did not grab you then, correct?

26      A    He touched me.

27           MR. McDANIEL: Your Honor, could you direct the

126

taf

1    witness to answer the question.

2              THE COURT: Oh, I think --

3              MR. McDANIEL: I mean is she --

4              MS. LUCAS: It's not a yes or no question.

5              MR. McDANIEL: Yes, it is.  Either he grabbed you or

6    he didn't.

7              THE COURT: I think it's pretty clear he just

8    touched her.

9              MR. McDANIEL: Okay.

10             BY MR. McDANIEL:

11       Q    And after he touches you you snatch away, correct?

12       A    Correct.

13       Q    And you get into your vehicle?

14       A    Yes.

15       Q    Now, he doesn't bank on your window, does he?

16       A    He -- no.

17       Q    Okay.  He doesn't even touch your car, correct?

18       A    I can't remember.

19       Q    And you couldn't really hear what he was saying

20    outside of the vehicle, correct?

21       A    Correct.

22       Q    That's because he wasn't yelling, isn't that right?

23       A    No, it's because I was in shock and because I was

24    talking and focusing on talking with the operator.

25       Q    Okay.  Well, do you recall if he was yelling or not

26    yelling?

27       A    His mouth was moving.

127

taf

1    Q    Ma'am, do you recall if he was yelling or not

2    yelling?

3         MR. McDANIEL: Your Honor, I don't think these

4    questions are complicated.

5         BY MR. McDANIEL:

6    Q    Do you recall if he was yelling or not yelling?

7    A    I, I know he was talking, I don't know if he was

8    yelling because I was talking.

9    Q    Okay.  So then the answer to that question is no I

10   don't recall if he was yelling or not yelling, correct?

11   A    No, the answer is no I don't know if he was

12   yelling, but I know he was talking.

13   Q    Okay.  And the only thing that he did after that

14   was leave, isn't that right?

15   A    Correct.

16   Q    So on the 13th you were in fear of some, I think

17   you used the word in fear for your life simply because he was

18   there, correct?

19   A    No, simply because he was there and he reached out

20   and approached me when I had numerous orders for no contact.

21   Q    Right.  And so that had nothing to do with the

22   incident on August the 7th.  I mean you were in fear for your

23   life based upon all of those things that had happened prior

24   to that, correct?

25        THE COURT: Prior to what?

26        MR. McDANIEL: Prior to the 13th.

27        THE COURT: Okay.

128

taf

BY MR. McDANIEL:

1

2    Q    Correct?

3    A    Correct.  And on the 13th, I'd like for the 13th to

4  be included also.

5    Q    But here now describing the incidents between

6  August 7th and August the 13th that would be two incidents,

7  correct?

8    A    In six days on August the 7th and August the 13th.

9    Q    Right, that would be two?

10    A    Those are two of many, yes.

11    Q    But that would be two, correct?

12    A    That is correct.

13    Q    Okay.  Now, and I think you testified on yesterday

14  that the next contact with Mr. Rodgers was on September the

15  18th, is that correct?

16    A    You mean physical contact?

17    Q    Any contact whatsoever.

18    A    That's not correct.

19    Q    When was the next contact?

20    A    The next unsolicited contact we were in court a

21  number of times 9/6 and 9/13, are you asking the next

22  unsolicited contact?

23    Q    No, no, no, I'm talking about between August the

24  7th and September the 18th, okay?

25    A    Mm-hm.

26    Q    You all didn't go to court between August the 7th

27  and September the 18th, did you?

129

taf

1    A    We went twice.

2    Q    Between August the 7th and September the 18th?

3    A    We went twice.

4    Q    What were those dates?

5         THE COURT: During that period of time is the

6    question?

7         MR. McDANIEL: Yes.

8         THE WITNESS: We went to court on September the 6th

9    and on September the 13th, one week later.

10        BY MR. McDANIEL:

11   Q    And so when you say unsolicited you're excluding

12   the contact that you had at the courthouse, is that correct?

13   A    That is correct.

14   Q    Okay.  So, yes, let's use your word.  The next

15   unsolicited contact.

16   A    Was on the 14th, the very next day.

17        THE COURT: Fourteenth of?

18        THE WITNESS: September, the very next day after the

19   Maryland District Court hearing.

20        MR. McDANIEL: Okay.

21        THE COURT: That was an unsolicited contact with the

22   defendant?

23        THE WITNESS: Correct.

24        BY MR. McDANIEL:

25   Q    And at that point in time the contact came in what

26   manner?

27   A    In the form of a telephone call --

130

taf

1    Q    Okay.

2    A    -- at my place of employment in Washington, D.C.

3    Q    And what was the nature of that conversation?

4    A    As I testified yesterday a call, I had previously

5    changed my direct dial number.

6    Q    Ma'am, what was the nature --

7    A    I, I just answered that.  It was a telephone call

8    from the defendant.

9    Q    Okay.  Well, what was said?

10   A    Again, the defendant called me by using the direct

11   dial --

12   Q    Ma'am, what was said?

13   A    He, when I answered the phone he said I think he

14   said are you going to, he said I don't want to fight anymore.

15   Q    On September the 14th he said I don't want to fight

16   anymore?

17   A    That is correct.

18   Q    And I think you testified on yesterday that that

19   was just followed by silence, correct?

20   A    Yes, because I gasped because, again, we had just

21   went to court the day before, and I was shocked that he even

22   got through.

23   Q    Ma'am, I understand that you want to tell your

24   story over and over again.

25   A    Well, I told it yesterday.

26   Q    I understand, so why are we hearing it again?

27   A    Well, why are you asking I guess?

131

taf

1    Q    Because this is cross examination --

2    A    Okay.

3    Q    -- and you're aware of what cross examination is.

4         THE COURT: Next question please.

5         BY MR. McDANIEL:

6    Q    So that's followed by silence, correct?

7    A    Correct.

8    Q    So --

9    A    And I hung up.

10   Q    Okay.  And then the next unsolicited contact is

11   September the 18th, correct?

12   A    Correct.

13   Q    And it was your testimony on yesterday that Mr.

14   Rodgers called you one time at your place of employment, is

15   that correct?

16   A    That's incorrect.  He called at least eight times.

17   Q    Okay.  But were you at your place of employment?

18   A    That is correct.

19   Q    And the first time the call was made what was said?

20   A    By whom, by him?

21   Q    Mr. Rodgers.

22   A    He went, he just talked about why I was doing this

23   to him and that he, that he had already spent the night in

24   jail in D.C. and how good the relationship was, he didn't

25   want to go to jail again, he just quit his job in the

26   military, basically things that I interpreted to try to

27   dissuade me from dropping the cases.

taf

1    Q    Okay.

2    A    Tried to dissuade me to drop the cases.

3    Q    Did he discuss with you at that point in time the

4    fact that your allegations were effecting his job?

5    A    No, he said he just quit his job.

6    Q    Okay.  And did he also mention to you that he knew

7    that you had been in contact with Mr., I think you said his

8    name was Delcampo yesterday at his place of employment?

9    A    No, not that I recall at all.

10   Q    You all didn't discuss that at all?

11   A    We didn't discuss much of anything.  He talked and

12   I cussed.

13   Q    How long did that conversation last?

14   A    There were three, the first one, they were all

15   three short, the first one was terminated promptly after

16   about a minute, his calling card expired and we were

17   disconnected.

18   Q    And at that point in time you called the officer,

19   correct?

20   A    Detective Durant, that's correct.

21   Q    And I think your testimony on yesterday was that

22   you placed Officer Durant on hold, correct?

23   A    No.

24   Q    So you didn't place him on hold?

25   A    Correct.

26   Q    Okay.  So you hung up with Officer Durant?

27   A    Correct.

133

taf

1      Q    Then it was your anticipation that Mr. Rodgers was

2    going to call you back, correct?

3      A    Correct.

4      Q    And your testimony on yesterday was that, in fact,

5    he did call you back, correct?

6      A    Yes.

7      Q    It was also your testimony that at that point in

8    time you tell Mr. Rodgers to hold on, correct?

9      A    No.

10     Q    No?

11     A    I didn't tell him to hold on.

12     Q    Okay.  Well, explain to me this, how was it that

13   you conference call Officer Durant in?

14     A    Because the defendant kept talking, and I pushed

15   the conference button, I dialed Detective Durant's number and

16   I pushed the conference button again.  It connects you

17   automatically.

18     Q    Okay.  And you can push the conference button,

19   right, without hanging up?

20     A    Absolutely.  That's a three-way call, yes.

21     Q    All right.  And so you don't have to put the

22   individual that you're on the phone with on hold in order to

23   make that call?

24     A    It's a transfer button that (indiscernible) kind of

25   puts the person on hold, yeah.

26     Q    Well, when you put an individual on hold are you

27   able to hear that individual as you're talking to them or are

134

taf

1    they on hold such that you can not hear what they're saying?

2         A    They can't hear anything.

3         Q    They can't hear anything?

4         A    Yes, it's effectively putting a call in suspense.

5    It takes a split second to dial the number, to hit a button,

6    to dial a number and to hit it again.  That's all it amounts

7    to.

8         Q    Okay.  So you're saying that you placed Mr. Rodgers

9    on hold, you made the phone call, you conference called the

10   other individual in, none of this makes a sound, right, I

11   mean there's no --

12        A    That's correct.

13        Q    -- beeps or anything, right?

14        A    That is correct.

15        Q    And that Mr. Rodgers is unaware of the fact that

16   you conference called in another officer?

17        A    At the time that I made the call, yes.

18        Q    Okay.  So what would Officer Durant have heard in

19   the body of that conversation?

20             MS. LUCAS: Objection as to what Officer Durant --

21             BY MR. McDANIEL:

22        Q    When did Officer Durant come in the conversation?

23        A    At the very, at the very beginning in time enough

24   for Virgil Rodgers to call me back a second time.  He picked

25   up, he said something, I talked to him and then I hit the

26   button, dialed and hit the button again, because I had

27   already, in between calls, the first call and the second call

                                                        135

taf

1    from the defendant I called Detective Durant and told him

2    that, I told him that I knew Virgil Rodgers was gonna call

3    back, and I wanted him to be conferenced in and for him not

4    to say anything.  I just called this particular number which

5    I always contacted him and I did it, it takes literally

6    seconds to conference call someone in.

7        Q    Okay.  What did Mr. Rodgers say to you when he

8    called you back for the second time?

9        A    The same type of --

10           THE COURT: Excuse me.  You mean when Detective

11   Durant was on the phone?

12           MR. McDANIEL: I'm talking about before.

13           THE COURT: Before the connection was made to the --

14           MR. McDANIEL: That's right.

15           THE COURT: Okay.

16           THE WITNESS: I don't know, same type of rambling,

17   same, same nature of the conversation, you know, why are we,

18   you know, fighting like this, you know, why are you trying to

19   make me lose my job, you know, I've been -- I mean it's

20   really a duplication.  I really wasn't focused on what he was

21   saying at the second call, I was focused on getting a

22   witness.

23           BY MR. McDANIEL:

24       Q    So at some point in time you all did discuss why it

25   is that you were calling his job?

26       A    No.

27       Q    Well, you just said he asked --

136

taf

1    A    He — again, there was no discussion.  He talked and
2    I talked over him.
3        Q    Right.  So he asked you why it is that you are
4    trying to have him lose his job.
5        A    I, he asked in a rhetorical way, it, I didn't
6    answer a single question --
7        Q    Ma'am --
8        A    -- it wasn't a dialogue.
9        Q    I understand that.  Listen to my question please.
10   He asked you why it is that you are trying to have him lose
11   his job, yes or no?
12       A    He may have, yes.
13       Q    Ma'am, if he didn't say that why is it that you
14   just said he said it?
15       A    He, well, yes.
16       Q    Okay.
17       A    He talked, he rambled, he said numerous things,
18   yes.
19       Q    Okay, and that was one of them, correct?
20       A    I -- yes.
21       Q    Okay.  Now how long did that conversation take
22   place?
23       A    Again, a short period of time, few, two minutes
24   maybe maximum, I don't really recall.  Again, it was
25   terminated in the same manner.  Defendant's calling card
26   terminated saying thank you for using Freeway.
27       Q    On the second time as well?

137

taf

1    A    Yes, that's correct.

2    Q    And how long was Officer Durant on the phone?

3    A    I'm not sure.

4    Q    The conversation didn't last any longer than a

5    minute, two minutes, correct?

6    A    I'm not sure.

7    Q    Ma'am, if you're not sure then you shouldn't

8    testify to it.

9    A    I said that it was a short period of time, it could

10   have been a minute or two.

11   Q    Okay.

12   A    Okay?

13   Q    Now, after that you hung up with Mr. Rodgers,

14   correct?

15   A    Again, his calling card expired so we were

16   automatically disconnected.

17   Q    Okay.  And then your testimony is that there was a

18   third call?

19   A    Yes.

20   Q    Okay.  And how long after the second call was the

21   third call made?

22   A    Short period of time, couple of minutes, one

23   minute, two minutes.

24   Q    Had you at that point in time hung up with Officer

25   Durant?

26   A    No, I continued to talk to Officer Durant.  I even

27   informed him that the phone was ringing.

138

taf

1    Q    All right.  And did Officer Durant tell you to

2    answer it?

3    A    He told me not to answer it.

4    Q    Okay.  But did you answer it?

5    A    No, I did not answer it.

6    Q    So the third phone call that comes in you don't

7    even know if it was Mr. Rodgers or not, isn't that right?

8    A    I suspected it was him like the other two.

9    Q    Okay.  Well, you suspect a lot of things, but you

10   don't know if, in fact, that was Mr. Rodgers or not, correct?

11   A    Well, I was the only one in the officer that night.

12   I mean, I already answered the question, I don't know what

13   you want me to say.

14   Q    Ma'am, these questions are not hard.

15   A    Again, I answered it.

16   Q    No, you didn't.

17   A    I did.

18        MS. LUCAS:  Objection, Your Honor, counsel --

19        MR. McDANIEL:  Your Honor, if you would direct the

20   witness just to answer the question we won't have this

21   problem.  Either she knows or she doesn't know.

22        THE COURT:  I would agree with that.  The question

23   was she suspected and you stated did she know.

24        MR. McDANIEL:  I wanted to know if she --

25        THE COURT:  You want to know one way or the other.

26        MR. McDANIEL:  Yes.  Whether or not that was Mr.

27   Rodgers on the phone or not?

139

taf

1           THE WITNESS: I didn't answer the phone so, no, I

2    could not have known.

3           BY MR. McDANIEL:

4    Q    Thank you.  And between August the 8th and

5    September the 18th were there any other contacts that you're

6    aware of?

7    A    None that I can recall at this minute.  Between

8    August, the question is between August the 8th or the 7th, the

9    7th --

10   Q    August the 7th --

11   A    -- and September the --

12   Q    -- and September the 18th.

13   A    -- 18th.  None that I can recall at this minute.

14   Q    Now, during this time Mr. Rodgers never threatened

15   you, is that correct?

16   A    Mr. Rodgers did not himself, correct.

17   Q    Okay.  He --

18   A    When you say this time you're talking just August -

19   -

20   Q    Im talking -- that's right.

21   A    -- you're not talking anytime prior to that?

22   Q    That's right, I'm talking about between August 7th

23   and September the 18th.  Did not threaten you, correct?

24   A    When you say threaten, do you want to explain that.

25   Q    I'm talking about in terms of verbal language.  He

26   never said to you, you now, you better come back to me

27   because I'm going to hurt you or --

140

taf

1    A    He threatened to kill himself.

2    Q    Okay.  That's fine.  But did he threaten you?

3    A    He, I consider a suggestion that if your husband

4    found out I'd consider that a threat.

5    Q    If your husband found out what?

6    A    About the relationship, I consider that a threat.

7    Q    I thought you said he knew since 1999?

8    A    I said that I told him I had an intimate

9    relationship with him in August of 2000.

10    Q    Okay, but I think your posture earlier was that he

11    couldn't have helped but to notice you had an intimate

12    relationship with Mr. Rodgers.

13    A    And was that contrary to what I just said?

14    Q    Why would you be threatened if he already knows?

15    A    Because the defendant didn't know what my husband

16    thought.  The defendant suggested that if he talked to my

17    husband directly there would be a problem.

18    Q    But there wouldn't have been because your husband

19    already knew you were having sex with him, right?

20    A    But is it something, is it something that I told

21    him or is it something that the defendant told him?

22    Q    Why does it matter?  Why would you be threatened by

23    that?

24    A    It matters because if he didn't know, it's not like

25    I had admitted to, and if a defendant comes and tells my

26    spouse I had sex with him you don't foresee a problem with

27    that, you don't see it as a threat when I had not previously

141

taf

1    admitted to it, of course it's a threat.

2        Q    Well, no, not if your husband — based upon your

3    testimony your husband already knows, it's free reign, he

4    knows you're with Mr. Rodgers, Mr. Rodgers is with you and

5    he's accepted your excused.

6        A    That's not what I --

7        Q    That's not it.

8        A    I said that he suspected.

9        Q    Okay.  All right.  And so he really --

10        A    I said I confirmed it.

11        Q    He really doesn't know that you're having this

12    intimate relationship with him until you tell him, correct?

13        A    That's what you just, we just talked about that,

14    yes.

15        Q    Is that right?

16        A    August 2000, yes.

17        Q    All right.  So you had some interest even up until

18    August of 2000 in not confirming that for him, is that right?

19        A    Do you care to explain that, what type of interest

20    do you mean?

21        Q    Well, you were concerned about that not being

22    confirmed for him?

23        A    No, I just didn't want to tell him myself.

24        Q    And you didn't want Mr. Rodgers to tell him, isn't

25    that the threat you were talking about?

