1          A.     Yes.

2          Q.     How many points of identification were on that

3     print?

4          A.     They were separate.  On the left index -- there

5     were fourteen, and our office policy is eight.  And on the

6     left middle there were ten.

7          Q.     All right.  Now there are no uniform standards

8     concerning points of identification for a match; isn't that

9     right?

10         A.     No uniform, no.  Office policy.

11         Q.     So it's your office policy.

12         A.     That's correct.

13         Q.     And in a perfect world how many points of

14    identification can be gotten from a fingerprint?

15         A.     That would depend on the fingerprint.

16         Q.     Well, let's say you have a perfect print.

17         A.     That could be anything between thirty and a

18    hundred, depending on a print.

19         Q.     All right.  So --

20         A.     And most of the time it's not that good, so we

21    don't get that many.

22         Q.     Right.

23                MR. POLIN:  That's all.  No further questions.

24                THE COURT:  Any redirect?

25                MR. BASILE:  No, Your Honor.

1          THE COURT:  Ma'am, you may be excused.  Please do

2    not discuss your testimony with any other witness.

3          Oh, excuse me.  Questions.  I'm forgetting.

4          Ladies and Gentlemen, if anybody has an important

5    question which you feel should be asked, please write it on

6    a piece of paper --

7          MR. POLIN:  Oh, Your Honor, before we do that,

8    can I ask just a couple more questions?  I'm sorry.

9          THE COURT:  Yes, you may.

10         MR. POLIN:  Thank you.

11         BY MR. POLIN:

12    Q.    Were there other letters submitted to you for

13    fingerprint examination that were connected with

14    Mr. Rodgers?

15    A.    Yes, there were, at separate times.

16    Q.    But you were given these letters saying that we

17    believe that Mr. Rodgers' fingerprints may be on these, we

18    want you to examine them?

19    A.    No.  I wasn't given it -- I was given it for an

20    assignment by the day; and the request was made by the

21    officer for me to make a comparison with Mr. Rodgers.

22    Q.    Did you find any fingerprints on those documents?

23    A.    It was positive; however, they weren't iden with

24    Mr. Rodgers.

25    Q.    Thank you.

34

1             MR. POLIN:  No further questions.

2             THE COURT:  Any redirect in light of those

3   additional questions, Mr. Basile?

4             MR. BASILE:  No, Your Honor.

5             THE COURT:  And are there any questions being

6   submitted by jurors?  I'm seeing a no.

7             Ma'am, I will excuse you.  Please do not discuss

8   your testimony with any other witness.

9             (Witness excused)

10             THE COURT:  Mr. Basile, I don't know if you want

11   to retrieve your exhibits from the witness stand.

12             Do you have any other additional witnesses?

13             MR. BASILE:  No, Your Honor.  At this time the --

14   excuse me.

15             Your Honor, at this time the Government would

16   move to admit Government's Exhibit 13 into evidence.

17             THE COURT:  Any objection?

18             MR. POLIN:  No.

19             MR. BASILE:  And the Government would also ask

20   that its evidence be published to the jury at this time.

21             THE COURT:  All right.  In other words, all of

22   the letters and all of the documents.

23             MR. BASILE:  Yes, Your Honor, everything.

24             THE COURT:  Well, why don't you give those things

25   to the jurors and I will have counsel come to up the bench.

35

1  And I am admitting Government's Exhibit 13.

2  (Thereupon, Government's Exhibit Number 13 was

3  admitted into evidence.)

4  (Bench Conference)

5  MR. BASILE:  Do you still have two letters?

6  THE COURT:  I want to make sure that the jury is

7  not getting anything it should not have.  In addition, if

8  you are giving them things in sleeves, they're going to take

9  them out of it.  And to the extent there might be papers

10  that are not attached, I don't know what you want to do to

11  keep them attached.

12  MR. BASILE:  I can staple them.

13  THE COURT:  It's up to you.  You could actually

14  have asked to publish these.

15  MR. BASILE:  I didn't want to distract the jury

16  with all those pages, Your Honor; that should slow down the

17  process.

18  THE COURT:  So hand them what you want to hand

19  them.

20  (Pause in the proceedings)

21  THE COURT:  Mr. Basile, would you approach,

22  please.