26        A    Sure, yeah.

27        Q    Okay.  So you had some interest in him not knowing

142

taf

1    that you had this type of relationship with Mr. Rodgers?

2         A    I didn't want him to know, correct.

3         Q    And, in fact, your husband left you in I think you

4    said July --

5         A    No.

6         Q    You didn't separate on July 4th weekend?

7         A    My husband never left me.

8         Q    You all separated?

9         A    I left the house for two or three days.

10        Q    Okay.  So your husband never left the house?

11        A    Never.  Well, no, I take that back.

12        Q    Right.

13        A    He may have left the house himself for a day or, a

14   day or two, yeah.

15        Q    What days were those?

16        A    I don't remember.  I think it was, I don't

17   remember.

18        Q    Around June?

19        A    Perhaps, I don't remember.

20        Q    Maybe after the mediation hearing thing?

21        A    It was actually I think after -- no, it was after

22   July the peace order hearing.

23        Q    Okay.  And at that point in time did he get certain

24   confirmation of information that led him to have a different

25   posture?

26             MS. LUCAS: Objection, asking for speculation.

27             THE WITNESS: No.

143

taf

1          THE COURT: How would she know?

2          MR. McDANIEL: I'll withdraw the question, Your

3   Honor.

4          BY MR. McDANIEL:

5      Q   Now, in these contacts between August the 7th and

6   September the 18th is it fair to say that Mr. Rodgers'

7   motivation was to have you stop calling his job, based upon

8   what your understanding of his motivation was?

9          MS. LUCAS: Objection, asking --

10         THE COURT: Well, let's hear the question.

11         BY MR. McDANIEL:

12     Q   Based upon your understanding of Mr. Rodgers'

13  motivation for calling you.

14         MS. LUCAS: Asking for speculation as to his

15  motivation.

16         THE COURT: Sustained.

17         BY MR. McDANIEL:

18     Q   Well, I think you testified on yesterday when asked

19  why Mr. Rodgers was calling you that he was attempting to

20  explain to you that you all didn't need to be apart, is that

21  right?  Did you testify to that yesterday?  Do you recall

22  answering any question on yesterday about why Mr. Rodgers was

23  calling?

24         MS. LUCAS: I object.  I didn't ask any question of

25  that nature.

26         THE COURT: Well, he's asking her.

27         THE WITNESS: I, I, I don't --

144

taf

1          THE COURT: If she doesn't recall she can say so.

2          THE WITNESS: I don't recall.

3          BY MR. McDANIEL:

4     Q     Well, Mr. Rodgers asked you when making these

5     contacts with you between August the 7th and September the

6     18th to drop charges?

7     A     He suggested, yes.

8     Q     Okay. And did he suggest that your relationship

9     between he and yourself was a good relationship and that it

10    should continue or that you all shouldn't be in the situation

11    that you're in?

12    A     He suggested, my understanding is that he wanted to

13    continue the relationship.

14    Q     Okay. Because he loved you at that point in time,

15    correct?

16    A     I can't tell you why.

17    Q     All right. But did he express to you that he loved

18    you?

19    A     During that time?

20    Q     During that time.

21    A     Hm-mm, no.

22    Q     Okay. But it's your understanding that he wanted

23    to get back with you?

24    A     I would, I would, from his contact I would say yes.

25    Q     Okay. And what in the nature of his contact with

26    you led you to believe that he wanted to get back with you?

27    A     The consistency of it.

                                                        145

taf

1    Q    Okay.

2         THE COURT: The what?

3         THE WITNESS: Consistency of his contact with me.

4         BY MR. McDANIEL:

5    Q    Was that consistency in the type of interaction

6    that you all had was that consistent with an individual who

7    was attempting to prepare a relationship?

8         MS. LUCAS: Objection, Your Honor.

9         THE COURT: Sustained.

10        MR. McDANIEL: Court's indulgence.

11        BY MR. McDANIEL:

12   Q    I think you testified on direct examination that

13   you did make contact with Mr. Rodgers' job, correct?

14   A    At what, at many, at many times, yes.

15   Q    Right.

16   A    That's how I got the no contact order.

17   Q    Right.  And in addition to the no contact order you

18   were asking them to dishonorably discharge him as well,

19   correct?

20   A    I can't ask them to do anything except to keep him

21   away from me.  They chose their own method of doing so.

22   Q    So you never asked them to dishonorably discharge

23   him?

24   A    I asked them to do everything they can to keep him

25   away from me.

26   Q    Did you ever use the language or request that you

27   would like to have him dishonorably discharged in any

146

taf

1    correspondence with his supervisor?

2        A    Yes.

3        Q    Okay, so then you did ask them to dishonorably

4    discharge him, correct?

5        A    If the circumstances were correct, yes.

6        Q    You did ask them to dishonorably discharge him,

7    correct?

8        A    I just said yes.

9        Q    Okay.  Now, why is it or how does his dishonorable

10   discharge help him to stay away from you?

11       A    Punishment helps people to stop offending another

12   person.

13       Q    Right.  And at that point in time you thought it

14   was appropriate for you to ask for this particular

15   punishment, that being he be dishonorably discharged,

16   correct?

17       A    No.  You're twisting the facts.

18       Q    No.  I'm not twisting anything, I'm asking

19   questions.  So if the answer's no --

20       A    I asked them to do everything they could to keep

21   him away from him, from me, and they said that they could do

22   whatever, a no contact order.  The no contact order did not

23   work.  I said can you please do whatever you need to do, if

24   you have to put him out, put him out, do something to keep

25   him away from me.

26       Q    So is it your testimony here today that you don't

27   recall asking specifically for dishonorable discharge?

147

FORM FED ® PENGAD • 1-800-631-6989

taf

1        THE COURT: I thought she said she did.

2        THE WITNESS: I just answered that.

3        BY MR. McDANIEL:

4     Q     And let me ask you this, were you satisfied with

5  the way that the Air Force was handling your allegations?

6     A     Absolutely not.

7     Q     And, in fact, you made several calls to the Air

8  Force asking them to continue their investigation and

9  prosecution of Mr. Rodgers, correct?

10    A     Correct.

11    Q     Ballpark number, how many times would you say you

12 called Mr. Delcampo?

13    A     I can only say that I called him every time that I

14 had a contact from the defendant or everyone on his behalf.

15 There's been too many times to keep track of.

16    Q     You can't even estimate how many times you called?

17    A     Again, I just answered that. And I contacted

18 Congressman Cindy Hoyas office too.

19    Q     You contacted the congressman as well?

20    A     Yes, I did.

21    Q     What, you wrote the congressman and asked the

22 congressman to mandate that the Air Force dishonorably

23 discharge the man?

24    A     They started a congressional inquiry into his

25 contacts in violation of the no contact order.

26    Q     Based upon your correspondence, correct?

27    A     Absolutely.

148

taf

1    Q    Okay. Did you write the president?

2    A    I wish I would have.

3    MR. McDANIEL: I don't have too much more, Your

4 Honor. Your Honor, I believe that ends my questioning.

5    THE COURT: All right. Any redirect?

6    MS. LUCAS: Yes, I do. Your Honor, I think the

7 complaining witness may need a five minute recess.

8    THE WITNESS: That's okay. That's okay.

9    MS. LUCAS: No?

10    REDIRECT EXAMINATION

11    BY MS. LUCAS:

12    Q    When did you first contact the Air Force?

13    A    In June of 2000.

14    Q    And why did you contact the Air Force in June of

15 2000?

16    A    Because I had a temporary peace order that the

17 defendant continued to just disregard blatantly.

18    Q    Was this a consent peace order that the defendant

19 had entered into?

20    A    No, it was not. Initially it was an ex parte,

21 however, on June the 26th we both went to court and agreed to

22 have it extended for another 30 days.

23    Q    And the defendant agreed to that, did he not?

24    A    That's correct.

25    Q    And what was in the peace order with regard to any

26 contact the defendant could have with you?

27    A    The peace order prohibited defendant from

149

taf

1    contacting me by any means, and it also specifically

2    that he was not to come to my place of employment and

3    listed the address, 2020 K Street, it also listed my

4    residence in Bowie, Maryland, and I requested that th

5    defendant be prohibited from engaging in e-mail conta

6    me and having others contact me on his behalf.

7         Q     And did the court grant that?

8         A     Yes, yes, they did.

9         Q     And so was the defendant present when the c

10   issued the order in Maryland in June of 2000?

11        A     That's correct.

12        Q     And you stated that you contacted the Air Fe

13   June, why did you contact them then?

14        A     I contacted them because the defendant cont:

15   despite the fact of June 26th we had a temporary order

16   very next day the defendant called me.

17        Q     And where did he call you at?

18        A     He called --

19             MR. McDANIEL: Objection, Your Honor.

20             MS. LUCAS: Your Honor, counsel has opened th

21   totally by asking about the contacts that this witness

22   with Officer Delcampo.

23             MR. McDANIEL: That's a bit different than as

24   for the foundation for what she was calling about.  If

25   wishes to describe the number of calls and contacts th

26   had with Mr. Delcampo defense counsel would not object

27   did not in any way discuss with her the underlying rea

for her calling.

MS. LUCAS: Well, he's making the defense that this witness is making up stuff about the defendant and certainly the fact that all of the contacts she made she testified to, and he asked this question was the reason why she contacted was on every single time the defendant had come some sort of contact with her, and that's when she contacted him. So it's highly relevant, not only to the issues of this document, also the state of mind of this witness as far as what the reasonable person standard is what happened in August. Defense counsel had also asked her about why she thought the defendant was continuing to try to continue this relationship, and she said well it was because of all of the contacts we've had. So he has opened the door with regard to all of the contact whether it was before August 7th of the year 2000.

MR. McDANIEL: No, Your Honor, that's a reach at best. I mean we're talking about her reports to the Air Force. I asked her questions about the number of contacts that she had with Mr. Delcampo, she explained to the Court, she explained to the Court that she was calling Mr. Delcampo based upon contacts. I did not ask her what the contact were, what the nature of the contacts were, she was answering that question in an attempt to answer counsel's question about the number of contacts. We did not get into the merit or the underlying matters that she was calling about which is just another attempt --

151

taf

1       MS. LUCAS: In fact, he --

2       MR. McDANIEL: — by counsel to deal with matters

3  outside of the scope of what's been claimed of here in D.C.

4       THE COURT: I guess what's troubling me a little

5  more in this is on cross examination you asked about the

6  contacts between August 7th and 18th, are those the only

7  contacts which she listed they had, and why were you

8  frightened, is that why you were frightened, and she says

9  because of those contacts and many other things which

10  happened.  That was stated on your cross examination.  Now,

11  why doesn't that open it up the question of what other things

12  have happened which would cause her to be frightened when she

13  had those contacts at 2020 or whatever it was K Street,

14  contact at Kinko's and the three telephone calls?

15       MR. McDANIEL: Well, Your Honor, because I was

16  asking specifically about those contacts.  I asked her about

17  that particular time frame and I asked her about that prior

18  to even posing the question I asked her about August the 7th

19  and whether or not, I said between August the 7th and

20  September the 18th describe for me the contacts, and we went

21  through each of the contacts.  And I was asking her in

22  particular why it is that she was fearful at that time or if

23  she was even fearful at that time.  And her description of

24  the behavior, particularly on the August 13th date explained

25  why she was in fear on that day.  She didn't even testify I

26  don't believe that she felt fearful, and matter of fact she

27  testified that she wasn't fearful on August the 7th, because

taf

1   of the nature of where they were.  And the August the 13th

2   date is a continuation of that same line.

3           MS. LUCAS: Your Honor, I would suggest the Court is

4   exactly right.  What the defendant is trying to do is try

5   this case in a vacuum, and it's not a vacuum.  This case

6   involves stalking which is a course of conduct by a person

7   towards another person.  One of the elements is what a

8   reasonable person would feel during the course of the

9   contacts.  Now, the Court had initially limited us to just

10  the August 7th through the September 18th, but defense counsel

11  by asking the victim why did you feel afraid in August and

12  she testified it's because of his actions on that day and

13  because of all of the other contact she had had previous to

14  him.  Then he goes further in his cross examination and asks

15  her about the contact that she may have had because of the

16  complaint she made to the Air Force which is all prior to, so

17  you can not just look at this case in a vacuum.  She has to

18  be allowed, because counsel has opened the door to allow all

19  the Johnson material in at this point.

20          MR. McDANIEL: First of all, I asked the question if

21  she was afraid because if she was not afraid then obviously

22  that goes towards the elements of the allegation, stalking.

23  And counsel is not attempting to try this case within a

24  myopic view, but again and I pointed out to the Court that

25  this individual testified to certain things on direct

26  examination in response to direct examination questions that

27  were objected to, but these questions were allowed to give

153

taf

1   the Court some background as to why it is we are here where

2   we are.  And, counsel, I haven't asked any questions about

3   anything that was not brought up on direct examination.

4        THE COURT: But the point of your cross examination

5   at least part of it was that here's an individual who wasn't

6   frightened, had no reason to be frightened on those contacts

7   on August, the first one was August 5, August 7th.

8        MR. McDANIEL: August 7th.

9        THE COURT: August 7, August 13 and the telephone

10  calls, she had no reason to be frightened because of the

11  innocuous nature of those contacts.  That was what you were

12  trying to show on your cross examination.

13       MR. McDANIEL: No.  That --

14       THE COURT: And if she says no, that's no correct

15  there are other things that happened which these contacts

16  when considered with these other things is the reason I was

17  afraid of these contacts which on the face appear to be maybe

18  not all that serious.

19       MR. McDANIEL: Well, I think what the Court can

20  point to and what I would point out to the Court is that we

21  did not contest, we did not attempt to keep from the Court

22  that there was a peace order in Maryland, and that there was

23  a peace order ordered from the Air Force.

24       THE COURT: But why was she upset on those dates

25  when --

26       MR. McDANIEL: Well, she — I'm sorry, Your Honor.

27       THE COURT: Why was she upset when they had this

154

taf

1    contact on August 7, August 13 and there was another one, was

2    it the 8th?

3            MR. McDANIEL: It was September the 14th and

4    September the 18th.

5            THE COURT: September 14.  Yeah, why was she upset

6    because of those, and you attempted to show us well he didn't

7    touch the car, he didn't bang on the windows.  She says --

8            MR. McDANIEL: Right, and --

9            THE COURT: -- that considered with other things

10   which happened is the reason I was upset, and why can't we

11   open that up?

12           MR. McDANIEL: Because she testified on yesterday in

13   response to questions on direct examination that the reason

14   that she was scared was because this individual repeatedly

15   contacted her in the face of the peace order in Maryland and

16   in face of the peace order that had been brought down by the

17   Air Force which is the basis for her fear, and that's what

18   she testified to in regard to questions on direct

19   examination.  And so to say now that because I asked a

20   question about that information that I've opened up the door

21   I have not.  I'm merely asking questions on cross examination

22   about information that came out on direct, and to say that,

23   and I'm not saying that's not reasonable.  I mean if she's

24   saying that the reason that she was fearful was because there

25   was this peace order in Maryland that the defendant was

26   present for when the order came down and there was this peace

27   order that was brought down by the Air Force and that there

155

taf

1  was continued contact in the face of those peace orders and

2  the order from the court, we haven't challenged that.  And

3  that's the distinction, Your Honor, it's a different thing to

4  say we're going to delve into the facts supporting each of

5  those peace orders.

6        THE COURT: I'm not going to try all of these other

7  incidents, but I'm going to allow redirect examination of the

8  question as to why she felt threatened on these dates when he

9  contacted her in the District of Columbia.

10        MR. McDANIEL: And will then counsel be allowed some

11  cross examination about those?

12        THE COURT: I'll allow some — we'll see what

13  happens, but at this point I'm going to permit what I just

14  stated without all of the nitty gritty details regarding it.

15  We are now 1 o'clock.  As much as our normal, past our normal

16  lunch hour, can you complete this in 10 minutes?

17        MS. LUCAS: Depends on how much leeway --

18        THE COURT: The reason I say that, we are in the

19  process of interviewing for law clerks in our chambers, one's

20  coming in at 2 o'clock, another one's coming in at 2:15, and

21  I'm not going to be there for the whole thing, I just want to

22  take a look at them and ask a couple of questions.

23        MS. LUCAS: I can see how far I can get in the next

24  10 minutes.

25        THE COURT: Okay.

26        (This portion of the tape was indiscernible.)

27        THE COURT: All right.

156

taf

REDIRECT EXAMINATION CONTINUED

BY MS. LUCAS:

Q    Ms. Johnson-Norman, you've stated that you felt fear during the August contacts because of the other events that had occurred prior to that time, is that correct?

A    That is correct.

Q    And could you tell the Court how many times the defendant had contacted you in violation of either the peace order or the no contact order by the military --

MR. McDANIEL: Objection, Your Honor.

THE COURT: Not contacts where she suspected, but contacts where she knows of.  In other words she yesterday started talking about calls which she received which she suspected being this individual, but she doesn't know for sure.  So as long as she understands your question, contacts which they had which she knows for a fact they were from this defendant.

BY MS. LUCAS:

Q    How many contacts did you have from the defendant either via telephone, at your place of employment, at your home in Maryland, at your choice after either the temporary peace order had been invoked by Maryland or the no contact order by the military?

A    A significant amount.

Q    Was it more than five?

A    It was more than 20.

Q    And could you tell the Court how many times the

157

taf

1    defendant called you at your home that you know of during

2    that time period between June of the year 2000 and August 7th

3    of the year 2000.

4         A    At home I'd say about five times.

5         Q    All right.  And how many times did he call you at

6    the office?

7         A    At least 20, at least 20.

8         Q    And at your place of worship or your church did he

9    ever go to that location during that time?