23  (Bench Conference)

24  THE COURT:  I don't see any way the jury can give

25  the letters a strong look; the letters are extremely long

36

1   and detailed.  If you want to publish the fingerprints, you
2   can at this time, but they're not going to get a chance to
3   look at them.
4             MR. POLIN:  In terms of the fingerprint card, I
5   think there might be some material on the card that maybe
6   the jury shouldn't see.
7             THE COURT:  If that is the case, I will take a
8   look at it.
9             I actually don't see anything on there but a PDID
10  number, but it is not described as a PDID.
11            While we're up here, do you have a motion?
12            MR. POLIN:  Yes, I do.
13            At this time we move for -- we make our motion
14  for judgment of acquittal.  Taking the evidence in the light
15  most favorable to the government, I do not believe that a
16  reasonable jury can infer that it was Mr. Rodgers that sent
17  these letters.  There is no evidence connecting Mr. Rodgers
18  to these letters, other than there is a fingerprint on one
19  of the letters; but of course we don't know when the
20  fingerprint was placed.  Actually, it was a picture and a
21  poem that went with the picture.  We don't know when that
22  fingerprint was placed on there.
23            And notwithstanding the fact of any evidence
24  linking Mr. Rodgers to the letters, the letters themselves
25  do not rise to the level of the type of willfulness and

37

1    maliciousness in terms of the harassing type behavior that

2    the statute has in mind.  And based on those reasons we move

3    that our motion be granted.

4            THE COURT:  Do you want to be heard?

5            MR. BASILE:  Your Honor, the government obviously

6    opposes the motion and argues that the government, through

7    the evidence, has proven the elements of its case.

8            Principally the Government argues that one of the

9    contentions is the telephone call where the witness

10   identified the voice, the other is a fingerprint that has

11   been linked directly to the witness, and yet a second letter

12   we have references to the complaining witness that the

13   complaining witness testified were only used by the

14   defendant.  And in that same letter we have a reference to a

15   contact, which is the word "Fortunate," which the defendant

16   has used as an e-mail address.  So we think there is

17   sufficient evidence to satisfy the identity issue that

18   defense counsel has raised.

19           THE COURT:  The evidence admitted at this stage,

20   taken in the light most favorable to the government, does

21   make out a prima facia case of stalking, part B, the

22   harassment definition.  There are two or more contacts, the

23   phone call has been identified as having been him.  The

24   letter, it was adduced on cross-examination of the

25   complainant, contains a picture of her that was taken by the

1    defendant himself, and numerous references that she has

2    testified that we need to bear on the discussions and

3    interactions, and a reference to the e-mail address, which

4    is Mr. Rodgers.  Taking the evidence in the light most

5    favorable to the government, I deny the motion for judgment

6    of acquittal.

7                I'm not going to let you publish all this to the

8    jury right now; it is just going to take too long.

9                What is your case going to consist of?

10                MR. POLIN:  It may consist of Mr. Rodgers

11    testifying; Mr. Rodgers is still deciding.

12                THE COURT:  Do you have a witness you can call

13    now?

14                MR. POLIN:  No.  The only witness I have isn't

15    available until three o'clock.  It was McLoughlin, who is in

16    the air force, who is in training today.

17                THE COURT:  Will he testify first, then?

18                MR. POLIN:  If Mr. Rodgers testifies, he will.

19                THE COURT:  Are you ready to proceed?

20                MR. POLIN:  Well, we need to -- I need a few

21    minutes to consult with Mr. Rodgers to see if that is indeed

22    his decision, to testify.  We have been going around it all

23    morning, Your Honor.

24                THE COURT:  All right.  I will give you a few

25    minutes to do that.  If I recall the case in ten minutes,

1   that ought to be --

2              MR. POLIN:  That ought to be, yes.

3              THE COURT:  I have to stop -- I can call a couple

4   of matters in the meantime, but I have to stop at 12:30.

5   Thank you.

6              (Open court)

7              THE COURT:  Ladies and Gentlemen, I'm not going

8   to have you look at all of the evidence right now because

9   you simply would not have enough time to review it, and you

10  would be extremely frustrated when I took it all away from

11  you.  So I'm not going to do that right now.  You will have

12  ample opportunity when you deliberate to look at the

13  physical evidence that the government has introduced.

14             What I am going to do is take a ten-minute break

15  right now and bring you all back in promptly in ten minutes

16  because I will be breaking for lunch with you all at about

17  12:30.  So please go stretch your legs, and we will see you

18  in ten minutes.  Please do not discuss the case.

19             (Jury out at 12:07 p.m.)

20             (The Court recessed at 12:07 p.m.)

21             (The Court resumed at 12:20 p.m.)

22             THE DEPUTY CLERK:  Calling United States versus

23  Virgil Rodgers, case number F-4208-03.

24             MR. BASILE:  Richard Basile on behalf of the

25  United States, Your Honor.

40

1                   THE COURT:   Good afternoon.

2                   MR. POLIN:   Your Honor, Steven Polin on behalf of

3 Mr. Rodgers, who is present.

4                   We discussed whether he should testify or not.

5 The one question that he has -- and I have advised him of

6 it, but I think he wants to hear it from the Court -- that

7 if he testifies he can be impeached with his prior

8 convictions.