10        A    Yes, he did.

11        Q    How many times did he go to your church?

12        A    Twice.

13        Q    How many times other than the two times that you've

14   described already had he gone to your place of employment

15   during that period of time?

16        A    About five.

17        Q    How many times during that period of time from June

18   of the year 2000 until August 7th of the year 2000 did he

19   show up at your home?

20        A    I'm sorry, one more time.

21        Q    Between --

22             THE COURT: What was the answer?  I didn't get the

23   answer.

24             THE WITNESS: I asked her to repeat the question.

25   I'm sorry.

26             THE COURT: Number of times he showed up at your

27   home.

taf

BY MS. LUCAS:

Q    Number of times he showed up at your home between June of the year 2000 and August 7th of the year 2000.

A    I think twice.

Q    Were any of these contacts by the defendant that you've just described were they solicited by you?

A    Absolutely none.

Q    And during the time that the defendant contacted you, made those contacts what, if anything, did you tell him with regard to the welcome he would receive as far as the nature of these contacts?

A    In, I told him --

MR. McDANIEL: Objection, Your Honor.  Relevance and unless we're going to talk about particular incidents and the nature of these incidents --

THE COURT: Excuse me.  What welcome he'd receive?

MS. LUCAS: I can rephrase the question a little bit better.

BY MS. LUCAS:

Q    What, if anything, did you tell the defendant about whether his calls, his coming over were welcome to you?

MR. McDANIEL: When?

BY MS. LUCAS:

Q    We're talking about June to August 7.

A    Each time I told him his calls, his show ups, his presence was not welcome.

Q    And what, if anything, was his response when you

159

taf

1    told him this?

2        A    He'd just ignore it.

3        Q    You had testified that the defendant had contacted

4    you on September 14th by telephone, is that correct?

5        A    Correct.

6        Q    You had been at a hearing in Maryland District

7    Court the day before?

8        A    That is absolutely correct.

9        Q    What, if anything, was stated with regards to a no

10   contact, stay away order at court on September 13th.

11       A    At the --

12           THE COURT: Thirteen or 14?

13           MR. McDANIEL: Objection, Your Honor.

14           MS. LUCAS: September 13th was the court date,

15   September 14th was the date of the telephone call that the

16   defendant called her.

17           THE COURT: What was your question again?

18           MS. LUCAS: My question was what, if anything, was

19   stated with regards to the no contact, stay away order on

20   September 13th in court.

21           THE WITNESS: At the close of the hearing Judge

22   Beverly Woodard reiterated to the counsel and to the

23   defendant as she had done the week before that he was to have

24   absolutely no contact with me, and she went a step further

25   and told both the defendant and his counsel that if any

26   contact was had with me she'd place him on a no bond status.

27           BY MS. LUCAS:

160

taf

1      Q    You stated that during the telephone conversation

2  which Detective Durant heard that you had cussed at the

3  defendant.

4

5      A    Yes.

6      Q    Why did you cuss at him?

7      A    I was beyond frustrated at that point as I am

8  today, beyond frustrated that absolutely nothing that I had

9  done was working.  This person would not leave me alone.  I

10  mean the average person once you get a simple temporary peace

11  order against them would fall by the wayside, I had gone a

12  step further than that and gone to his supervisor who was so

13  difficult for, to even grab their attention it took me a

14  month just to get a no contact order, and the court system,

15  the District of Columbia, too much for a single person when

16  all I wanted to be, is just to be left alone.  I'm

17  aggravated, I'm frustrated and I'm angry.

18      Q    Prior to November of 1999 was your husband aware

19  that you knew somebody by the name of Virgil Rodgers?

20      A    Yes.

21      Q    Did you have to give him any explanations regarding

22  your contact with Mr. Rodgers at any time?

23      A    I had, yes.

24      Q    Okay.  And what kind of explanation had you given

25  previously?

26      A    Well, he knew that I talked to him from my cell

27  phone records, he knew that my absence was explained, a

161

taf

1    number of absences were unexplained.

2        Q    My question was what explanation did you give your

3    husband?

4        A    Oh, I'm sorry.  I told him that, that he was a

5    friend of mine.

6        Q    And that seemed to, that was no problem with your

7    husband?

8        A    It was a problem.

9            MR. McDANIEL: Your Honor, I'm sorry, can we get

10    clarification on the time frame that you're talking about.

11            MS. LUCAS: I had said --

12            THE COURT: Before November of '99 I believe she

13    said.

14            MR. McDANIEL: I didn't --

15            BY MS. LUCAS:

16        Q    At Any time prior to November of 1999 did you ever

17    indicate to your husband that you were having a problem with

18    the defendant as a friend?

19            MR. McDANIEL: Objection, Your Honor.

20            THE COURT: Overruled.

21            THE WITNESS: Yes.

22            BY MS. LUCAS:

23        Q    Okay.  And when did you make the comment to your

24    husband that you were having some trouble with him?

25        A    In the summer of '99.

26        Q    Okay.  What trouble, if any, did you tell your

27    husband about then?

162

taf

1       A    The defendant was showing up at my job at a

2   Baltimore firm uninvited.

3       Q    Other than that contact did you ever discuss the

4   issue in November of 1999, did you discuss with your husband

5   any problems you might have had with the defendant?

6       A    Yes.

7       Q    And when was that?

8       A    Since November.

9       Q    When in November was this incident where there was

10  an actual confrontation between the defendant and your

11  husband?

12      A    November the 1st.

13      Q    Okay.  And at that time who called the police?

14      A    A witness to the incident called the police.

15      Q    Okay.  And when was it that you actually had the

16  conversation with your husband that the defendant was making

17  unwelcome visits to you?

18      A    Two days before.

19      Q    So this was prior to the altercation with the

20  defendant on November 1st?

21      A    Yes.

22      Q    And at that time did you tell your husband that you

23  believed the defendant was stalking you?

24      A    Yes.  I told him that he snatched my cell phone

25  from me two days before.

26

27          MR. McDANIEL: Objection, Your Honor.

163

taf

1      THE COURT: That could be answered yes or no,

2    couldn't it?

3      THE WITNESS: The question again, I'm sorry.

4      BY MS. LUCAS:

5      Q    I can't remember the exact question.

6      A    Okay.

7      Q    When was it that you told your husband that the

8    defendant was stalking you in relationship to the November

9    1st incident between he and Mr. Rodgers?

10     A    I, I think that may have been the first time in

11   which I actually used the word stalking.  I, I mean I told

12   him that, you know, he's appearing uninvited which in a sense

13   is, is probably one and the same.

14     Q    And when would you have told your husband before

15   the November 1st that the defendant was making, besides the

16   summer time, close in proximity to the November time that he

17   was making unwelcome --

18     A    It was two days before when the defendant came to

19   my subdivision uninvited.

20     MR. McDANIEL: Objection, Your Honor.

21     THE COURT: I'm sorry.

22     MR. McDANIEL: The question has been answered and

23   now it's being answered in a narrative.

24     THE WITNESS: It was two days before.

25     BY MS. LUCAS:

26     Q    Why did you tell your husband two days before that

27   the defendant was making unwelcome contact with you?

164

taf

1          MR. McDANIEL: Objection, asked and answered.

2          MS. LUCAS: I haven't gone into the specifics.

3          THE COURT: I believe so.  She may answer.

4          THE WITNESS: Two days before the defendant appeared

5     in my subdivision, and when I say my subdivision I live two

6     streets over from the entrance of my subdivision.  I pulled

7     into my subdivision --

8          THE COURT: Well, I guess instead of going — two

9     days before you told your husband defendant was stalking you

10    is that because you felt he was stalking you or because you

11    were trying to cover up your relationship with the defendant?

12         THE WITNESS: It's because he was stalking me.  He

13    came uninvited to my subdivision and snatched my cell phone

14    out of my hand when I tried to call the police.

15         THE COURT: Well, you've answered the question.

16         THE WITNESS: Okay.

17         MS. LUCAS: I don't have anything further.  Thank

18    you.

19         THE COURT: Do you have some additional questions?

20    We'll take our luncheon recess.

21         MR. McDANIEL: Can I ask one before we even go, Your

22    Honor?

23         THE COURT: All right.

24                    RECROSS EXAMINATION

25         BY MR. McDANIEL:

26    Q    If he's stalking you in November of 1999 and this

27    is the explanation that you give your husband then for the

                                                            165

taf

1    first time you know, correct?

2          MS. LUCAS: Objection as to the term explanation,

3    explaining what?

4          THE COURT: Let's have that again.

5          MR. McDANIEL: I believe she testified that --

6          THE COURT: Let's hear your question.

7          BY MR. McDANIEL:

8      Q    November the 1st, 1999 is the first time you recall

9    telling your husband that Mr. Rodgers was stalking you,

10   correct?

11     A    Correct.

12     Q    Okay. And were you in fear for your life at that

13   time when he was stalking you?

14     A    I would say I wasn't in fear of my life. I was

15   afraid, but I, I didn't think that he would kill me, I

16   thought he would maybe hurt me.

17     Q    You thought he might hurt you physically?

18     A    By snatching my cell phone out of my hand it hurts.

19     Q    Right. But you thought that he was capable of

20   hurting you, is that right?

21     A    yes.

22     Q    And you were in fear at that time, right?

23     A    Absolutely. His anger said it all.

24     Q    And you continued to sleep with him from November

25   the 9th of 1999 until May of 2000, correct?

26     A    No, I answered that earlier, I said no.

27     Q    Did you sleep with him after November the 1st,

                                                        166

taf

1    1999?

2        A    I said sporadic, yes, but no at about three months

3    after.

4        Q    Yes, okay.

5            MR. McDANIEL: If I could continue after we get

6    back.

7            THE WITNESS: Sure.

8            THE COURT: Very well.  All right.  I'm going to

9    take a luncheon recess.

10           MS. LUCAS: Okay.

11           THE COURT: Mr. Loven, hearing on your matter?

12           MR. LOVEN: Just very brief, Your Honor.  If I could

13   have 30 seconds with my client I can maybe waive the hearing.

14           THE COURT: Oh.

15           MR. LOVEN: Very brief, Your Honor.

16           THE COURT: And you want to do that right now?

17           MR. LOVEN: I'd like to because Government counsel

18   is also (indiscernible).

19           THE COURT: Okay.  All right.

20           MR. LOVEN: Thank you, Your Honor, it will be brief.

21           THE COURT: All right, we'll recess this until let's

22   make it 2:30 otherwise if I come back at 2:15 I'll have to

23   leave to go down to talk to this other person for a few

24   minutes, and we can move faster I think.  Recess this trial

25   until 2:30, promptly at 2:30.

26           MR. McDANIEL: Thank you, Your Honor.

27           (Thereupon, the matter was in luncheon recess.)

167

taf

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17                    AFTERNOON SESSION (2:24 P.M.)

18          DEPUTY CLERK: Returning to the bench trial, United

19   States v. Virgil M. Rodgers, case number M9709-00.

20          MS. LUCAS: Good afternoon, Your Honor, Diane Lucas

21   on behalf of the United States.

22          MR. McDANIEL: Good afternoon, Your Honor, Brian

23   McDaniel on behalf of Mr. Rodgers who is present and standing

24   to my left.

25          THE COURT: Good afternoon.  Do you have some

26   questions of the witness?

27          MR. McDANIEL: Just in regard to the last questions

                                                          168

taf

1    that were asked.

2                 THE COURT: Okay. All right.

3                 (This portion of the tape was indiscernible.)

4                 THE COURT: All right, Ms. Johnson-Norman is back on

5    the stand, and you're still under oath. Do you understand

6    that? Mr. McDaniel. Any witness in the courtroom?

7                 MR. McDANIEL: No.

8                       KAREN JOHNSON-NORMAN,

9    having been previously duly sworn, testified further as

10   follows:

11                  RECROSS EXAMINATION CONTINUED

12                BY MR. McDANIEL:

13   Q    Ms. Johnson-Norman, good afternoon.

14   A    Good afternoon.

15   Q    In response to counsel's questions on redirect I

16   believe you testified that Mr. Rodgers called you five times

17   between the June 2000 date and an August 2000 date, is that

18   correct, at your home?

19   A    I'd say approximately.

20   Q    Okay. You have any evidence or proof of the fact

21   that he called you on those five times here with you today?

22   A    What was the, the end date again?

23   Q    August 2000, between June and August 2000?

24   A    You mean June and September, correct?

25   Q    No, I'm asking about June and August.

26   A    What, what, the end of August?

27   Q    Yeah. No, well, between June of 2000 and August

169

taf

1    the 8th, because I think we've testified about the calls that

2    were allegedly made.

3        A    No, that's not correct.  The, the date extends to

4    9/30 that he called me at home.

5        Q    So you're saying five times including all of those

6    dates --

7        A    Correct.

8        Q    -- up to 9/30?

9        A    Correct.

10       Q    Okay.  So between June and September 30th of 2000

11   you say he called five times to your home?

12       A    And it's a, it's an approximate amount of times,

13   correct.

14       Q    Okay.  And --

15       A    And when I say June I'm talking we got our, we went

16   to court June the 26th, that was the day that we went before

17   Judge Brown and told him that we were gonna mediate outside

18   of the court.

19       Q    That's right, so you're limiting that scope between

20   June the 26th and September the 30th?

21       A    That's what I thought her question was.

22       Q    Okay.  I mean if that's the time frame that you're

23   talking about that's fine.

24       A    Okay.

25       Q    Now, you had called Mr. Rodgers actually on the

26   25th of June, isn't that correct?

27       A    That's correct, mm-hm..

170

taf

1   Q    And you called him approximately how many times on

2   that day?

3        A    Probably three or four times.  I'm really not sure,

4   about three or four times.

5        Q    If I said you called him five times would that be

6   out of the ballpark?

7        A    I said three or four, that's close, so no I

8   wouldn't say that would be out of the ballpark.

9        Q    Okay.  And during any of those five calls that you

10  made to Mr. Rodgers — and may I ask was that to his home?

11       A    Yes.

12       Q    And during any of those five --

13       A    I'm sorry, I think it was to his cell phone, but he

14  was at home, at home according to him.

15       Q    Okay.  And you were calling him for the purpose of

16  discussing how you all were going to proceed on June the

17  26th?

18       A    Yes, at his request for me to call him that day,

19  yes.

20       Q    Well, when had he requested that you call him?

21       A    The week before.

22       Q    You don't recall the date on that, right?

23       A    I think the, I believe the 26th was, the 25th was

24  a Sunday so I think it was that Friday before.

25       Q    Okay.  So you called him and eventually you did

26  contact, correct?

27       A    I spoke with him just about every time that I

taf

1    called, correct.

2         Q    Okay.  And if you can recall why is it that you

3    needed to call five times instead of having just one

4    conversation?

5         A    Because we talked several times he had a visitor

6    and he told me to call back.

7         Q    Okay.  But at some point in time did you all have a

8    lengthy discussion on the cell phone prior to you doing

9    anything else?

10        A    I, I don't recall how -- I don't recall the length

11   of the calls.

12        Q    Okay.  But you do recall having a conversation with

13   him on that day about mediation?

14        A    Absolutely.

15        Q    And that was on the cell phone, correct?

16        A    I don't recall because I told you and I testified

17   earlier that I did meet with him also.

18        Q    Okay.  And, in fact, on June the 25th you went to

19   his house, correct?

20        A    At his request, yes.

21        Q    Right.  And this is based upon a request that he

22   made to you on the cell phone when you all had spoken?

23        A    During, on the Friday before and during when we

24   talked, correct.

25        Q    Okay.  And at that point in time you went to his

26   home, correct?

27        A    At some point in time during the day, that's

172

taf

1    correct.

2        Q    Do you recall what time it was that you went?

3        A    I do not.

4        Q    Okay.  And when you got there Mr. Rodgers was, in

5    fact, there, correct?

6        A    That is correct.

7        Q    Now, you testified before that you did not go into

8    his house?

9        A    That is correct.

10       Q    Okay.  But you invited Mr. Rodgers out of his house

11   to come and talk to you about how you all were going to

12   proceed on the next day?

13       A    That is correct.  He had a guest so he told me, and

14   he told me that to just wait in the car and I did.

15       Q    Okay.  And so at this point in time Mr. Rodgers

16   came out based upon your testimony and sat in the vehicle

17   with you?

18       A    That's correct.

19       Q    How long were ya'll in the vehicle together?

20       A    We were, we were together in the vehicle for hours,

21   but it wasn't just in the vehicle, it was outside also.

22       Q    Okay.  So you all were in and around your vehicle

23   for a couple of hours?

24       A    Yes.  I mean it was a few hours and it wasn't

25   around the vehicle, we were in his complex, his apartment

26   complex.

27       Q    Right.  And there's a parking lot in front of his

173

taf

1  complex, is that correct?

2       A    It was all around the complex, all around

3  literally.  It was the front, the side and the backside, it

4  was all around.  There was a parking, it was a like a slide,

5  playground area, I mean his apartment complex at that time

6  was huge.

7       Q    So you all were walking around then?

8       A    Correct.

9       Q    Okay.  And at this point in time this is obviously

10  after the November 1999 date, correct?

11      A    I had testified it was June 25th.

12      Q    Okay.  Of 2000, correct?

13      A    Correct.

14      Q    And I think you testified to the Court that in

15  November of 1999 that you had explained to your husband that

16  he was stalking you because in your mind's eye he was

17  actually stalking you, correct?

18           MS. LUCAS: Objection, beyond the scope of redirect.

19           MR. McDANIEL: No, she --

20           MS. LUCAS: I didn't go into the November stuff.

21           MR. McDANIEL: That was testified to on her

22  redirect.  As a matter of fact, she asked her --

23           THE COURT: I'd have to check my notes to the --

24           MR. McDANIEL: She asked her what she told her

25  husband in November of 1999.