9                   THE COURT:   And I believe that's correct.

10                   Let me ask you, sir, if you will raise your right

11 hand, please.

12                   (Defendant sworn)

13                   THE COURT:   Sir, in this trial the government has

14 the burden of proof; and what that means is that the

15 government must present evidence proving you guilty beyond a

16 reasonable doubt.  Do you understand?

17                   THE DEFENDANT:   Yes.

18                   THE COURT:   You have a right to remain silent

19 through this trial, you don't have a burden to prove

20 anything.  Do you understand?

21                   THE DEFENDANT:   Yes.

22                   THE COURT:   If you choose not to testify, nobody

23 can force you to, including your own lawyer.  On the other

24 hand, if you choose to testify, you have an absolute right

25 to do that as well, and nobody can keep you from testifying

41

1    if that's what you choose to do.  Do you understand?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  It's your decision whether to testify

4    or not testify.  You should listen to the advice of your

5    lawyer because he can provide assistance in helping you make

6    the decision, but ultimately it is your decision whether to

7    remain silent or to testify.  Do you understand?

8                    THE DEFENDANT:  I understand.

9                    THE COURT:  If you do testify, you give up your

10   right to remain silent, and that means that after your

11   lawyer asks you questions the prosecutor will cross-examine

12   you.  During the course of the cross-examination Mr. Basile

13   can ask you questions about any number of things, which

14   would include asking you whether you are the person who was

15   convicted of stalking on the prior occasion.

16                    Do you understand that?

17                    THE DEFENDANT:  I wasn't convicted of stalking,

18   Your Honor.

19                    MR. POLIN:  Attempt stalking.

20                    THE COURT:  The prosecutor may cross-examination

21   you.

22                    THE DEFENDANT:  Am I able to bring out that that

23   is currently under appeal, Your Honor?

24                    THE COURT:  No.  And so that is something that

25   you have to discuss with your lawyer and factor into your

                                                              42

1    own decision-making.  The fact that it is on appeal is not

2    relevant in this case.  So I need to ask you first, have you

3    had enough time to talk to Mr. Polin about whether or not --

4    your decision whether or not you want to testify?

5                THE DEFENDANT:  I believe so, Your Honor, yes.

6                THE COURT:  What have you decided you want to do?

7                THE DEFENDANT:  I will.

8                THE COURT:  You will testify?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Is there anything else you would like

11   me to ask?

12               MR. POLIN:  No, nothing else.  I want to put on

13   the record that he is doing this against advice of counsel.

14               THE COURT:  Given that your lawyer has advised

15   you that it would be a better idea not to testify, you

16   understand that you have the right to decide to testify

17   anyway; is that correct?

18               THE DEFENDANT:  Yes.

19               THE COURT:  And is it your decision to testify

20   even though your lawyer has advised you not to?

21               THE DEFENDANT:  Yes.

22               THE COURT:  In that case, let's bring in the jury

23   and -- shall I have him in the witness chair?

24               MR. POLIN:  Yeah, that would be a good idea.

25               THE COURT:  Please take the witness stand, sir.

1    And I will swear you in front of the jury.  So if you have a

2    seat, I will bring in the jury.

3                (Jury present at 12:25 p.m.)

4                THE COURT:  Good afternoon, Ladies and Gentlemen.

5    Once again, Mr. Polin, will you be calling any witnesses?

6                MR. POLIN:  Yes.  We will be calling Mr. Rodgers

7    to the stand, Your Honor.

8                         **VIRGIL RODGERS,**

9    having been called as a witness by the Defense, and, being

10   first duly sworn by the Deputy Clerk, was examined and

11   testified as follows:

12               THE COURT:  Please proceed, Mr. Polin.

13               MR. POLIN:  Thank you, Your Honor.

14                       **DIRECT EXAMINATION**

15          **BY MR. POLIN:**

16        Q.    Would you please state your full name for the

17   record.

18        A.    Virgil Rodgers.

19        Q.    Okay.  How old are you?

20        A.    Thirty-three.

21        Q.    And where do you live?

22        A.    Sacramento, California.

23        Q.    And how long have you lived there?

24        A.    I've lived in Sacramento since June of 2002.

25        Q.    Okay.  And do you live with anyone there?

                                                        44

1        A.      I live with a friend of mine who is a police

2   officer, and his family; his name is Sam Davis.

3        Q.      And what is your educational background?

4        A.      I attended the University of Texas for

5   undergraduate, and I went to graduate school at Oklahoma

6   University for a Masters of Business Administration.   And I

7   attended the air force's computer information software

8   engineering course.