26           MS. LUCAS: I apologize, Your Honor.  He's correct.

27           THE COURT: Very well.  Go ahead.

174

taf

1    THE WITNESS: The question again?

2    BY MR. McDANIEL:

3    Q    This is after the November 1999 date which you

4    explained to your husband that this individual was stalking

5    you, and I think you testified to the Court that you believed

6    at that point in time that he was stalking you because he was

7    actually stalking you or that you gave that explanation

8    because he was stalking you?

9    A    That is correct.

10   Q    Okay.  And in November of 1999 you were actually in

11   fear for some physical harm, correct?

12   A    That is correct.

13   Q    Okay.  Now, after the November 1999 communication

14   with your husband when was the next time that you were with

15   Mr. Rodgers intimately?

16   A    I actually do not recall.

17   Q    So it could have been December, it could have been

18   January, you just don't know?

19   A    No, I think it was actually March.  I'm not really

20   sure, but I think it was March.  The defendant and I, and I

21   explained this probably on about three occasions, had a

22   period of time and December was included in that time in

23   which it was at least six weeks because he was going to

24   therapy and his counselor told him (indiscernible) hasn't

25   been with you in six weeks like you've testified to, like

26   you've told me anything, of course, she doesn't want to be

27   bothered with you.

taf

1    Q    I'm sorry, I'm not understanding who?

2    A    I, again, I testified that there was I mean long

3  periods of time in which the defendant and I did not see each

4  other.

5    Q    Mm-hm.

6    A    And that includes the period from November 1 to

7  probably March.  I'm not really sure.  And during that period

8  of time, do you follow me?

9    Q    Yeah, Ms. Johnson-Norman, but I mean earlier you

10  testified that you believed that your relationship with Mr.

11  Rodgers may have ended in March?

12         MS. LUCAS: I disagree, Your Honor, that

13  (indiscernible).

14         THE WITNESS: That's not what I said.

15         MR. McDANIEL: March, April or May.

16         THE COURT: Just a second.  You may ask her.

17         BY MR. McDANIEL:

18    Q    Isn't that correct?  I mean did you not testify

19  earlier that you believed that your relationship with Mr.

20  Rodgers ended in sometime of March, April or May?

21    A    That is correct.

22    Q    Okay.  And so your testimony here today is that you

23  then were only intimate with him one other time after the

24  November 1 date?

25    A    I did not just say that.

26    Q    Okay.  So then --

27         THE COURT: I did not say that you said?

176

taf

1     THE WITNESS: I did not just say that.

2     MR. McDANIEL: I did not say that.  That is what she

3 just said, but --

4     MS. LUCAS: I'm going to object to counsel's

5 comments.

6     THE WITNESS: That is not what I just said.

7     THE COURT: Just a minute.

8     THE WITNESS: He asked me, Your Honor --

9     THE COURT: Did you say I did not say that or I did

10 say that?  I didn't --

11     THE WITNESS: I did not say that.

12     THE COURT: Did not, okay.  Thank you..

13     THE WITNESS: My testimony was I didn't know how

14 many times, however, there was an extended period of time of

15 a minimum of six weeks which he and I didn't even see each

16 other.

17     BY MR. McDANIEL:

18  Q Minimum of six weeks after the November date?

19  A Yes.

20  Q Okay.  So six weeks from November 1 would be what?

21  A I didn't say starting November 1.  I said during

22 that period of time.

23  Q So I mean you're talking about six weeks.  I'm

24 assuming that the six weeks has a starting time and an ending

25 time.

26  A I'm not saying it was only the, that was only a

27 period of time during that in which I didn't see him.  He and

taf

1    I had a very sporadic relationship especially after the

2    November 1 incident.

3        Q    Okay.  So it could have been anywhere from six

4    weeks from November 1 to March, is that right?

5            MS. LUCAS: For what?

6            THE WITNESS: I'm sorry, what are you talking about?

7            BY MR. McDANIEL:

8        Q    For your intimate contact with Mr. Rodgers.

9            MS. LUCAS: Objection, Your Honor.  She's asked and

10   answered this question.  She has testified that she believes

11   the first intimate contact she had with the defendant may

12   have been in March, that there was at least a six period, she

13   doesn't know exact dates.

14           MR. McDANIEL: Right.  So my question only was --

15           THE COURT: Well, she also said, I believe she said

16   there may have been other intimate contacts between November

17   and March.  Did you say that, there may have been?

18           THE WITNESS: I know I said I didn't know.  I know

19   there was a period of time in which we didn't have, you know,

20   it's not something that I write down, it's not something that

21   I need to find or remember.

22           THE COURT: We just want to be sure we understand

23   your best recollection.

24           THE WITNESS: My best recollection is that.

25           THE COURT: You did say, did you not, that between

26   November and March you may have had other intimate contacts?

27           THE WITNESS: I did say that.

                                                          178

taf

1        THE COURT: Okay.

2        MR. McDANIEL: Okay.

3        BY MR. McDANIEL:

4    Q    But you're just not sure when they were, correct?

5    A    That is correct.

6    Q    Okay.  Well, between November 1st and whenever it

7    is that you had these other intimate contacts with Mr.

8    Rodgers what is it that changed that allowed you not to be in

9    fear of this stalking?

10   A    You know, I cared for the defendant was the only

11   reason that I saw him, I mean I, I didn't stop caring for the

12   person, because he was doing the things.  I tried to ask him

13   why would he do the things that he did that would cause us to

14   have a severe fallout.

15   Q    Ma'am --

16   A    I always cared for him.

17   Q    Ma'am, what changed?

18   A    I'm telling you what changed.

19   Q    No, you said you always cared for him so that

20   didn't change.  What changed?

21   A    It did change.  When, when someone imposes

22   themselves on you, when they show up at your home, when they

23   show up at your job uninvited it makes you change, you don't

24   want to be around that person.

25   Q    Okay.  But at some point in time you decided that

26   you didn't want to be around him, right?

27   A    That is correct.

179

taf

1      Q    Okay.  So what made you decide that, what made you

2  go from I don't want to be around this person who comes to my

3  job uninvited, who I'm scared of, who is stalking me to okay,

4  I am not fearful of this individual, I don't think that he's

5  going to harm me physically, I don't mind him coming to my

6  job and I'm going to sleep with him?  What changed?

7      A    I'll repeat my answer, I cared for him and when he

8  stopped doing those imposing things, when he begged that he,

9  and pleaded that he'd never do it again, that he just lost

10  his temper I forgave him.

11      Q    Okay.  So the history of this then is that he'll do

12  some things that you're uncomfortable with, then you'll

13  complain and stop seeing him and then he'll apologize to you

14  and then you all will continue on with your relationship?

15  Because it happened twice, isn't that right?

16      A    Do you want to give me a time frame?

17      Q    You said something --

18      A    It happened in November and it happened in

19  February.

20      Q    Right.  And --

21      A    And it came to a head in, in April/May.

22      Q    Right.  And so, you know, obviously it's happened

23  at least twice --

24      A    Yes.

25      Q    -- correct?  So that's not a pattern, I mean

26  there's no pattern to that that in November you're fearful

27  for your life then at some point in time either six weeks or

taf

1    all the way up until March which would include February you

2    don't have that fear anymore?  I'm trying to figure out what

3    it is that happened in both instances that removed that fear.

4         A    I can give you specifics --

5              MS. LUCAS: Objection, asked --

6              THE WITNESS: -- if you need it.

7              BY MR. McDANIEL:

8         Q    I would like that.

9              MS. LUCAS: Can I make the objection.

10             THE COURT: I don't understand your question --

11             MS. LUCAS: I don't either.

12             THE COURT: -- and I doubt she does.

13             MR. McDANIEL: I think she does.

14             THE WITNESS: I do not.

15             BY MR. McDANIEL:

16        Q    Okay, well you --

17        A    I answered your question.

18        Q    But you were about to give me specifics, right?

19        A    You asked me and I told you because I cared about

20   him and I forgave him and I thought that he really wasn't

21   going to continue to harass me and stalk me and show up and

22   call my friends and have his friends call me including his

23   grandmother.  I thought it was going to stop and I wanted to

24   stop.

25        Q    Okay.  Now you said that he showed up twice at your

26   church, when were those times, what were the dates on those?

27        A    The most obvious date to my recollection is May

181

taf

1    25th.

2         Q    Any other time?

3         A    Of 2000.  And the other time I don't remember the

4    exact date, but he actually attended a service at my church

5    uninvited.  I didn't even tell him where the church was

6    located, I simply told him the name of the church.

7         Q    Was this after May the 25th or before?

8         A    You know, I think it was before.

9         Q    Was this during a time when you all are seeing each

10   other or not seeing each other?

11        A    Not seeing each other.

12        Q    Okay.  But you don't recall exactly when that was,

13   right?

14        A    I do not.

15        Q    Okay.  Now, I think you testified to an incident

16   that involved both your husband and Mr. Rodgers in November

17   of 1999 --

18        A    Correct.

19        Q    -- correct?  And it was your testimony that Mr.

20   Rodgers came upon you unexpectedly at that time?

21        A    That's correct.

22        Q    Okay.  And so it's not --

23        A    Well, when I say -- when you say unexpectedly

24   that's really not accurate.

25        Q    Uninvited?

26        A    Correct.

27        Q    Okay.  So it's not the case then that on November

182

taf

1    the 1st you and Mr. Rodgers were actually walking down the

2    street and your husband came upon the both of you?

3        A    Okay, this is my description of it.  I came from

4    Farragut North subway station, I walked down K Street, the

5    defendant didn't know which subway station I came in on,

6    because I typically come on, in on either Farragut North or

7    Farragut West, the defendant like he has so many times before

8    was standing outside of Farragut West on K Street waiting for

9    me to come by to return my cell phone to me that he had taken

10   from me two days before.

11       Q    Okay.  And so as you all are walking down the

12   street --

13       A    No, no.  As I am walking down the street telling

14   him to get the hell away from me --

15       Q    Right.

16       A    -- and asking him why the hell he is there he

17   followed me --

18       Q    Right.

19       A    -- that's a big difference.

20       Q    Okay.  All right.  And while that is taking place

21   your husband jumps out and says to you aha I got you, doesn't

22   he?

23       A    No, that's not what he said.

24       Q    What did he jump out and say?

25       A    My, I saw, first of all, my husband, I told him

26   that more than likely I suspected that Virgil Rodgers would

27   appear that day and return my cell phone to me.  My husband

183

taf

1  did not tell me that he was going to be there as well.  My

2  husband, I saw my husband coming and I froze and I said oh my

3  god, there is Percy.

4      Q    Mm-hm.

5      A    And I immediately went into a panic mode, and Percy

6  came up to me and, and they, he started screaming because he

7  said I saw you down the street, Karen, he said something like

8  I saw you down the, down the street and where is your cell

9  phone.  So he just started screaming and I can't remember

10  exactly what he said.

11      Q    All right.  Had you all gotten coffee together, I'm

12  talking about you and Mr. Rodgers that day?

13      A    No, I as I do just about three or four days a week

14  went to Starbuck's and got coffee, he ordered coffee and he

15  paid for the both of us and he walked out with my coffee,

16  left him in the shop and he followed me.

17      Q    And you let him pay for the coffee?

18      A    No, I walked out on him and took my coffee.

19      Q    Okay.

20          MR. McDANIEL: Do you have any markers the

21  defendant's exhibits?

22          (This portion of the tape was indiscernible.)

23          MR. McDANIEL: I appreciate it.

24          THE COURT: What do you need to mark, Mr. McDaniel?

25          MR. McDANIEL: It's correspondence from Ms. Johnson-

26  Norman to Mr. Rodgers.

27          MS. LUCAS: Your Honor, I'm going to object to it.

184

taf

1    First of all, it's beyond the scope of redirect, it's about

2    events in May.

3              THE COURT: Well, let's --

4              MS. LUCAS: I limited my conversations --

5              THE COURT: Just one second.  He has a right to have

6    it marked.

7              MS. LUCAS: Yes.

8              THE COURT: I'm not sure he has any -- can it be

9    marked -- can you write a little bit?

10             MR. McDANIEL: I can write on it, Your Honor, yes.

11             BY MR. McDANIEL:

12      Q    While she's looking for that, is it your testimony

13   that you then did not have any correspondence with Mr.

14   Rodgers in any form or shape even as late as May of 2000 of

15   last year?

16      A    No, that's not right at all.  I said since June the

17   26th of

18      Q    Okay.  But it's your testimony that you were not

19   intimate as best you know with Mr. Rodgers in May of 2000?

20      A    That's not what I said.

21      Q    So it's then possible that you might have been

22   intimate with him even in May?

23             THE WITNESS: Your Honor, I already testified that

24   it was either March, April or May.

25             BY MR. McDANIEL:

26      Q    March, April or May.

27      A    You just said that before the --

185

taf

1      Q    I'll show you what's been marked for identification

2    purposes as Defendant's Exhibit 1.  Please take a look at

3    that.

4      A    Okay.

5      Q    Okay.  Did you, in fact, make this correspondence

6    to Mr. Rodgers by e-mail on May the 2nd of 2000?

7      A    In the --

8            MS. LUCAS: Objection, Your Honor.  Beyond the scope

9    of redirect.

10           THE COURT: I have absolutely no idea what's on that

11   piece of paper.

12           MS. LUCAS: Right, and he's talking about it being

13   on May 2nd.  We didn't get into anything in May on my

14   redirect.

15           THE COURT: I didn't hear him state any date.

16           MS. LUCAS: He just did.

17           MR. McDANIEL: I asked if she recognized this

18   correspondence that had been sent by e-mail on May the 2nd,

19   2000.

20           MS. LUCAS: And my redirect was limited to the dates

21   of June through August 7 about other bad acts of the

22   defendant.  Plus, then we went into a little bit about the

23   November 1999.  I in no way got into February, March, April

24   or May.

25           THE COURT: Why is this May relevant?

26           MR. McDANIEL: Well, this confirms confirmations

27   that, number one, she was contacting Mr. Rodgers up until May

186

taf

1  of 2000, and secondly that the intimate portion of their

2  relationship extended into May of 2000.

3             MS. LUCAS: She has never --

4             THE COURT: She hasn't denied that, has she?

5             MS. LUCAS: -- denied it.

6             THE WITNESS: No.

7             MR. McDANIEL: Well she, in effect, has not

8  confirmed it for the Court either.  Her testimony was that --

9             THE COURT: Well, what is this, to refresh her

10 recollection or what?

11            MR. McDANIEL: It is.

12            MS. LUCAS: Your Honor --

13            MR. McDANIEL: And in her testimony, if I might

14 finish --

15            THE COURT: Just one at a time.

16            MR. McDANIEL: Her testimony is very unclear on the

17 point of when it is that the relationship finally ended,

18 whether it be March, April or May of 2000.  This at least

19 confirms for the Court that the relationship extended itself

20 into May which is information that was elicited from counsel

21 on redirect as it related to when it is that her husband was

22 informed of the relationship and when it actually ended.

23            THE COURT: But she hasn't denied that, has she?

24            MR. McDANIEL: Well, this is confirmation, Your

25 Honor.

26            THE WITNESS: Your Honor --

27            MR. McDANIEL: This is different.  If she's willing

187

taf

1    to admit that she now remembers that it extended into May

2    then I don't need to present it.

3              MS. LUCAS: Your Honor, this is beyond --

4              MR. McDANIEL: If this refreshes her recollection

5    rather.

6              MS. LUCAS: She hasn't said that she needs her

7    recollection refreshed, first of all.

8              THE COURT: I'll sustain the objection.

9              MS. LUCAS: Thank you.

10             BY MR. McDANIEL:

11       Q    You have a better idea of when it is that your

12   relationship with Mr. Rodgers finally ended?

13       A    Based on what?

14       Q    Based upon what you've just read.

15             MS. LUCAS: I'm going to object, Your Honor.  He can

16   not now ask her to refresh her recollection on something that

17   has not been admitted and the Court sustained an objection

18   on.

19             MR. McDANIEL: Well, I'm not offering it into

20   evidence.

21             THE COURT: On the redirect the prosecutor asked her

22   questions pertaining to a number of incidents which took

23   place between June and August and she told us what those

24   were.  And now you're asking her questions regarding what

25   happened before June.

26             MR. McDANIEL: That's correct.

27             THE COURT: Why is that proper recross?

taf

1      MR. McDANIEL: Well, because the extent and

2   scope of her redirect went above and beyond that in te

3   explaining what happened between her husband and herse

4   what communications were made between her husband and

5   as it related to the November 1 stalking allegation an

6   February 2000 stalking allegations.

7      THE COURT: Right. There were some questions

8   regarding confrontation November 1 on recross, but thi

9   document you're showing her now is not impeachment. I

10  it's merely confirmation.

11     MR. McDANIEL: Well, I --

12     THE COURT: You mean substantive proof that t

13  happened, is that what you're saying?

14     MR. McDANIEL: Well, no, I think it's relevar

15  because the complainant has admitted that there's at l

16  two allegations of stalking on the part of Mr. Rodgers

17  before we get to June of 2000, that it's relevant that

18  each of these particular incidents she continues the

19  relationship with Mr. Rodgers up and until at least th

20  on this correspondence which is why I think it's relev

21     MS. LUCAS: This is recross, and I didn't bri

22  anything up about this on redirect. He's talking abou

23  that happened in May and I didn't ask any questions re

24  the complaining witness's husband's knowledge of the a

25  in May of the year 2000. It's totally outside the scc

26     THE COURT: The last note I have on redirect

27  November 1 husband and defendant had a confrontation,

taf

1    days before witness told the husband defendant was stalking

2    her.