9        Q.      And what is your profession, sir?

10       A.      I spent -- for the first eleven years after

11  college I was in the air force, my final assignment was as a

12  captain at the Pentagon.  After that I was a defense

13  contractor at the Pentagon until immediately after September

14  11th.

15              I then worked at the State Department as director

16  of security, working on security upgrades for the embassies

17  and chancelleries overseas.  And after I left the State

18  Department in December of 2001 I moved to Atlanta, and I

19  took some IT courses there for the next six months, and then

20  I was hired by a corporation in Sacramento, California.

21       Q.      Do you know Karen Johnson-Norman?

22       A.      Yes, I do.

23       Q.      How do you know her?

24       A.      I met her in October of 1998, about two weeks

25  after I was assigned at the Pentagon; I met her at a night

45

1    club.  And as I said, I had just gotten stationed here, this

2    was my first assignment in Washington, D.C.  And we

3    exchanged numbers and we became friends.

4         Q.    And after you exchanged numbers, can you describe

5    how your relationship evolved.

6         A.    Well, as I said, when I first came to the area I

7    was single at the time, and it --

8         Q.    Well, let me back up and ask you; have you ever

9    been married?

10        A.    I've never been married.  I was single when I

11   moved to the D.C. area, and it was my intention to enjoy

12   being single when I moved here to this area.  Shortly after

13   I met her we began a romantic relationship, probably about a

14   week later, and the relationship proceeded fairly quickly.

15   She was quite a bit older than I am, she's six years older

16   than me, and it was her intention that we were going to have

17   a monogamous relationship.

18        Q.    Well, let me back up.  During the course of the

19   relationship did you -- can you tell us, when did you learn

20   -- or did you learn that Ms. Johnson-Norman was married?

21        A.    I did.

22        Q.    When?

23        A.    It wasn't very long, maybe a few days, maybe a

24   week or so after I met her.

25             THE COURT:  Can I have counsel come to the bench,

46

1    please.  And sir, if you will just step down briefly.  Stand

2    right there if you would.

3                    (Bench Conference)

4                    THE COURT:  I know that there has been no

5    objection.  I am not going to permit this to evolve into a

6    trial about the sordid details of the relationship.  In my

7    view none of this is relevant.  I'm not going to let him get

8    into this about who started the relationship, what her

9    intentions were, what she elected or not or anything of

10   those things.  Now if you don't object...

11                   MR. POLIN:  And I will try to get him to not

12   interject --

13                   THE COURT:  Ask the questions you want to ask.

14                   MR. POLIN:  Okay.  Thanks.

15                   (Open court)

16                   BY MR. POLIN:

17       Q.    Mr. Rodgers, just answer my questions directly,

18   okay; and if anything needs to be followed up I will follow

19   it up.

20       A.    Yes.

21       Q.    There came a point when you learned she was

22   married, right?

23       A.    Yes.

24       Q.    What effect, if any, did the fact that she was

25   married have on your relationship?

47

1           MR. BASILE:  Your Honor, the government would
2     object on the grounds of relevancy.
3           THE COURT:  I overrule that objection -- well,
4     can you make it specific as to time?
5           MR. POLIN:  All right.
6           BY MR. POLIN:
7       Q.    When you first started the relationship with her,
8     did the fact that she was -- tell us what effect, if any,
9     her married status had on the relationship.
10          THE COURT:  I do sustain the objection if it is
11    at the beginning of the relationship.
12          MR. POLIN:  All right.
13          BY MR. POLIN:
14      Q.    At any point during the relationship did the fact
15    that she was married have an effect on the relationship?
16      A.    Yes.
17      Q.    Can you tell us when and what effect?
18      A.    Towards the latter part of the relationship it --
19    I felt very bad; I mean, I felt guilty about continuing
20    this.  And I didn't -- I wasn't interested in continuing
21    this because it didn't seem like it was going anywhere.  And
22    I found out that I was coming up for an assignment, so I was
23    going to be leaving anyway, so there wasn't really a
24    point --
25          MR. BASILE:  Your Honor, I'm objecting as

48

1  narrative.

2            THE COURT:  Sustained.  Please ask the next

3  question.

4            BY MR. POLIN:

5       Q.   There was testimony -- you heard the testimony of

6  Ms. Johnson-Norman about the fact that the relationship was

7  on again, off again.  Can you tell us whether -- can you

8  tell us whether there were any breaks in the relationship?

9       A.   There wasn't any breaks in the relationship.  My

10  take on that statement is that --

11            MR. BASILE:  Your Honor, I'm going to object.

12  This is narrative.  He has answered the question.

13            THE COURT:  This is not responsive, and I

14  sustain.  Please answer your lawyer's questions, sir.

15            THE WITNESS:  It was not --

16            THE COURT:  Sir -- Mr. Polin, what is the

17  question?