3              MS. LUCAS: Correct.

4              THE COURT: That was November.

5              MS. LUCAS: That's correct.  I admitted that we had

6    gone over the issues that happened in November and that had

7    started in June.  We had nothing about anything else in

8    between.

9              THE COURT: I'll let you ask regarding that.

10   Objection overruled.

11             BY MR. McDANIEL:

12        Q    Based upon your recollection right now, Ms.

13   Johnson-Norman, when is your best estimate of when it is that

14   you terminated your intimate relationship with Mr. Rodgers?

15        A    Exactly what I already testified to, March, April

16   or May.

17        Q    And in light of the information that you have now,

18   correct?

19        A    Yes.

20        Q    Okay.  And you don't believe that that's less than

21   truthful?

22             MS. LUCAS: Objection, Your Honor.

23             THE WITNESS: No, I don't.  Thank you.

24             MS. LUCAS: Objection.

25             THE COURT: Sustained.

26             MR. McDANIEL: Your Honor, may we approach?

27             THE COURT: Very well.

taf

1    MR. McDANIEL: Just briefly.

2    THE COURT: All right.

3    (Bench conference with Mr. McDaniel and Ms. Lucas)

4    MR. McDANIEL: I don't want to belabor this point,

5    but she has testified that she doesn't know when the

6    relationship with her and Mr. Rodgers actually terminated in

7    either March, April or May of 2000. I was attempting to, and

8    I gave her an opportunity to refresh her recollection and to

9    change her testimony.

10    THE COURT: She said she doesn't remember. Do you

11    want to ask her if there's something to refresh her

12    recollection?

13    MR. McDANIEL: I'll ask that question, Your Honor,

14    I'll ask that question. And I don't mean to (indiscernible),

15    but I think it is (indiscernible) of both factual information

16    and it also bears upon credibility which is very important in

17    this case.

18    MS. LUCAS: Your Honor, with --

19    THE COURT: If she says she doesn't remember and

20    this refreshes her recollection so you have that, I'm not

21    sure that we can argue it maybe.

22    MS. LUCAS: Your Honor, if I might just add for the

23    record, I'm going to object because I didn't ask her on

24    redirect about when her relationship with the defendant

25    ended. That was (indiscernible --

26    THE COURT: Well --

27    MS. LUCAS: -- per se.

191

taf

1    THE COURT: Which was asked back in November might

2    be broad enough to bring this into play.

3    (This portion of the tape was indiscernible.)

4    (Open court)

5    THE COURT: You may come back.

6    BY MR. McDANIEL:

7    Q    Ms. Johnson-Norman, is there any document that I

8    might be able to show you to refresh your recollection as to

9    when it is that your intimate relationship with Mr. Rodgers

10    actually ended?

11    A    Is there any document that I'm aware of?

12    Q    That you're aware of.

13    A    That, I have no idea how to answer that question.

14    Q    So in light of what it is that you've already read,

15    I'm asking you is there anything in my possession and I'm

16    giving you an opportunity to let me know if there's anything

17    in my possession that would refresh your recollection about

18    that particular point?

19    MS. LUCAS: How is she supposed to know what he has

20    in his possession.

21    MR. McDANIEL: Because she's read it.

22    THE COURT: She can say no or yes, whatever.

23    MS. LUCAS: If you want to specifically ask whether

24    the document he just showed her refreshes her recollection

25    about the end of the relationship, fine, then he should ask

26    that question.

27    THE COURT: Right.  Ask that question then.

192

taf

1          BY MR. McDANIEL:

2          Q     The document that I just showed you does that

3    refresh your recollection about when your intimate

4    relationship with Mr. Rodgers terminated?

5          A     No, it doesn't.

6          Q     Okay.

7               MR. McDANIEL: Your Honor, I'd like to offer this

8    into evidence at this point bearing on the information that

9    was presented to Ms. Johnson-Norman and the Court can look at

10   this information and make a determination of whether or not

11   this would be sufficient to have refreshed her recollection

12   or if she's being disingenuous in her testimony.

13               THE COURT: How would I know what may or may not

14   refresh her recollection.   I assume you object?

15               MS. LUCAS: Yes.

16               THE COURT: Sustained.

17               MR. McDANIEL: Your Honor, may I approach with this

18   particular document?

19               THE COURT: Approach her?

20               MR. McDANIEL: Yes.

21               THE COURT: Yes.

22               BY MR. McDANIEL:

23         Q     I'm showing you what's been marked for

24   identification purposes as Exhibit No. 1.   You see at the top

25   there where it says from?

26         A     Yes.

27         Q     And is this your e-mail address,

                                                              193

taf

1    normankb@wellsfargo.com?

2         A    It was before I had it changed.

3         Q    And when did you have it changed?

4         A    I don't remember the exact week but it was after

5    too much contact with the defendant.

6         Q    Okay.  And you don't know if I twas before Tuesday,

7    May 2nd, of 2000.

8         A    Oh, it was definitely after.

9         Q    Okay.  And so do you recall sending this particular

10   e-mail to Mr. Virgil Rodgers at

11   virgilrodgers@pentagon.af.mil?

12        A    I don't recall, but it has my e-mail name on it,

13   yes.

14        Q    Okay.  And the subject below that regarding I want

15   you, correct?

16        A    That's his theme to his favorite song, yes.

17        Q    Right.  And that's a song by Marvin Gaye?

18        A    That is correct.

19        Q    Okay.  And so read for me the language below the

20   subject, I want you.

21             MS. LUCAS: Objection.

22             THE COURT: Sustained.  This is to refresh her

23   recollection I believe.

24             BY MR. McDANIEL:

25        Q    Could you read it to yourself.

26             MS. LUCAS: Objection, Your Honor.  She hasn't said

27   that this is refreshing her recollection.  In fact, she says

                                                                  194

taf

1        --

2                THE COURT: He's asked her to read it.

3                THE WITNESS: To myself?

4                THE COURT: Yes.

5                BY MR. McDANIEL:

6        Q    Yes.

7        A    Okay.

8        Q    Okay.  And were you, in fact, at Mr. Rodgers

9    on May -- strike that.  Were you in Mr. Rodgers' compa

10   May the 1st, 2000?

11       A    No, I can't remember.

12               MR. McDANIEL: I have no further questions, Y

13   Honor.

14               THE COURT: All right.

15               MS. LUCAS: No further questions for this wit

16               THE COURT: Thank you, you may step down.  Re

17   your next witness.

18               MR. McDANIEL: Your Honor, I did ask madam cl

19   she directed me to ask you how you felt about beverage

20   your courtroom.  Is this something that's disallowed?

21               MS. LUCAS: I'm sorry, I can't hear you becau

22       --

23               MR. McDANIEL: I was asking the Judge about

24   beverages in his courtroom.

25               THE COURT: If you're thirsty, if it's a soft

26               MR. McDANIEL: Yes, it is, Your Honor.

27               THE COURT: You may proceed.  I don't do it w

taf

1   jurors are here.  I don't think it looks too good to see

2   others drinking and --

3           MR. McDANIEL: They can't drink.

4           THE COURT: -- them not.

5           MR. McDANIEL: That's right.

6           DEPUTY CLERK: We normally just put it there on the

7   side.

8           MR. McDANIEL: Yes, ma'am.

9           DEPUTY CLERK: Yeah, that, that's much more

10  appropriate.  Thank you, counsel.

11          MR. McDANIEL: No problem, ma'am.

12          DEPUTY CLERK: Sir, please raise your right hand.

13                  JOHN ZANGAS,

14  having been called as witness for and on behalf of the

15  Government, and having been first duly sworn by the Deputy

16  Clerk, was examined and testified, as follows:

17          DEPUTY CLERK: Please be seated now.

18          THE WITNESS: Okay.

19                  DIRECT EXAMINATION

20          BY MS. LUCAS:

21      Q   Could you please state your name for the record.

22      A   John Zangas.

23      Q   Mr. Zangas, where are you employed?

24          THE COURT: How do you spell your last name, Mr.

25  Zangas?

26          THE WITNESS: Z-A-N-G-A-S.

27          THE COURT: Thank you.

taf

1          BY MS. LUCAS:

2     Q    Mr. Zangas, where are you employed?

3     A    At Kinko's, 2020 K Street.

4     Q    Okay.  And were you employed there on August 13th

5  of the year 2000?

6     A    Yes.

7     Q    And I'm going to direct your attention specifically

8  to about 6:30 in the evening hours.  On that occasion on that

9  day did you have the occasion to notice anybody in particular

10  that was in the Kinko's store?

11          THE COURT: What was that date again, August what?

12          MS. LUCAS: Thirteenth.

13          THE COURT: Thank you.

14          THE WITNESS: Yes.

15          BY MS. LUCAS:

16     Q    Okay.  And can you describe for the Court what the

17  person was wearing that drew your attention?

18     A    They were wearing, the individual was wearing a

19  pair of light blue jeans.

20     Q    Anything on top?

21     A    I don't recall what they were wearing, maybe a t-

22  shirt, I'm not sure --

23     Q    Okay.

24     A    -- the color of the t-shirt.

25     Q    Was the person male or female?

26     A    A male.

27     Q    White or black?

197

taf

1    A    African-American.

2    Q    Okay.  Is the person that drew your attention at

3    Kinko's here in the courtroom today?

4    A    Yes.

5    Q    Could you point him out and describe what he's

6    wearing for the Judge.

7    A    A suit, olive colored suit.

8         MS. LUCAS: Let the record reflect the witness has

9    identified the defendant.

10        THE COURT: Yes.

11        MR. McDANIEL: Your Honor, if I might, may I ask for

12   a proffer from the Government as to what this witness is

13   going to testify to, because we may be able to stipulate to

14   it.

15        THE COURT: Very well.

16        MS. LUCAS: Your Honor, he's going to testify to the

17   fact the defendant was --

18        THE COURT: Do you want to do outside the presence

19   of him or not?

20        MS. LUCAS: It should be a short direct, Your Honor,

21   we might as well just go through it.

22        THE COURT: Okay.  All right.

23        MR. McDANIEL: Well, if his testimony is going to be

24   that Mr. Rodgers was in his store then we would stipulate to

25   that.

26        THE COURT: Might be a time frame and --

27        MS. LUCAS: No, it's more than that.

198

taf

1    MR. McDANIEL: Okay.

2    THE COURT: Why don't you go ahead.

3    MS. LUCAS: Thank you.

4    BY MS. LUCAS:

5    Q    Mr. Zangas, what specifically drew your attention

6    to the defendant?

7    A    Well, in my capacity as the commercial business

8    representative I intercept or interact with customers on a

9    regular basis. If they're in the store I'm required to

10    address them, to greet them so to speak as is all co-workers,

11    and I, I observe the person standing by a carousel which is

12    an express area, but being a Sunday there weren't too many

13    co-workers in the branch at the time or the store, we call

14    the store the branch. And I asked him if he needed any help

15    and he said no, he was browsing at, with some, over some

16    paperwork that, or some brochures that we have displayed, and

17    he said no which okay could be the case, you know, he didn't

18    --

19    Q    And then after he said no, he didn't need any help

20    what, if anything, did you see him do?

21    A    He continued to browse for maybe a few more minutes

22    and then I went about my respective work, and then a few

23    minutes later I observed him by the, the office supplies

24    browsing there, but not actually touching anything, just

25    looking.

26    Q    Where is the office supplies in comparison to the

27    window or the door of Kinko's at that location?

taf

1       A    Okay, the carousel is in the center of the, of the

2   forward portion of the office building, in front of that

3   directly is the window which is about 15 feet from that

4   carousel.  The front counter where I was behind the front

5   counter is about 30 feet from the carousel.

6       Q    How long did you notice the defendant by the office

7   supply carousel just looking, but not touching anything?

8       A    Probably two or three minutes.

9       Q    Okay.

10      A    I greeted him as soon as I saw him.

11      Q    Okay.  And why did you focus your attention on the

12  defendant at that point?

13      A    I focused it as required as my responsibility.

14      Q    Okay.  What happened next with the defendant?

15      A    Well, he said he didn't need any help or he

16  gestured that he didn't need any help, he said no, and then

17  he proceeded over to the office supplies or I observed him

18  there.  And I just observed him looking which is, which to me

19  was out of the ordinary because usually people take things

20  that they need from the office supplies which are located on

21  the wall to the left as you come in or to my right.  And he

22  was just looking at things, just not anything in particular.

23      Q    How long was he there by the office supplies then?

24      A    Probably five minutes, maybe 10.

25      Q    Did he --

26      A    I didn't actually time it because I was working on,

27  on a project at that time.

200

taf

1      Q    At any time did he use any of the copy machines in

2    Kinko's?

3      A    I didn't observe that, no.

4      Q    At any time did he actually touch any of the

5    supplies or bring any of the supplies up to the counter?

6      A    No, I didn't observe that either.

7      Q    What were you thinking at this point when you saw

8    this person standing for about 10 minutes in front of this

9    office supplies area, if anything?

10          MR. McDANIEL: Objection.

11          THE COURT: Overruled.

12          THE WITNESS: I thought that I was about to be

13    shoplifted.

14          BY MS. LUCAS:

15      Q    And why did you think you were about to be

16    shoplifted?

17      A    Because I've been at Kinko's for eight years and

18    usually when somebody is observing or just looking at things

19    on the wall not taking them down or not intending to buy I,

20    I'm about to be shoplifted.

21      Q    Did you see defendant move at all from the area by

22    the office supplies?

23      A    Yes.

24      Q    Okay.  And where did he go from there?

25      A    He walked over to the, there's a FedEx box just to

26    the right of the, of the, of the front doors, it's a double

27    door, only one of them is left open though, he walked to that

taf

1    and he browsed with the envelopes and then he went over to

2    the window or the copier, he looked at the copier, didn't use

3    anything, and then he was there, I observed him there at

4    least on two occasions.

5        Q    Approximately how long then total time do you think

6    he was in the store for?

7        A    Not less than 15 minutes, but not more than 25.

8        Q    Okay.  And during that time period did defendant

9    ever purchase anything or use any of the equipment there?

10       A    No, I said he didn't that I, I didn't, I already

11   said that I didn't observe that.

12       Q    Did you see him leave?

13       A    No, I didn't.

14       Q    Did you at any time have anybody come into the

15   store asking or inquiring about the defendant after he had

16   left?

17       A    Sometime later I don't recall how much time several

18   police officers came into the branch.

19           MR. McDANIEL: Objection.  As to whether the police

20   officers came in after this.

21           MS. LUCAS: I didn't ask --

22           THE COURT: She didn't ask, she didn't ask that.

23   Overruled.

24

25           BY MS. LUCAS:

26       Q    What happened next?

27       A    Several police officers came in with a lady.

202

taf

1      Q    Okay.  And have you seen that lady here today?

2      A    Yes.

3      Q    Okay.  Was she the person who just came out of the

4   courtroom?

5      A    Yes.

6      Q    And what, if anything, did you give or tell them

7   about?

8      A    A police officer asked me -- one of the two police

9   --

10          MR. McDANIEL: Objection.

11          THE COURT: Just one second.  This may or may not be

12   hearsay.  I don't know what --

13          MR. McDANIEL: And if it's going to the actual tape,

14   I mean the tape has already been admitted and we've already

15   seen the tape and we know he was at Kinko's, we know he was

16   there for approximately 20 minutes.

17          MS. LUCAS: I was tying that in, that he was in fact

18   the person that the police came in immediately that day and

19   got the tape.

20          MR. McDANIEL: The tape is already in evidence.

21          THE COURT: I'm not sure I understand what you're

22   trying to do here.  You already have the tape in evidence,

23   you have --

24          MS. LUCAS: That's correct.  I'm just --

25          THE COURT: -- the defendant on the tape.

26          MS. LUCAS: -- painting the entire picture for the

27   Court, Your Honor.

203

taf

1      THE COURT: Police officers came in, what happened

2  without telling us what was said.

3      MS. LUCAS: Yes, that's what I was asking about the

4  tape.

5      THE COURT: What happened?

6      MS. LUCAS: That's exactly what my question was, and

7  he objected.

8      THE COURT: I thought he was about to say they asked

9  so and so or said so and so.

10      MR. McDANIEL: His testimony was that they asked

11  him.

12      THE COURT: That's what I thought.

13      MS. LUCAS: Right, but I'm not offering it for the

14  truth of the matter what the officer said.  I'm only asking

15  what his actions were.

16      THE COURT: I have no idea what he's about to say,

17  that's the reason I'm being reluctant.

18      MS. LUCAS: I'm sorry?

19      THE COURT: I have no idea what he's about to say,

20  that's the reason I'm being reluctant to allow what appears

21  to be a hearsay statement.

22      MS. LUCAS: Your Honor, I'll just withdraw the

23  question --

24      THE COURT: Okay.

25      MS. LUCAS: -- Your Honor, and I have no further

26  questions --

27      THE COURT: All right.

204

taf

1        MS. LUCAS: -- for this witness.

2        MR. McDANIEL: No questions, Your Honor.

3        THE COURT: Okay, Mr. Zangas, thank you very much.

4        THE WITNESS: All Right.

5        THE COURT: Next witness please.

6        MS. LUCAS: Thank you.

7        DEPUTY CLERK: Please remain standing and raise your

8    right hand.

9                        MARY KIRBY,

10   having been called as witness for and on behalf of the

11   Government, and having been first duly sworn by the Deputy

12   Clerk, was examined and testified, as follows:

13       DEPUTY CLERK: Thank you.  Please be seated.

14                    DIRECT EXAMINATION

15       BY MS. LUCAS:

16   Q    Can you please state your name for the record.

17   A    Mary Kirby.

18   Q    And, Ms. Kirby, where are you employed?

19   A    Kinko's, Inc.

20   Q    Okay.  And how long have you been employed at

21   Kinko's?

22   A    Six years.

23   Q    Okay.  And what is your title at Kinko's?

24   A    General manager.

25   Q    And at what particular branch or store are you a

26   manager of?