18            BY MR. POLIN:

19       Q.   The question was, were there any breaks in the

20  relationship?

21       A.   No.

22       Q.   Okay.  Did there come a time where the

23  relationship ended?

24       A.   Yes.

25       Q.   All right.  Can you tell -- okay.  How did the

49

1   relationship end?

2       A.    In May of 2000 I found out that I was getting

3   assigned overseas, and I let the complainant know that I was

4   going to be leaving soon.  And she --

5       Q.    Let me stop you there.  How did she take this

6   news that you were leaving?

7       A.    Not well.  She asked me if I was going to take

8   her with me.

9       Q.    Okay.  Can you tell us how the relationship

10  ended?

11      A.    Yes.  During that same conversation in May of

12  2000 when I said I was not going to take her with me because

13  she was married, she told me that she would take care of

14  that, and she said that she was going to kill her husband

15  and claim the four hundred thousand dollars of life

16  insurance.

17              MR. BASILE:  Objection, Your Honor.

18              THE COURT:  Sir, if you will just step down, and

19  I'll have counsel come to the bench.

20              (Bench Conference)

21              THE COURT:  You're needed for a sentencing.

22              MR. BASILE:  An assistant was taking care of it;

23  I do have one in 219.

24              THE COURT:  If someone is taking care of it,

25  they're late.  In any event...

                                                        50

1                    MR. BASILE:   There were two misdemeanor

2     assistants up there that I left the jacket with and I have

3     given instructions to.

4                    THE COURT:   Your objection is what ensued in the

5     conversation in May; he answered it.   What is your

6     objection?

7                    MR. BASILE:   Well, first of all, it's hearsay.

8     He's making a system of --

9                    THE COURT:   Did you object when he asked the

10    question or did you object after the testimony was out?   Do

11    you want me to sustain the objection now and tell them to

12    disregard it?   I can do that.

13                   The question was responsive -- I mean, the answer

14    was responsive, so what she said would go to her state of

15    mind.   It would probably be an appropriate defense or an

16    appropriate part of the case relevant to testimony that this

17    was something she said, it would go to her state of mind or

18    bias, I imagine.   You may argue that she's here putting this

19    on him and saying he's wrong because of the fact that she

20    was so upset because he would not take her.

21                   I will overrule the objection.

22                   (Open court)

23                   THE COURT:   I overrule the objection.   Please

24    have a seat, sir.

25                   BY MR. POLIN:

                                                               51

1          Q.     What was discussed as to the break-up of the
2     relationship?
3                 THE COURT:     And it is a hearsay objection; is it
4     being offered for its truth?
5                 MR. POLIN:     No.
6                 THE COURT:     I will admit it only for its bearing
7     on the state of mind.
8                 MR. POLIN:     Right.
9                 THE WITNESS:     The statement which I just
10    mentioned is what led to the eventual break-up.  Because I
11    was devastated when I heard this because I didn't think that
12    the person was capable --
13                THE COURT:     The question was what did she say.
14    Have you answered, What did she say?
15                BY MR. POLIN:
16         Q.     What was your response to that request?
17         A.     I said that's a terrible idea; I definitely don't
18    want any part of that.
19         Q.     And what was her response to your rejecting that
20    idea?
21         A.     She said if you tell anyone what I just said to
22    you, I'm gonna ruin your life.
23         Q.     Okay.  And did the relationship break up after
24    that?
25         A.     Not immediately after that, no.

52

1       Q.    All right.  Do you remember the -- do you
2   remember the month and the year in which the relationship --
3   when the relationship ended?
4       A.    From that point on we continued to talk pretty
5   regularly for about two more months, until about sometime in
6   July, the end of July.
7       Q.    Okay.  Now this threat that she made to you
8   concerning that she would ruin your life if you didn't act
9   on her request, did she -- can you tell us whether she
10  followed through on that request -- I mean on that threat?
11              MR. BASILE:  Objection, leading, Your Honor.
12              THE COURT:  Overruled.
13              THE WITNESS:  Well, my life has definitely been
14  damaged, I'm sitting in this courtroom.  And she filed
15  previous charges in D.C. for which I was convicted of
16  attempted stalking in D.C. immediately after that, that same
17  comment that she made to me.  And that's what led to the
18  stay-away order in this matter.
19              BY MR. POLIN:
20      Q.    So you're the same Virgil Rodgers that was
21  convicted in case M-9709-00 on March 19th of 2003 for
22  attempt stalking?
23      A.    That's correct.
24      Q.    Okay.  Now what happened with your career with
25  the air force after you rejected her request?