27   A    2020 K Street.

taf

1      Q    Did you have the occasion to have contact with a

2  person by the name of Virgil Rodgers?

3      A    Yes, I was contacted by Mr. Rodgers via telephone.

4      Q    Okay.  And when were you contacted by Mr. Rodgers

5  via telephone?

6      A    It was in the afternoon on, around Wednesday of

7  that week following the 13th which would be I guess the 16th.

8      Q    What month would that have been in?

9      A    August.

10     Q    And what, if anything, did Mr. Rodgers say to you?

11         MR. McDANIEL: Objection, Your Honor.

12         THE COURT: Grounds of the objection?

13         MR. McDANIEL: Authentication basis.

14         THE COURT: I beg your pardon?

15         MR. McDANIEL: Authentication basis.  I don't know

16  how she could know that the individual who was on the phone

17  was Mr. Rodgers.

18         THE COURT: Well, we'll found out.  I don't know.

19         BY MS. LUCAS:

20     Q    Did the person identify --

21         MR. McDANIEL: Could she be made to --

22         MS. LUCAS: Yes.

23         MR. McDANIEL: — lay some foundation?

24         THE COURT: Well, you haven't given her a chance

25  yet.

26         MR. McDANIEL: She asked him what he said.

27         THE WITNESS: I believe the question was, before we

taf

1    were interrupted, what happened.  I received a phone call

2    my branch directed to me and I answered the phone, and the

3    individual on the other end of the line identified himself

4    Virgil Rodgers and that he was calling in regards to --

5              MR. McDANIEL: Objection.

6              THE WITNESS: -- a videotape that --

7              THE COURT: Overruled.

8              THE WITNESS: He was calling in regards to a

9    videotape that we have inside of the store.  Our store is

10   under 24 hour surveillance.  And he stated that he was in th

11   branch over the weekend and he wanted to obtain the videotap

12   for some reason or another.

13             BY MS. LUCAS:

14        Q    At that same time did you know that there had been,

15   police officers had been inquiring about Mr. Rodgers that

16   weekend?

17        A    I was I guess contacted it would have been Monday

18   afternoon by Detective Durant who came in personally to

19   inquire about the videotapes.  I gave him my home office

20   phone number in California and told him he needed to go

21   through there in order to obtain the tapes, and that's

22   exactly what he did.

23        Q    What, if anything, did you tell Mr. Rodgers or the

24   person who identified himself as Mr. Rodgers who called

25   Wednesday about the inquiry about the videotape?

26        A    Basically, I asked him to please not call the store

27   again unless he had, you know, business with the store.  That

207

taf

1    this was something that was out of my hands and to please not

2    call again.

3         Q    Did he indicate why he wanted the videotape?

4         A    He said he wanted to review them.

5         Q    Did he say for what purpose he wanted to review the

6    tapes?

7         A    Just that there was something that occurred over

8    the weekend that he wanted to review the tapes, and again I

9    just informed him that that was not gonna be possible, and to

10   please not call again.

11        MS. LUCAS: I have nothing further of this witness.

12   Thank you.

13        THE COURT: Any questions.

14        MR. McDANIEL: Yes.  Just briefly.

15                    CROSS EXAMINATION

16        BY MR. McDANIEL:

17        Q    Did you think that the police officers had any more

18   right to the tape than Mr. Rodgers did?

19        A    Well, I simply stated to Detective Durant on Monday

20   what he needed to do to get the tapes, he followed that chain

21   and I was ordered by home office to comply.

22        Q    That's right.  And you didn't provide that

23   information to the individual that identified themselves as

24   Virgil Rodgers, correct?

25        A    Not on a Wednesday when this was on a Monday, no.

26        Q    Okay.

27        A    It was already taken care of.

208

taf

1    Q    And so why couldn't you have directed Mr. Rodgers

2  about the same procedures that you directed Officer Durant

3  on?

4    A    Because I had already received word from my home

5  office to turn over the tapes to Detective Durant because he

6  had, they stated to me that they had been subpoenaed, so

7  that's what I did.

8    Q    Right.  And instead of telling Mr. Rodgers that you

9  just told him not to call the store again, correct?

10    A    Right, because I work for Kinko's not Mr. Rodgers.

11    Q    You don't work for police officers either, do you?

12    A    No.

13    Q    Okay.

14    A    But I was told by the home office --

15    Q    Thank you.

16    A    -- to turn them over.

17    Q    Thank you.

18         MR. McDANIEL: No further questions.

19         THE COURT: Anything else?

20         MS. LUCAS: No, nothing for this witness.

21         THE COURT: All right, Ms. Kirby, thank you.  Next

22  witness.  How many more witnesses do you have?

23         MS. LUCAS: Two brief witnesses, Your Honor.

24         THE COURT: Okay.

25                   STEPHAN ALLEN,

26  having been called as witness for and on behalf of the

27  Government, and having been first duly sworn by the Deputy

209

taf

1    Clerk, was examined and testified, as follows:

2              DEPUTY CLERK: Please be seated.

3                      DIRECT EXAMINATION

4         BY MS. LUCAS:

5         Q    Officer Allen, can you please state your full name

6    for the record.

7         A    My name is Stephan Allen, police officer assigned

8    to the second district of the Metropolitan Police Department.

9         Q    And how long have you been with the second district

10   of the Metropolitan Police Department?

11        A    Thirteen years.

12        Q    I want to direct your attention to the date of

13   August 13th of the year 2000.  Were you on duty on that date?

14        A    Yes.

15        Q    And did you have the occasion to go to the location

16   of the Kinko's store at 2020 K Street, NW, here in

17   Washington?

18        A    Yes.

19        Q    And why did you go to that location?

20        A    I responded to that location in reference to a

21   radio run for, what was that radio run for, it was I can't

22   exactly remember what the radio run for, was for.  My mind

23   just drew a blank, but --

24        Q    Is there anything that would refresh your

25   recollection about what the radio run was for?

26        A    I mean if you have something there that could tell

27   me what it was actually for.

210

taf

1          MR. McDANIEL: Objection, Your Honor.

2          THE COURT: I beg your pardon?

3          MR. McDANIEL: You know, if he has some idea of what

4    he might need in order to refresh his recollection then maybe

5    --

6          THE COURT: Well, she may have some other questions.

7          MR. McDANIEL: Right.

8          BY MS. LUCAS:

9      Q    Officer, did you come into contact with anybody at

10   the Kinko's store?

11     A    Yes.

12     Q    Okay.  Who did you come into contact with, sir?

13     A    I encountered a female there who was, had a

14   complaint about an individual who she had, was following her,

15   had followed her to a job on that day, on Sunday.

16     Q    Okay.  And what was the demeanor of that person

17   like when you first came upon her?

18     A    She was very upset, she was, she was scared and,

19   and she was --

20         MR. McDANIEL: Objection to the characterization of

21   scared, Your Honor.

22         THE COURT: Overruled.

23         THE WITNESS: And she was crying.

24         THE COURT: You may cross examine on that.  I'm

25   sorry, what?

26         THE WITNESS: And she was crying.

27         BY MS. LUCAS:

                                                             211

taf

1      Q    What was the name of the individual whom you've

2    just described?

3      A    Ms. Johnson.

4      Q    Have you seen that person here in the courthouse

5    today?

6      A    Yes.

7      Q    Okay.  Have you seen her testify here today or come

8    out of this courtroom?

9      A    Yes.

10          MS. LUCAS: I have nothing further.  Thank you.

11          THE COURT: Any questions?

12                    CROSS EXAMINATION

13          BY MR. McDANIEL:

14      Q    Sir, have you seen Ms. Johnson-Norman since August

15    the 13th?

16      A    Excuse me.

17      Q    Have you seen the individual that you know as Ms.

18    Johnson-Norman since August the 13th?

19      A    No.

20      Q    Okay.  And have you had occasion to speak with her

21    today?

22      A    Yes.

23      Q    And what did you all discuss today?

24          THE COURT: I'm sorry, you said you haven't seen her

25    since August 13, but you saw her today?

26          THE WITNESS: Well, I, I mean we just have, you

27    know, good morning, you know, stuff like that.

212

taf

1    BY MR. McDANIEL:

2    Q    All right.  And what else did you all discuss?

3    THE COURT: When, today or what?

4    MR. McDANIEL: Today.

5    THE WITNESS: Today.

6    MS. LUCAS: Objection.  Beyond the scope of my

7    direct examination.  The only thing I asked about was what

8    the demeanor of the victim was like at the scene of the crim

9    on August 13th.

10   THE COURT: Well, I just want to be sure they're

11   talking about the same person.  Overruled.

12   BY MR. McDANIEL:

13   Q    What did you all discuss today?

14   A    Nothing.  I mean other than good morning, I mean we

15   just had a conversation outside about basketball and stuff

16   like that, you know, when --

17   Q    Okay.

18   A    -- she was in college but that was it.

19   Q    Nothing about her testimony?

20   A    No, sir.

21   Q    Okay.  Now, how long after you received the radio

22   run did you arrive at the K Street address?

23   A    I guess about I don't know five minutes.  I'm not

24   sure what the exact time frame was, I'm guessing five

25   minutes.

26   Q    Okay.  And was the individual who you identified as

27   Ms. Johnson-Norman there by herself at this time?

213

taf

1      A    Yes.

2      Q    Okay.  And were you by yourself?

3      A    No, I had, my partner at the time was Officer

4  Charles Smith, but he is currently not on the police

5  department because he relocated to Florida.

6      Q    Okay.  And did Ms. Johnson-Norman tell you that she

7  wanted you to do something in particular?

8          MS. LUCAS: Objection, Your Honor.  This is totally

9  beyond the scope of my direct.

10         THE COURT: Sustained.

11         BY MR. McDANIEL:

12     Q    Let me ask you this, you said that she appeared to

13 be scared to you, did she tell you that she was scared, did

14 she say that?

15     A    I can't remember her exact words as, that day but

16 she did indicate to me that she was frightened of this

17 particular guy.

18     Q    Okay.  Did she tell you that she was angry?

19     A    No, I, I can't remember her saying that she was

20 angry, but she, she was crying and she was, she was, she was

21 visibly crying, I could see tears coming out her eyes and,

22 and that she was scared of, you know, she was, indicated to

23 me that she was scared.

24     Q    Okay.  And so now you're saying that she did say

25 that?

26     A    Huh?

27     Q    Now you're saying --

214

taf

1    MS. LUCAS: Objection.  That's not what he said.

2    THE COURT: No, he didn't say that.

3    BY MR. McDANIEL:

4    Q    She was indicating to you that she was scared?

5    A    I can't remember her exact words that she said that

6    day, but like I said before she, she was, indicated to me

7    that she was frightened of this particular person.

8    Q    Okay.  And so that's where we're getting mixed up.

9    When you say indicating you're not necessarily saying that

10    she said this, this is something that you discerned from her

11    demeanor, is that correct?

12    A    Yes.

13    Q    Okay.  Officer, do you know anyone in your

14    experience that cries when they're angry?

15    MS. LUCAS: Objection.

16    THE COURT: Sustained.

17    MR. McDANIEL: No further questions, Your Honor.

18    THE COURT: Anything else?

19    MS. LUCAS: Nothing for this witness.

20    THE COURT: Thank you, Officer.  Next witness.

21    DEPUTY CLERK: Your Honor, this is the bench warrant

22    returned when Judge Lugo was on the bench back in

23    (indiscernible) for a trial.  I've left a message with Mr.

24    Charles Donn during the luncheon break and have not heard

25    from him.

26    THE COURT: Donn is in West Virginia.

27    DEPUTY CLERK: Oh, is he?

215

taf

1          THE COURT: He had a case, I mean tried the case,

2     but he had another case on the calendar today.

3          DEPUTY CLERK: Oh, okay.

4          THE COURT: Matter of fact, the name of the case was

5     I don't think it's (indiscernible), David Jardin was the case

6     appearing for status.

7          DEPUTY CLERK: Oh, okay.

8          THE COURT: Charles Dom (indiscernible).

9          DEPUTY CLERK: Oh, okay.

10         THE COURT: Is he (indiscernible) custody now?

11         DEPUTY CLERK: Yes, he is, Your Honor.  He's back

12    there (indiscernible).

13         THE COURT: See if we can get somebody to stand in

14    and see what --

15              (This portion of the tape was indiscernible.)

16         DEPUTY CLERK: Yes, will do.

17         THE COURT: Okay.

18         DEPUTY CLERK: (Indiscernible) returning to the

19    trial.  Please raise your right hand.

20                   RALPH DURANT,

21    having been called as witness for and on behalf of the

22    Government, and having been first duly sworn by the Deputy

23    Clerk, was examined and testified, as follows:

24         DEPUTY CLERK: Thank you.  Please be seated.

25                DIRECT EXAMINATION

26         BY MS. LUCAS:

27         Q    Detective, can you please state your full name and

216

taf

1    spell your last name for the record.

2        A    Ralph Durant, it's D as in David, U-R-A-N-T.

3        Q    And, Detective, where are you employed?

4        A    Metropolitan Police Department, second district

5    detectives.

6        Q    And how long have you been a detective with the

7    police department?

8        A    I've been a detective 15 years.

9        Q    Have you had the occasion to come into contact with

10    a Karen Johnson-Norman on the date of September 18th of the

11    year 2000?

12        A    Yes, I did.

13        Q    And by what means were you contacted by Ms.

14    Johnson-Norman on that date?

15        A    She called me on my cell phone.

16        Q    Okay.  And what, if anything, did she say when she

17    contacted you on your cell phone on that day?

18        A    She called me the first time, it was around 6:30,

19    6:35 and stated she had just, that Virgil Johnson had just

20    called, I'm sorry, Virgil Rodgers had just called her on her

21    work phone and she hung up on him and that if he called back

22    she would make a three-way conversation so that I could hear

23    him talking.  About five minutes later she called back, on my

24    cell phone, and I could hear him on the other end asking who

25    else was on the phone, who else was on the phone, and he,

26    they started talking back and forth about, he was saying that

27    he had been in jail, he didn't like it, and why she was doing

217

taf

1    this to him and she kept telling him that she told him to

2    leave her alone, that the police had told her, told him to

3    leave her alone, that the judge had told him to leave her

4    alone, and she was tired of him.  And he kept going on about

5    their having special feelings for each other.  Conversation

6    went on for about two or three minutes, then the conversation

7    ended when his card apparently ran out.

8        Q    How did you know his card ran out?

9        A    At the end it came, it came a voice recording came

10   up thanks for using, and I couldn't make out the, the name of

11   the company.  And we continued to talk, Ms. Johnson and

12   myself continued to talk about two or three minutes and then

13   she hung up and I hung up.

14       Q    Okay.  At any point in time did the defendant say

15   to Ms. Johnson-Norman that he understand that he wasn't

16   supposed to be contacting her?

17       A    No.

18       Q    Did he in --

19            THE COURT: What was that question again, did who

20   say what?

21            MS. LUCAS: Did the defendant ever acknowledge that

22   he wasn't supposed to be contacting her.

23            THE COURT: And the answer is?

24            THE WITNESS: No.

25            THE COURT: Okay.

26            BY MS. LUCAS:

27       Q    Did he in any way respond to what she was saying at

218

taf

1    all?

2        A    No, he just, he kept running on and on, she kept

3    telling him that, you know, that everybody had told him to

4    leave her alone and she had told him to leave her alone and

5    stop calling her, and he just kept going on about a special

6    relationship they had, special feelings for each other and

7    that he had been in jail, and that he didn't like it, and

8    that he was losing his job because of her and it was her

9    fault and, you know, just on and on like that, but he

10   wouldn't acknowledge it.  He would repeatedly ask who was on

11   the other end.

12       Q    At any point in time what was Ms. Johnson-Norman's

13   demeanor like to the defendant during this conversation?

14       A    She was very upset.

15       Q    And how do you know she was upset?

16       A    Well, she was curing at him and telling him to

17   leave her alone and that, you know, people have been telling

18   him to leave her alone and she was tired of it, and for him

19   to leave her alone.

20           MS. LUCAS: Thank you.  I don't have anything

21   further.  For the record, I'm handing counsel a copy of the

22   report that --

23           MR. McDANIEL: Court's brief indulgence.

24           MS. LUCAS: -- Detective Durant made as a result of

25   the phone conversation.

26           (This portion of the tape was indiscernible.)

27                       CROSS EXAMINATION

                                                              219

taf

1          BY MR. McDANIEL:

2      Q    Good afternoon, Officer Durant.

3      A    Good afternoon.

4      Q    Describe for the Court Mr. Rodgers demeanor on the

5   phone.

6      A    He was calm.

7      Q    And when you say he was calm you mean he didn't

8   raise his voice, did he?

9      A    No.

10     Q    Okay.  And he did not threaten her in any way, did

11  he?

12     A    No, he did not.

13     Q    Okay.  And, in fact, Ms. Johnson-Norman has never

14  communicate to you that he's threatened her, correct?

15          MS. LUCAS: Objection, beyond the scope.

16          THE COURT: Sustained.

17          BY MR. McDANIEL:

18     Q    Now, you say that Ms. Johnson-Norman called you

19  originally, correct --

20     A    That --

21     Q    -- and said that Mr. Rodgers had phone called her?

22     A    That is correct.

23     Q    Okay.  And then you hung up the phone, is that

24  correct?

25     A    No, she said, stated that if he called again that

26  she would call me and make it a three-way conversation so

27  that I would hear what he was saying.