                                                        53

1        A.     Well, after the conversation that we just

2  mentioned, she gave me opportunities after that to change my

3  mind and decide whether I wanted to stay with her.  When I

4  said I did not want to, she again reiterated that you're not

5  going to be with any other woman, ever.  And it's gonna be

6  my lifetime mission to make sure that you are never with

7  another woman.  I still didn't relent on that, and she --

8        Q.     Well, the question is, what steps -- what

9  happened to your career with the air force after you said

10  that you wouldn't follow through on her request?

11        A.     Well, the air force found out that I had been

12  having an adulterous relationship.  She called my commander

13  and she said that I have been having an adulterous

14  relationship with captain so and so.  And they investigated

15  me for that based upon her information, and eventually I had

16  to leave the service because of that.

17        Q.     All right.  Now did all this take place after

18  this conversation where she asked you to help get rid of her

19  husband?

20        A.     Yes.

21        Q.     Okay.  Now let's talk about going out -- let's

22  talk about this case.

23             THE COURT:  Is this a good time to break for

24  lunch, Mr. Polin?

25             MR. POLIN:  Yes, it is a great time to break for

1  lunch.

2           THE COURT:  What I'm going to do is excuse the

3  jury for lunch until two o'clock.  Please be on time at

4  two o'clock.  I'll have you come back then.  And please, as

5  always, do not discuss the case with anyone.

6           (Jury out at 12:40 p.m.)

7           THE COURT:  I want to quickly discuss

8  instructions.

9           The basic instructions that I will be giving are

10  201, function of the judge; 202, function of the jury; 203,

11  jury's recollection; 204, evidence in the case; 1.04,

12  definition of a stipulation.  2.05, statements of the

13  lawyers; 2.06, the information is not evidence; 2.08,

14  presumption of innocence; 2.09, reasonable doubt; 2.11,

15  credibility of the witnesses; 2.26, police officers'

16  testimony; 2.13, the number of witnesses; 2.28, defendant as

17  witness; and 1.13, impeachment of the defendant with a

18  conviction.

19           2.74, possible punishment; 2.75, communications

20  between the jury and the Court; and 2.71, selection of a

21  foreperson.

22           2.72, unanimous verdict; 1.02, taking of notes,

23  1.20 regarding questions -- and I have to redact that

24  slightly.  The stalking instruction, which is 4.99 B; and I

25  propose part B only.

55

```
 1                    MR. POLIN:  Right.
 2                    THE COURT:  And 1.08, the testimony of an expert.
 3               Is there anything else that you request?
 4                    MR. POLIN:  I can't think of anything right now.
 5                    MR. BASILE:  Actually, Your Honor, the government
 6     had -- I believe there is an on or about instruction.
 7                    THE COURT:  There is.  Are you requesting that?
 8                    MR. BASILE:  I request that.
 9                    THE COURT:  Is there any objection to the on or
10     about instruction?
11                    MR. POLIN:  No.
12                    MR. BASILE:  And also the government has noted
13     2.10, the direct and circumstantial evidence.
14                    THE COURT:  Any objection to that?
15                    MR. POLIN:  No, that's a proper instruction.
16                    MR. BASILE:  And actually, I have drafted one
17     proposed instruction -- I haven't had a chance to run it by
18     Mr. Polin -- about stay-away orders.
19                    THE COURT:  There has not, as yet, been any
20     impeachment with a prior inconsistent statement, as yet, but
21     there is the testimony of the defendant which addresses
22     statements of the complainant which I'm admitting only --
23                    MR. POLIN:  State of mind.
24                    THE COURT:  -- for state of mind.
25               Is the government -- think about whether you want
```

1   me to give an instruction about that.  It's sort of
2   redundant to say they're not being admitted for their truth
3   because, in fact, if the statement is, I'm angry at you, and
4   if do you this to me I will do X, while it does reflect a
5   state of mind, it also, in fact, is being offered for its
6   truth, in other words, this is what I am thinking about
7   doing.
8              MR. POLIN:  And technically it may even come
9   under as a statement against penal interest, too --
10             THE COURT:  I don't agree with that, but...
11             So think about whether there should be an
12  instruction as to that.
13             Is there anything else that you can think of now
14  that you will be asking me to give, Mr. Polin?
15             MR. POLIN:  I can't think of anything else at
16  this point.
17             THE COURT:  And is there any objection to --
18  whatever it is, the instruction that's been proposed?
19             MR. POLIN:  Well, it's an instruction on the
20  stay-away order.
21             THE COURT:  I haven't seen it.  Of course
22  Mr. Basile is supposed to give me a copy.  But Mr. Polin, do
23  you object to it?
24             MR. POLIN:  I have a question.  Is it the Court's
25  practice in jury trials to send back a copy of the