                                                          220

taf

1   Q    Okay.  And how long between the time that you hung

2   up with her during the first conversation and the time that

3   she called you for a second time?

4   A    It was about five minutes maybe.

5   Q    Okay.  And did you speak to Ms. Johnson-Norman the

6   second time that she called?

7   A    When she first, when I first picked up the phone

8   she, she was talking and I said hello and then Virgil Rodgers

9   came on the line and said who was that, who are you talking

10  to, and then I didn't say anything after that until after his

11  conversation had ended.

12  Q    Okay.  So when you came on and said hello is it

13  your understanding that both of the individuals on the phone

14  heard you?

15        MS. LUCAS: Objection, speculation as to whether or

16  not the other individuals heard.  He can only state what he

17  said.

18        MR. McDANIEL: I'm talking about what his

19  understanding of the connection was, Your Honor, whether or

20  not all three of them are on the phone at this time, if he's

21  being conferenced in to some --

22        THE COURT: If he knows he may answer.

23        MR. McDANIEL: If he knows.

24        THE WITNESS: I couldn't tell you.  I know she knew

25  I was on the phone, I couldn't tell you if he knew.

26        BY MR. McDANIEL:

27  Q    Okay.  And when you said hello she didn't say

221

taf

1    anything back to you?

2        A    No.

3        Q    Okay.  And so the first thing you hear from anyone

4    after you answer the phone and say hello is Mr. Rodgers

5    asking if someone else is on the other line or if someone

6    else is on the phone?

7        A    That's correct.

8        Q    Okay.  And do you know at that time how long that

9    phone call had, well, how long they had been on the phone?

10        THE COURT: How would he know that unless somebody

11    told him.

12        MR. McDANIEL: I'm asking.

13        BY MR. McDANIEL:

14        Q    Do you --

15        A    I have no idea.

16        Q    Okay.  Did Ms. Johnson-Norman respond to Mr.

17    Rodgers when he asked if someone else was on the phone?

18        A    No, she did not.

19        Q    Okay.  And how long was the conversation from that

20    point on?

21        A    About two or three minutes.

22        Q    Do you recall Mr. Rodgers asking Ms. Johnson-Norman

23    anything about her contacting his job?

24        A    No, I don't remember that.

25        Q    Okay.  But there was some discussion about him

26    losing his job, correct?

27        MS. LUCAS: Objection.  I don't believe there's been

222

taf

1   any testimony that there was any discussion whatsoever.

2            THE COURT: I'm not sure there was a discussion,

3   there was --

4            MR. McDANIEL: I'm sorry, Your Honor.

5            THE COURT: It wasn't a discussion, was it?  You may

6   rephrase your question.

7            BY MR. McDANIEL:

8       Q    Well, Mr. Rodgers made a statement then that you

9   recall about her having him to lose his job, correct?

10      A    He stated that I have lost my job.

11      Q    Okay.  Now, you've been here both of these days,

12  correct, yesterday and today?

13      A    That's correct.

14      Q    Isn't that right?  And you've had an occasion to

15  speak with Ms. Johnson on both of those days, have you not?

16      A    I haven't spoke to her about this case.

17      Q    Okay.  But you've spoken with her, correct?

18      A    I've spoke to her casually.

19      Q    Okay.  And you all haven't said anything to either

20  of each other about her testimony?

21      A    No.

22      Q    Okay.  Did you all at any time between August the

23  13th or when do you say this phone call took place?

24      A    September the 18th.

25      Q    September the 18th.  Have you all been in contact

26  with one another between September the 18th and today?

27      A    Yes.

223

taf

1    Q    Okay.  And when was that?

2    A    Several occasions that she would call and update me

3    on the case that was in another jurisdiction.

4    Q    Okay.  And would she make any requests of you at

5    that time or she was just keeping you up-to-date?

6    A    Just keeping me up-to-date.

7    Q    Okay.  And on those occasions would you all or have

8    you all discussed ever the content of the conversation that

9    took place on September the 18th?

10    A    No.

11    Q    Okay.  So since September the 18th to today you all

12    have never talked about that conversation?

13    A    Not that I can remember, no.

14        MR. McDANIEL: No further questions, Your Honor.

15        THE COURT: Anything else?

16        MS. LUCAS: Just briefly based upon defense

17    counsel's cross examination.

18                    REDIRECT EXAMINATION

19        BY MS. LUCAS:

20    Q    Did you have occasion to talk with Ms. Johnson-

21    Norman about phone calls she received on September 30th of

22    the year 2000 from the defendant, Mr. Rodgers?

23        MR. McDANIEL: Objection.

24        MS. LUCAS: He opened the door.

25        MR. McDANIEL: I asked about September 18th

26    conversation that he described.

27        MS. LUCAS: He asked --

                                                        224

taf

1    THE COURT: How did he open the door?

2    MS. LUCAS: He asked the detective whether he had

3  had any contact with Ms. Johnson-Norman after September 18th

4  until the present day --

5    THE COURT: Regarding telephone conversations of

6  September 18.

7    MS. LUCAS: The first question was more open ended

8  than that.  The first question was whether or not he had any

9  conversations with her about anything relating to this case,

10  and he said yes I've talked with her on several occasions

11  about the circumstances in Maryland and other things.  He's

12  opened the door.

13    THE COURT: What is your question, let's have it

14  again.

15    MS. LUCAS: My question was did the detective have

16  any conversations with Ms. Johnson-Norman about telephone

17  calls she received from the defendant on September 30th of

18  the year 2000.

19    MR. McDANIEL: I asked him --

20    THE COURT: Do you object?

21    MR. McDANIEL: I object, Your Honor.

22    THE COURT: Sustained.  Sustained.

23    MS. LUCAS: I don't have anything further then.

24    THE COURT: All right.  Detective, thank you very

25  much.

26    THE WITNESS: Thank you.

27    THE COURT: Next witness.

225

taf

1          MS. LUCAS: Your Honor, at this time the Government

2     rests.

3          THE COURT: All right.

4          MR. McDANIEL: May I call my first witness, Your

5     Honor?

6          THE COURT: Yes.

7          MR. McDANIEL: And I'd make a motion for judgment of

8     acquittal.

9          THE COURT: That motion is denied.  How many

10    witnesses do you have?

11         MR. McDANIEL: At most, Your Honor, two.

12         THE COURT: Okay, all right.

13         MR. McDANIEL: I anticipate one.

14         THE COURT: Just trying to get some idea.

15         MR. McDANIEL: Right.  At this time the defense

16    would call Mr. Percy Norman.

17         DEPUTY CLERK: Please remain standing and raise your

18    right hand.

19                    PERCY NORMAN,

20    having been called as witness for and on behalf of the

21    Government, and having been first duly sworn by the Deputy

22    Clerk, was examined and testified, as follows:

23         DEPUTY CLERK: Please be seated now.

24                  DIRECT EXAMINATION

25         BY MR. McDANIEL:

26    Q    Good afternoon, Mr. Norman.

27    A    Good afternoon.

226

taf

1      Q      Could you describe for the Court your relationship

2   with --

3              THE COURT: Have you asked him his name?

4              MR. McDANIEL: I'm sorry, I just identified him.

5              BY MR. McDANIEL:

6      Q      Could you please identify yourself for the record

7   giving the full spelling of your last name.

8      A      It's Percy Norman, and it's N-O-R-M-A-N.

9      Q      And what is your relationship to Ms. Johnson-

10  Norman?

11     A      My wife.

12     Q      Okay.  And how long have you all been married?

13     A      Seven years.

14     Q      And have you all been living together the entire

15  seven years of your marriage?

16     A      Yes.

17     Q      Okay.  And you all live somewhere in Maryland,

18  correct?

19     A      Yes.

20     Q      Okay.  Now, in November -- strike that.  Do you

21  know a Mr. Virgil Rodgers?

22     A      Not really personally, but yes.

23     Q      Okay.  But you know who he --

24     A      Yes.

25     Q      -- who he is and you've actually had conversations

26  with him, correct?

27     A      Yes.

227

taf

1      Q      Okay.  How many conversations would you say you've

2   had with him?

3      A      I guess one.

4      Q      Just one?  Okay.  And when was that conversation?

5      A      I, I don't exactly remember, I think it was April

6   or March, something like that.

7      Q      April or March of what year?

8      A      Of 2000.

9      Q      Okay.  And when was the first time that you are

10  aware of Mr. Rodgers' existence at all?

11     A      Probably January of 1999.

12     Q      And how is it that you became aware of Mr. Rodgers?

13     A      My wife informed me.

14     Q      Okay.  And when you said she informed you, you mean

15  what, what did she tell you about --

16     A      She said they were friends.

17     Q      Okay.  And at that point you didn't know that they

18  were anything more than friends?

19     A      I had an idea.

20     Q      Okay.  And what gave you that idea?

21     A      Telephone records, behavior changes, receipts.

22     Q      Okay.  And when you say telephone records when is

23  it that you were aware of any telephone records that revealed

24  her friendship with Mr. Rodgers?

25     A      January of '99.

26     Q      Had you at any time after January of 1999 got or

27  retrieved any of her phone records?

228

taf

1     A    Yes.

2     Q    And when were those?

3     A    Probably up until April of '99 or maybe later.

4     Q    Okay.  You at no time retrieved any records of her

5    phone calls after January 2000?

6     A    No.

7     Q    Now, there were several times between the time that

8    you first became aware of Mr. Rodgers in January of 1999 and

9    April of 2000 that you had discussions with your wife about

10   Mr. Rodgers, correct?

11    A    Yes.

12    Q    Okay.  And approximately how many times did you all

13   discuss Mr. Rodgers?

14    A    I have no idea.

15    Q    It was numerous times --

16    A    Right.

17    Q    -- right?  Okay.  And what was her position on

18   their relationship -- strike that.  When did you find out

19   that the true nature of their friendship was not a true

20   friendship but was an intimate relationship?

21    A    August I think of 2000.

22    Q    August of 2000?  And how did you find that out?

23    A    She told me.

24    Q    Now, you were aware of court proceedings between or

25   involving the two of them in June of 2000 as well --

26    A    Yes.

27    Q    -- correct?  And, in fact, you were present at the

229

taf

1    June 26th, 2000 hearing --

2        A    Yes.

3        Q    -- weren't you?  Okay.  And is it safe to say that

4    you were upset about the posture of the case at that point in

5    time?

6        A    Sure.  Sure.  I had my own (indiscernible).

7        Q    You had your own -- I'm sorry, you said you had

8    your own what?

9        A    My own case that I had pending.

10       Q    That was against Mr. Rodgers?

11       A    Mm-hm.

12       Q    Okay.  But did you anticipate that the case would

13   proceed differently, I'm talking about the peace order case

14   now, differently on June 26th than it actually did?

15       A    Not really.

16       Q    Okay.  And so you weren't upset about the fact that

17   the case was going to mediation?

18       A    Oh, I was, but I, it wasn't like it wasn't

19   expected.

20       Q    Okay.  And you expected it because of what?

21       A    Because of the behavior of my wife.

22       Q    Okay.  Now, she had explained it away to you before

23   as him stalking her, correct?

24            MS. LUCAS: Objection, Your Honor.

25            THE COURT: Overruled.

26            BY MR. McDANIEL:

27       Q    Did she ever explain to you that Mr. Rodgers was

230

taf

1    around because he was stalking her?

2        A    No, but I was, you know, I was just wondering what

3    he was doing in the neighborhood and that seems like stalking

4    to me.

5        Q    Okay.  So she never used the word stalking in

6    describing his behavior?

7        A    At a point I guess I could say.  I'm, I'm really

8    kind of unsure what you're talking about.

9        Q    I'm talking about her attempting to explain to you

10   why it is that Mr. Rodgers was around.

11       MS. LUCAS: Could he define a time frame, because

12   obviously that changed over the course of time.

13       THE COURT: Very well.

14       BY MR. McDANIEL:

15       Q    Let's start from January of 1999 until, let's talk

16   about all of '99.  Did she ever describe Mr. Rodgers to you

17   as having stalking her during that time?

18       A    Yes.  Yes.

19       Q    Okay.  When was the first time she told you that

20   Mr. Rodgers was stalking her?

21       A    I think it was fourth of July 1999.

22       Q    Fourth of July 1999?

23       A    Mm-hm.

24       Q    Okay.  And that was as a result of you all having a

25   conversation or did something happen at that time?

26       A    She called me after he showed up unannounced at a

27   friend's house for no reason at all which he shouldn't even

231

taf

1    know where the friend lived.

2        Q    Okay.  And was that the only time that she

3    described him as having stalked her --

4        A    No.

5        Q    -- in 1999?

6        A    No.

7        Q    When was the next time?

8        A    I don't remember all the times.  I just, the next

9    time that I remember distinctively was October like 31st I

10   think or October 30th around that time before November.

11       Q    Okay.  Around October 31st?

12       A    Maybe the 30th.

13       Q    Okay.  She described him as having been stalking

14   her?

15       A    The behavior was like stalking.

16       Q    Now, after July the fourth --

17            THE COURT: Excuse me.  I'm sorry, the 31st she

18   described his behavior as being stalking or you observed his

19   behavior as being stalking, which?

20            THE WITNESS: I guess both.

21            THE COURT: Okay.

22            BY MR. McDANIEL:

23       Q    Now, after the July 4th communication between you

24   and her was it your understanding that they stopped seeing

25   one another or did her --

26       A    No.

27       Q    -- or did her --

232

taf

1      A    No.

2      Q    -- behavior continue to be questionable?

3           MS. LUCAS: Objection, Your Honor, to the

4    characterization, compound question as well.

5           MR. McDANIEL: I'm trying to couch it in terms that

6    are not so offensive, Your Honor.  He said that he was aware

7    --

8           THE COURT: Let's hear the question again, she said

9    it's compound.

10          MR. McDANIEL: I said after the July 4th, 1999

11   communication from Mrs. Johnson-Norman to Mr. Norman that Mr.

12   Rodgers had been stalking her did her behavior still seem to

13   him to be questionable?

14          MS. LUCAS: That was not the same question.

15          THE COURT: Okay.

16          MS. LUCAS: The first question was --

17          THE COURT: That's the question he's asking now.

18          MR. McDANIEL: Now.  Yeah, that's the question I'm

19   asking now.

20          THE COURT: Could you just repeat that please.

21          BY MR. McDANIEL:

22     Q    There was a July 4th, 1999 communication that he

23   was stalking her, correct?  Now, what I'm asking you is did

24   her behavior change between July 4th and October the 31st or

25   was it --

26     A    Fear.

27     Q    -- still clear --

233

taf

1    A    Fear.

2    Q    -- to you --

3    A    Fear.

4    Q    I'm sorry?

5    A    Fear.

6    Q    No, no.  I understand that, but --

7    A    You said behavior so that's how I'm taking it.

8    Q    I understand.  So she then changed her behavior

9    such that you didn't think that they were seeing each other

10   anymore?

11   A    I didn't say that.

12   Q    Okay.  So based upon what it is that you were able

13   to observe was it your feeling that they were still each

14   other after July 4th, 1999?

15   A    I, I really don't know.  I don't, honestly I don't

16   know.

17   Q    Okay.  Well let me ask you this.  What was she

18   doing before July 4, 1999 that arose your suspicion?

19   A    It appeared to me, I mean from the phone records

20   and whatever else I don't know that she was trying to stop

21   because she no longer after a particular period of time was

22   making calls to him, but there were all these incoming calls.

23   So that's the only thing I know.  So that to me doesn't

24   appear to be that someone's trying to have a relationship, it

25   appears to be that someone's trying to stop the relationship

26   from going on but this person keeps calling.  So I, you know,

27   I don't know what you want to call that, but it appears that

234

taf

1   like I guess if you think in terms of stalking that's what it

2   seems like to me that someone just doesn't get the point to

3   leave the person alone.

4        Q    No, no, no.  I'm not asking for a description of --

5        A    Okay, clarify then please.

6        Q    Okay.  What I'm asking you is, point of

7   clarification, you said that there were behaviors or there

8   was behavior on the part of your wife that revealed to you

9   that there was maybe something more to her relationship with

10  Mr. Rodgers than what she described of it originally, that

11  they were friends in January of 1999, correct?  That in

12  addition to the phone records, correct?

13       A    Right.

14       Q    Okay.  Now, did that behavior then change after

15  July 4th such that you believed that they were not seeing

16  each other?

17       A    Not to the extent.

18       Q    Not to the extent?

19       A    No.

20       Q    But is it your understanding that they did see each

21  other between --

22       A    I didn't know, it wasn't like I was asking so I

23  don't know.

24       Q    Okay.  So you don't know if they saw each other

25  between July 4th, 1999 and October 31st of 1999?

26       A    No.

27       Q    Okay.  Do you know if the relationship continued

taf

1    beyond October the 31st of 1999?

2        A    No.

3        Q    Well, at some point in time you do because you find

4    out that they were in an intimate relationship, isn't that

5    right?

6            MS. LUCAS: Objection, counsel is mischaracterizing

7    what his testimony was.

8            MR. McDANIEL: He said that at some point in time

9            THE COURT: You said he does know?

10           MR. McDANIEL: Well, because he --

11           THE COURT: You haven't established that, have you?

12           MR. McDANIEL: Well, he already testified that in

13   October, not October but in I believe it was August of 2000

14   that his wife so much as told him.

15           MS. LUCAS: That they were having --

16           THE COURT: As to when?  Let's hear the question

17   again --

18           MR. McDANIEL: Okay.

19           THE COURT:  -- without suggesting facts which may

20   or may not be in evidence.

21           MR. McDANIEL: I understand, Your Honor.  I'll see

22   if I can't pose it a different way.