57

1    information?   Many times in felony trials the indictment
2    goes back, so...
3                  THE COURT:   I actually -- no, it's not.
4                  MR. POLIN:   Okay.
5                  THE COURT:   And let me ask you, do you have an
6    objection to the requested instruction?
7                  MR. POLIN:   Yeah, I do, as a matter of fact.
8                  THE COURT:   First of all, just on first glance, I
9    would not mention the evidence in the instruction in any
10   event, so I would not tell them what they have heard
11   evidence about.   There is, in fact, a stipulation that there
12   was a stay-away order in place, and the only proposition
13   that you're really asking me to address to this jury is that
14   a court order is binding upon the defendant unless and until
15   the Court has changed the language in the court order.
16                 I want to look at the BRA instruction to see
17   whether there is a similar instruction in the BRA
18   instruction.   It seems to me that telling a jury that a
19   court order is binding is unnecessary.   And, in fact, this
20   is not a trial of the defendant for violating a court order;
21   the fact of the order is simply one piece of information
22   that the jury has in front of it.   So I --
23                 MR. BASILE:   And the reason the government would
24   ask for that is that I think it helps explain the whole
25   question of intent.   And because of that I think the jury

58

1    should know that the order is binding until the Court says

2    no or the Court changes it.  And although it seems obvious

3    to the Court and counsel, I don't know that it's obvious --

4    and I suspect it is not obvious based on some of their

5    questions.

6              THE COURT:  Well, Mr. Polin objects.  I'm going

7    to look at the other instructions and see whether I see

8    anything like that anywhere; although my inclination is that

9    it is unnecessary to instruct a jury that a court order is

10   binding, but I'll decide that after lunch.

11             All right.  I will see you at two.

12             (Whereupon, at 12:50 p.m. a lunch recess was

13   taken.)

14                     **AFTERNOON SESSION**

15                          (2:10 p.m.)

16             THE COURT:  Calling the United States versus

17   Virgil Rodgers, F-4208-03.

18             MR. BASILE:  Richard Basile on behalf of the

19   United States, Your Honor.

20             MR. POLIN:  Steven Polin on behalf of the

21   defendant, Your Honor.

22             THE COURT:  Good afternoon.

23             With respect to the jury instruction involving

24   the order and the significance of a court order, I am not

25   going to give the jury instruction that you request.  You

59

1    all have stipulated to the fact that an order was in effect,
2    and I don't think the jury needs an instruction as to the
3    fact that it didn't go away.
4                  MR. BASILE:  Understood, Your Honor.
5                  MR. POLIN:  Should we have Mr. Rodgers go back up
6    to the stand before the jury comes out?
7                  THE COURT:  Sure, why don't you.  Thank you.
8                  (July present)
9                  THE COURT:  Good afternoon, Ladies and Gentlemen.
10   Thank you all for being on time.  I apologize for keeping
11   you waiting for ten minutes this afternoon.
12                 Please resume your direct examination of
13   Mr. Rodgers.
14                 Sir, I remind you that you are still under oath.
15                 BY MR. POLIN:
16        Q.    Mr. Rodgers, I want to direct your attention to
17   November of 2001.
18                 You've heard testimony from Ms. Johnson about
19   being at a church where she attends.  Can you tell us how
20   you happened to attend that particular church on that
21   particular day?
22        A.    Yes.  I was invited by two separate individuals.
23   She alluded to a Minister Pugh.  I had, in fact, received a
24   general invitation from her several months prior as well, as
25   well as a colleague of mine, Captain Cole, that was

                                                            60

1      stationed in Guam at the time that was TDY in Washington and
2      was attending the church.  And she invited me to church as
3      well on that particular day, and we were meeting for lunch
4      afterwards.
5           Q.   Did you have any knowledge prior to your
6      attending church on November 4th of 2001 that Ms. Johnson
7      was also a member of that church?
8           A.   I didn't know she was a member of the church.  I
9      had known she had attended the church at various times in
10     the past, but I did not know that she was a member.
11          Q.   Did you have any reason to believe that she would
12     be there on that particular day?
13          A.   I had no specific knowledge about that.
14          Q.   Did you -- there has been -- tell us what you
15     were doing when you were approached by the security people.
16          A.   I was in the front row of the church watching the
17     service.  I was in the front row.  There were monitors
18     there, and I was watching the service.
19          Q.   And at any time while you there were did you make
20     contact with Ms. Johnson?
21          A.   Absolutely not.
22          Q.   All right.  Did you see Ms. Johnson at all?
23          A.   Yes.  The usher came and tapped me on my shoulder
24     and asked me to come out into the vestibule.  And he asked
25     me if I knew her, and I said yes, I did.  He said she was

61

1    unhappy with my presence and would I be willing to leave to

2    avoid any type of issue, and I said yes, I would.  I walked

3    out the front door, and she was standing right outside the

4    front door where my exit path was.  I didn't say anything to

5    her, and I walked past her and I left.