23           BY MR. McDANIEL:

24       Q    Let me ask you this, what is your understanding of

25   the nature of Mr. Rodgers and your wife's relationship

26   between October 31st, 1999 and March, April or May of the

27   year 2000?

236

taf

1    A    Didn't have a clear understanding.

2    Q    Okay.  What is your understanding now?

3    A    From what she told me it was an intimate

4  relationship, but the, the amount or frequency I don't know.

5  I don't know, and I still don't know and I don't care to

6  know.

7    Q    Okay.  So you didn't ask her --

8    A    No.

9    Q    -- when she terminated her relationship or how

10  often they were together, none of that?

11    A    No, not really.

12    Q    Now, on November the 1st of 1999 you had an

13  encounter with Mr. Rodgers, isn't that correct?

14    A    I guess you could say that.

15    Q    Okay.  And what happened on that day?

16    A    It was that weekend before that when Mr. Rodgers

17  confiscated my wife's cell phone and she told me more than

18  likely he was gonna show up on the 1st, she wasn't aware that

19  I was coming, I didn't tell her, I just went to see and she

20  looked threatened at the time, and his arms were flailing and

21  everything else and I felt that my wife was in immediate

22  bodily, you know, harm's way or danger.  So I went to --

23    Q    You felt that she was — I'm sorry, say that again.

24    A    She appeared to me that she was threatened by him

25  because he had this arm motion going on and she was walking

26  with her head down so that didn't appear like they were

27  walking down the street arm in arm to me.

237

taf

1    Q    Right.

2    A    And so I --

3    Q    But what did you say about bodily harm?

4    A    That it appeared to me that there might have been

5    some bodily harm that could take place at some point because

6    of the way that his arms were moving, and I was away from

7    them --

8    Q    Right.

9    A    -- from across the street just observing.  And

10    after that I approached him and told, 'cause I had told him

11    before that time or was it before or after I can't exactly

12    remember, but I think it was after so I guess that's

13    irrelevant, but I at that point told him that he needs to

14    leave my wife alone 'cause she had told me that she wants him

15    to leave her alone and he wouldn't.  And if someone took your

16    cell phone off of you I would think the same that, you know,

17    this is a problem.  So I approached him and, you know, I was

18    a little upset, but I had someone call the police to, you

19    know, handle the situation rather than put myself in danger.

20    And the police came, they detained him and spoke with him

21    and, you know, we left after a period of time.

22    Q    The November 1999 incident did your wife at any

23    point in time explain to you that Mr. Rodgers was stalking

24    her after that?

25    A    Yes.

26    Q    And when was that?

27    A    I can't remember, it was numerous times he wouldn't

238

taf

1  leave her alone.

2      Q    Okay.  But when you say numerous times are you

3  talking about five times, 10 times --

4      A    Honestly, I don't know.  It could be over a hundred

5  times, I don't know.  She was calling me all the time frantic

6  so I don't know.

7      Q    Okay.  She was calling you all the time frantic

8  from July of 1999 until --

9      A    It was various times all the way through from July,

10  beginning until, you know, just I guess July of 2000 or

11  whenever we had the peace order and then after that too.

12     Q    And then after that too?

13     A    Mm-hm.

14     Q    So you would say she described the man as stalking

15  her some close to at least 20 times?

16     A    More than that.

17     Q    More than that?

18     A    Mm-hm.  But they may need some clarification.  I

19  don't, she wasn't necessarily saying stalking, she was saying

20  that he was calling, he was, you know, showing up, popping

21  up, that type of thing.

22     Q    Well, how often did she use the word stalking?

23     A    I don't know.  I don't know.

24     Q    But you do recall her using it more than five

25  times?

26

27     A    I don't know.

taf

1          MR. McDANIEL: Court's indulgence.

2          BY MR. McDANIEL:

3      Q    Mr. Norman, did there come a time when you moved

4   out of the home that you all have?

5      A    I wouldn't call it moving out if I stayed with a

6   friend for a day or two.

7      Q    Okay.  And when was that?

8      A    I think it was June something, maybe June 26th, I

9   don't know.  I think, yeah, June 26th.

10     Q    Okay.  And that was after the hearing in Maryland?

11     A    Yep.

12     Q    And why did you leave at that time?

13     A    My mother was staying with me at the time and he

14  prior to this had come by the house and I just didn't feel,

15  you know, this issue wasn't handled so I didn't feel

16  comfortable and, you know, I had to help my mother move and

17  dramatic situation.

18     Q    When you say the issue wasn't handled how would you

19  have had it to be handled?

20     A    Stop contact, that's it but, you know, it's not

21  like she didn't try.  I just didn't think maybe she was, I

22  don't know, trying enough, I don't know.

23     Q    And the fact that she, in your opinion, wasn't

24  trying enough how did you feel about that?

25     A    I was upset.

26     Q    And did you tell her that?

27     A    I'm pretty sure she knew.  I didn't need to tell

                                                        240

taf

1   her.

2       Q    But you don't recall telling her?

3       A    I probably said I was upset, sure, but I don't, you

4   know, I can't tell you that was however long ago.

5       Q    Right.  But you don't recall having a conversation

6   with her about how she proceeded on June the 26th?

7       A    Not before I moved, I mean I didn't move but, you

8   know, before I stayed with my friend, no, 'cause I didn't

9   talk to her.  I just didn't have anything to say.

10      Q    And even after then?

11      A    Sure, yes.

12      Q    Okay.  And what did you describe to her, what did

13  you explain to her?

14      A    I told her I was hurt and, you know, I just thought

15  she could have dealt with it differently.

16      Q    Okay.  And did you use that tone of her voice with

17  her or were you a little angry with her?

18      A    No, I wasn't, I don't really get angry at my wife,

19  I mean I'm not that type of person for the most part.  So I

20  mean I, I think so.

21      Q    So you never yell at her?

22      A    Never is a stretch.

23      Q    Right.  So there are going to be occasions when you

24  are mad enough to yell, correct?

25      A    I guess.  I mean, but not, not on a normal, no.

26      Q    And this isn't one of them?  The fact that she

27  agrees to mediation at the peace order hearing.

241

taf

1    A    That's why I, you know, I had to stay with a friend

2    'cause I was too angry. I know myself very well and, you

3    know, I work with psychiatric patients so you know well.

4    Q    That's candy. That's candy. And so you are angry

5    at this time, correct? You just don't recall your voice

6    being loud?

7    A    Not at that --

8    Q    Okay. But you did explain to her that you were

9    upset about the way she proceeded and that you planned to

10   leave or that you had left?

11   A    No. No, no, no, I didn't talk about it at all with

12   her.

13   Q    Okay. So you all never discussed the possibility

14   of divorce during this --

15   A    No.

16   Q    -- entire --

17   A    No.

18   Q    -- this entire ordeal?

19   A    Obviously I think you would, anybody would, but I

20   didn't threaten her, I didn't say that I would leave, I just,

21   you know, you have to set some boundaries and this was

22   something I wasn't gonna continue to deal with the rest of my

23   life so.

24   Q    And I mean that's understandable. That's

25   understandable. I'm trying to find out when that

26   communication was made. I mean at some point you do tell her

27   that you're not going to stand for this, isn't that right?

242

taf

1      A     Yeah, but more so it was just my behavior 'cause I
2   was, you know, I just had to stay with a friend for a couple
3   of days and I was like, you know, this is, it's not fair.
4      Q     Okay.  And is that the first time you did anything
5   affirmative in an attempt to communicate to her how serious
6   you were taking it?
7      A     I don't think so.
8      Q     Had you ever moved out or spent two days with a
9   friend before?
10     A     No, not that I recall.
11     Q     Okay.  So this was -- well, tell me this, when had
12  you discussed divorce prior to that?
13     A     I never said I discussed divorce.
14     Q     The word divorce never came up?
15     A     You know, you'd say it in joking, but I mean it
16  wasn't, that wasn't the only way I thought of dealing with
17  this.
18     Q     Okay.  Sir, I understand that, but at some point in
19  time you did have a conversation with her in which you
20  explained to her your displeasure with the situation,
21  correct?
22            MS. LUCAS:  Your Honor, I'm going to object to --
23            THE COURT:  That's repetitive.
24            BY MR. McDANIEL:
25     Q     Did you never discuss with her the possibility of
26  divorce based upon the fact that Mr. Rodgers was seeing her?
27     A     Honestly, I don't, don't totally, I don't think I

243

taf

1    said divorce.  I might have said something else, I don't

2    know, but I don't really remember saying divorce.

3        Q    If you wouldn't --

4        A    I don't remember.  I don't remember.

5        Q    Right, I understand that.  And if you --

6        A    I don't remember.

7        Q    Did you ever discuss terminating your relationship

8    with your wife based upon the fact that she was seeing

9    another man?

10       A    I probably said something maybe that I wasn't gonna

11   put up with it, you know, but so much.

12       Q    Okay.  And when was that communication made?

13       A    I can not remember.

14       Q    Do you recall making it prior to June 26th?

15       A    I may.  I may.

16       Q    You just don't recall.

17

18       A    I don't know.  It's a long period of time we're

19   talking about, if it was a couple weeks or months it would be

20   different but this was almost two years.

21       Q    I understand.  Now, did you know that your wife had

22   gone to Mr. Rodgers' home on June the 25th?

23            MS. LUCAS: Objection.  These are all leading

24   questions, this is direct examination of a witness?

25            MR. McDANIEL: That's an open ended question, Your

26   Honor, that's yes or no.

27            THE COURT: He may answer.  Overruled.

244

taf

BY MR. McDANIEL:

1

2      Q    Did you know that she was going to Mr. Rodgers'

3  home on June the 25th?

4      A    I knew after.

5      Q    Did you know before she went that she was going to

6  his house on June the 25th?

7      A    I don't think so.  I don't recall, no.

8      Q    Okay.  And when you say you knew after when did you

9  know?

10     A    That same day.

11     Q    On the 25th?

12     A    Mm-hm.

13     Q    Okay.  And you knew because of what?

14     A    Discussing I think mediation or something like

15  that.

16     Q    So she had discussed mediation with you prior to

17  going on the 26th?

18     A    Right.

19     Q    And is that something that you agreed to?

20     A    I probably didn't agree to it, because it didn't

21  seem like he was listening to anybody so I didn't think that

22  would make much of a difference.

23     Q    Okay.  But on the 26th of June you were upset

24  because of the posture of the case, isn't that correct?

25     A    Sure.

26     Q    Okay.  And your testimony is that you knew what the

27  posture of the case was going to be on the 25th?

245

taf

1    A    No, I didn't.

2    Q    Okay.  But you all discussed mediation on June the

3    --

4    A    That doesn't mean that's what's gonna happen.

5    Q    So you knew it was a possibility?

6    A    It was a possibility, but she didn't think that's

7    what's gonna happen.

8    Q    Okay.  And so did you think after June the 25th

9    going into June 26th that she was gonna there and ask for

10   mediation?

11        MS. LUCAS: Objection again, leading.

12        THE COURT: Overruled.

13        THE WITNESS: I wasn't sure.

14        BY MR. McDANIEL:

15   Q    But you were upset about the fact that she did?

16   A    Mm-hm.

17        MR. McDANIEL: No further -- well, just Court's

18   indulgence, Your Honor.  No further questions, Your Honor.

19        THE COURT: Any cross?

20        MS. LUCAS: Just briefly.

21                     CROSS EXAMINATION

22        BY MS. LUCAS:

23   Q    Mr. Norman, in fact, you thought your wife should

24   have asked for something other than mediation, isn't that

25   correct?

26   A    Right, 'cause he didn't appear to (indiscernible).

27   Q    So your wife was wanting less to happen to the

246

taf

1    defendant at that point in time than what you thought was

2    appropriate to stop the defendant's stalking behavior?

3        A    She didn't want to have everything out in the open

4    at that time.

5        Q    And --

6        A    And the mediation would've saved that.

7        Q    And she didn't want to prosecute the defendant at

8    that point in time, is that correct?

9        A    If she could not, yes.

10       Q    If she could avoid it she --

11       A    Right.

12

13       Q    -- would have done so?

14       A    Right.

15       Q    And what caused her to not go through with the

16   mediation?

17            MR. McDANIEL: Objection.

18            THE COURT: What caused her not to go through

19   mediation?  Overruled.

20            THE WITNESS: Mr. Rodgers contacted her.

21            BY MS. LUCAS:

22       Q    How many times did he contact her?

23       A    Who knows, it, a lot.

24       Q    You stated that you yourself had told him that he

25   wasn't to contact your wife.

26       A    Right.

27       Q    Did you tell him that after the June 26th, 2000?

247

taf

1       A    I never talked to him again.

2            MS. LUCAS: I don't have anything further, Your

3   Honor.

4            THE COURT: I beg your pardon?

5            MS. LUCAS: I don't have anything further of this

6   witness.

7            THE COURT: Any redirect?

8            MR. McDANIEL: No, Your Honor.

9            THE COURT: All right, Mr. Norman, thank you.  Next

10  witness.

11           MR. McDANIEL: Your Honor, may I have a five minute

12  pass to discuss with my client whether or not he's going to

13  testify?

14           THE COURT: Yes.  You know, we've got to stop at

15  quarter of.

16           MR. McDANIEL: Yes, yes, Your Honor.

17           THE COURT: Okay.  Five minutes?

18           MR. McDANIEL: Five minutes.

19           THE COURT: Five minutes, all right.

20           DEPUTY CLERK: Court stands in a five minute recess.

21           (Thereupon, the matter was passed.)

22           DEPUTY CLERK: Returning to the trial matter, United

23  States v. Virgil M. Rodgers, case number M9709-00.

24           THE COURT: All right, everybody's here.

25           MR. McDANIEL: Good afternoon, Your Honor, Brian

26  McDaniel on behalf of Mr. Rodgers.  At this point in time --

27           THE COURT: You may have a seat.

                                                          248

taf

1        MR. RODGERS: Thank you.

2        MR. McDANIEL: -- I have discussed Mr. Rodgers'

3    constitutional right to testify and explained to him that he

4    can not be made to testify, but if, in fact, he would like to

5    testify that he has a right to, and he has at this point in

6    time decided that he does not wish to testify.  And with

7    that, Your Honor, the defendant would rest.

8        THE COURT: Let me be sure that Mr. Rodgers

9    understands that.

10        MR. McDANIEL: Certainly.

11        THE COURT: Mr. Rodgers, as your lawyer said, you

12   have a right to take the stand and testify, you also have a

13   right not to testify.  The decision is yours.  Of course, you

14   should talk with your lawyer about this.  My understanding is

15   you have, we took a recess for you to do that.  You should

16   listen to what he has to say, but the final decision is

17   yours.  I wish to say it somewhat differently.  If this

18   decision would go against you, final decision in this case

19   you could not come back later and say I wanted to testify but

20   my lawyer advised me against it, because you would not be

21   heard to say that.  The reason you wouldn't be is because the

22   decision is yours and not your lawyer's.  Do you understand?

23        MR. RODGERS: Yes.

24        THE COURT: So, with that, what is your final

25   decision, not to testify or to testify?

26        MR. RODGERS: Yes, sir.  Same as the --

27        THE COURT: Not to testify?

249

taf

1    MR. RODGERS: I will not testify.

2    THE COURT: Very well.  And you rest, Mr. McDaniel?

3    MR. McDANIEL: The defense rests, Your Honor.

4    THE COURT: Any rebuttal?

5    MS. LUCAS: No.

6    THE COURT: I assume you're renewing your motion?

7    MR. McDANIEL: Yes, Your Honor.

8    THE COURT: All right.

9    MR. McDANIEL: Renew the motion for judgment of

10   acquittal.

11   THE COURT: That motion's denied.  How much time do

12   you want to argue this case?

13   MS. LUCAS: Five minutes, Your Honor.

14   THE COURT: Pardon?

15   MS. LUCAS: Five minutes, Your Honor.

16   THE COURT: Five minutes?

17   MS. LUCAS: Maybe a little bit longer, but not that

18   much longer.

19   MR. McDANIEL: Your Honor, I anticipate just to be

20   safe I would say 15.

21   THE COURT: All right.  I don't think that the two

22   of you are going to be able to argue this case in 20 minutes.

23   MS. LUCAS: Okay.

24   THE COURT: All of the testimony is in.  As I

25   indicated earlier we're required to recess at quarter of.

26   That gives us only 20 minutes.  Twenty minutes is not enough

27   time for both lawyers to argue this case.  Mr. McDaniel says

250

taf

1    he wants 15 and a couple of those minutes have gone already.

2    So as not to rush you I'm inclined to continue this tomorrow

3    at 11 o'clock and having closing arguments and a decision

4    immediately thereafter.  Okay?

5

6            MS. LUCAS: Thank you, Your Honor.

7            MR. McDANIEL: Thank you, Your Honor.

8            THE COURT: All right.  And, Mr. Rodgers, what I

9    said before still applies.  Failure to return, this case will

10   go forward in your absence, also another charge could be

11   placed against you for not appearing and appearing on time,

12   and all restrictions in your release order are still in

13   effect.  Do you understand that?

14           MR. RODGERS: I understand, Your Honor.

15           THE COURT: Very well.

16           DEPUTY CLERK: Please sign the new return notice

17   (indiscernible).  Thank you, counsel.

18           MR. McDANIEL: Thank you.

19           (Thereupon, the matter was continued.)

20

21

22

23

24

25

26

27

taf

1

2

3

C E R T I F I C A T E

I, Tricia A. Fritz, a transcriber, do hereby certify that I transcribed the proceedings and the testimony adduced in the matter of UNITED STATES v. VIRGIL RODGERS, Case No. M9709-00 in said Court, on the 17th day of January, 2001.

I further certify that the foregoing pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this, the 6th day of August, 2001.

_____
Tricia A. Fritz

252