6         Q.   Do you recall how many feet you may have -- what

7    the distance you were from her when you passed her on your

8    way out?

9         A.   She was standing right outside the door.  I mean,

10   she was waiting outside the door, peeking around the door at

11   me as the usher spoke to me.

12              MR. BASILE:  Objection, Your Honor, that is

13   nonresponsive.  He asked for a distance.

14              THE COURT:  Overruled.

15              THE WITNESS:  She was standing right outside the

16   door, maybe -- maybe eight to ten feet is a good guess.

17              BY MR. POLIN:

18        Q.   Okay.  And after that what happened?

19        A.   I got in my car and I drove away.

20        Q.   All right.  Did you go to church that day with

21   Captain Cole?

22        A.   We were intending to meet at the church, and we

23   were going to have lunch afterwards.

24        Q.   Did you ever see her?

25        A.   No.  Because I got asked to leave the church

62

1     prior to the end of the service.

2          Q.    All right.  Now when did you -- did there come a

3     time when you made a decision to move to California?

4          A.    Yes.

5          Q.    And when was this?

6          A.    I left -- well, I left Washington, D.C. the last

7     day of December of 2001.

8          Q.    All right.

9          A.    December 31st.

10         Q.    Is there a particular reason why you wanted to --

11    why you left the Washington, D.C. area to go to California?

12         A.    Absolutely.

13         Q.    Yes?

14         A.    Yes.

15         Q.    And what was the reason?

16         A.    These incidents had kept occurring, allegations

17    from the complaining witness had kept occurring with more

18    frequency, and I wanted to put as much distance as possible

19    between me and her.

20         Q.    Did you let her know -- I mean, did you

21    communicate with her that you were leaving the area?

22         A.    Absolutely not.  I mean, she made various efforts

23    through other people, third parties, to try to track my

24    whereabouts at different times.

25               MR. BASILE:  Objection, Your Honor, it's

63

1    nonresponsive.

2              THE COURT:  Sustained.  It is nonresponsive; in

3    other words, answer the question you're asked, sir.

4              BY MR. POLIN:

5         Q.   Now --

6              THE COURT:  Did you want an answer to your

7    question, did he make an effort to contact her?

8              BY MR. POLIN:

9         Q.   Did you make an effort to contact her to let her

10   know that you had left the area?

11        A.   Absolutely not.

12        Q.   During any of this time -- strike that question.

13             There has been a lot of testimony about e-mail

14   addresses and e-mails and that type of thing.  Tell the jury

15   what communications, if any, you had during the -- during

16   the time period that you had the relationship with

17   Ms. Johnson, tell us what type of communications you had in

18   written form.

19        A.   Most of our communications were by e-mail.

20        Q.   And what e-mail address did you use?

21        A.   My e-mail at the Pentagon.  And I have a Yahoo

22   e-mail address and a -- at the time I was a member of MSN,

23   and I had an MSN e-mail address.  And I did use that

24   Fortunate address at the time.

25        Q.   How long did you use that Fortunate address for?

64

1      A.    The last time I used that address may have been

2    sometime early last year.

3      Q.    When you say early last year, can you specify a

4    time period, early last year, a month?

5      A.    Well, basically when I left the Washington, D.C.

6    area, I left that e-mail address behind.  So January of 2002

7    would have been the last time I used that particular e-mail

8    address.

9      Q.    Do you know if you ever discontinued that

10   account?

11     A.    I didn't discontinue it, it was just an on-line

12   e-mail address, and I just went and got another e-mail

13   address.

14     Q.    Okay.  Now the contents of these e-mails that you

15   exchanged with Ms. Johnson, what type of messages would you

16   and her send each other?

17     A.    You name it.  I believe there was about three

18   thousand e-mails in my in-box at the time we broke up from

19   her.  So you name it, from "I'll be over to your apartment

20   at X, Y, Z time" or "I'm going to this place" or "I'm

21   thinking about you," any number of different type of

22   messages.

23     Q.    Did any of these messages include poetry or

24   demonstrations of love?

25     A.    Oh, absolutely, yes.  There was, I would say, a

65

14   love?

15     A.    About half of them.

16     Q.    Okay.  Now you've heard testimony -- now when you

17   left the Washington, D.C. area, do you recall where

18   Ms. Johnson's office was located?

19     A.    The last time I had spoken to her it was on 2020

20   K Street.

21     Q.    All right.  And did you ever learn that that

22   Wells Fargo had moved locations?

23     A.    No.

24     Q.    Now Ms. Johnson, in her testimony, said that she

25   received a telephone call on her birthday, May 29th of -- I